### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **ENTRUST ENERGY, INC.,** *et al.*, | § | **Case No. 21-31070 (MI)** |
| | § | |
| Debtors. | § | **Jointly Administered** |
| | § | |
| ———————————————— | § | |
| | § | |
| **ENTRUST ENERGY, INC., ENTRUST** | § | |
| **ENERGY EAST, INC. and POWER OF** | § | |
| **TEXAS HOLDINGS, INC.,** | § | |
| | § | |
| Plaintiffs, | § | **Adv. Pro. No. 21-03930 (MI)** |
| | § | |
| v. | § | |
| | § | |
| **SHELL ENERGY NORTH AMERICA (US),** | § | |
| **L.P. and SHELL TRADING RISK** | § | |
| **MANAGEMENT, LLC** | § | |
| | § | |
| Defendants. | § | |
| | § | |

### SHELL ENERGY NORTH AMERICA (US), L.P. AND
### SHELL TRADING RISK MANAGEMENT, LLC'S
### MOTION TO DISMISS AMENDED COMPLAINT (ECF NO. 8)

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

    I.    The Global Agreement ...................................................................................................... 3

    II.   The Master Agreements ..................................................................................................... 5

    III.  The Debtors' ██████████████ Defaults.......................................................................... 7

    IV.  Procedural History ........................................................................................................... 9

ARGUMENT ................................................................................................................................ 10

    I.    Standard of Review......................................................................................................... 10

    II.   The Court Should Dismiss All Claims Against STRM Because the Debtors Fail to State a Claim Against STRM.......................................................................................... 11

    III.  All the Debtors' Claims Should Be Dismissed Because the Shell Defendants Had the Right to Terminate the Agreements and Suspend Power Delivery .......................... 13

           A.  "Wrongful and/or early termination"................................................................. 13

           B.  "Failure to deliver electric power"...................................................................... 16

           C.  "Wrongful offset" ................................................................................................ 17

           D.  "Failure to pay invoiced amounts" ...................................................................... 18

           E.  Extra-Contractual Claims.................................................................................... 19

    IV.  The Court Should Dismiss the Claims Arising Under Title 11 ....................................... 22

           A.  Disallowance of the Shell Defendants' Claims .................................................. 22

           B.  Turnover of Estate Property................................................................................. 23

           C.  Equitable Subordination....................................................................................... 25

           D.  Avoidance of Fraudulent Transfers ..................................................................... 26

           E.  Recovery of Fraudulent Transfers ....................................................................... 28

CONCLUSION............................................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*,
   747 N.Y.S.2d 29 (App. Div. 2002)........................................................................... 21

*Alaska Elec. Pension Fund v. Asar*,
   768 F. App'x 175 (5th Cir. 2019) ........................................................................... 12

*ASARCO LLC v. Americas Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) ............................................................................... 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).......................................................................................... 11, 12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................... 11, 15

*Collins v. Morgan Stanley Dean Witter*,
   224 F.3d 496 (5th Cir. 2000) ................................................................................. 2, 3

*Dalton v. Educ. Testing Serv.*,
   663 N.E.2d 289 (N.Y. 1995)................................................................................... 21

*Del Castillo v. PMI Holdings N. Am. Inc.*,
   No. 4:14-CV-3435, 2015 WL 3833447 (S.D. Tex. June 22, 2015)........................ 12

*DirectTV Latin Am., LLC v. RCTV Int'l Corp.*,
   982 N.Y.S.2d 96 (App. Div. 2014) ........................................................................ 16

*DM Arbor Ct., Ltd. v. City of Houston*,
   No. CV H-18-1884, 2021 WL 4926015 (S.D. Tex. Oct. 21, 2021)........................ 20

*E. Profit Corp. Ltd. v. Strategic Vision US LLC*,
   No. 18-CV-2185 (LJL), 2021 WL 2554631 (S.D.N.Y. June 22, 2021) ................. 17

*Fed. Deposit Ins. Corp. v. Coleman*,
   795 S.W.2d 706 (Tex. 1990)................................................................................... 21

*Fireman's Fund Ins. Co. v. Murchison*,
   937 F.2d 204 (5th Cir. 1991) ................................................................................. 21

*Frosch Holdco, Inc. v. Travelers Indem. Co.*,
   No. 4:20-CV-1478, 2021 WL 1232777 (S.D. Tex. Feb. 11, 2021) ........................ 19

*Great Am. Ins. Co. v. Goin*,
   No. 3:15-CV-75-L, 2017 WL 4238698 (N.D. Tex. Sept. 25, 2017)........................ 20

*In re Adler, Coleman Clearing Corp.*,
　263 B.R. 406 (S.D.N.Y. 2001) ......................................................................... 27, 28

*In re Aikens*,
　623 B.R. 303 (Bankr. E.D. Mich. 2020) ................................................................ 24

*In re ATP Oil & Gas Corp.*,
　No. 12-36187, 2015 WL 1093568 (Bankr. S.D. Tex. Mar. 10, 2015) ..................... 24

*In re Black Elk Energy Offshore Operations, LLC*,
　No. 15-34287, 2018 WL 889355 (Bankr. S.D. Tex. Feb. 12, 2018) ....................... 25

*In re Black Elk Energy Offshore Operations, LLC*,
　No. 15-34287, 2021 WL 346226 (Bankr. S.D. Tex. Feb. 1, 2021) .......................... 11

*In re CajunElec. Power Co-op., Inc.*,
　119 F.3d 349 (5th Cir. 1997) ............................................................................... 26

*In re Calvin*,
　329 B.R. 589 (Bankr. S.D. Tex. 2005) ................................................................. 23

*In re Charter Co.*,
　913 F.2d 1575 (11th Cir. 1990) ........................................................................... 24

*In re Davis*,
　889 F.2d 658 (5th Cir. 1989) ............................................................................... 22

*In re Dual D Health Care Operations, Inc.*,
　No. 17-41320-ELM, 2021 WL 3083344 (Bankr. N.D. Tex. July 21, 2021) ..................... 26, 27

*In re First All. Mortg. Co.*,
　471 F.3d 977 (9th Cir. 2006) ............................................................................... 26

*In re IFS Fin. Corp.*,
　No. 02-39553, 2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008) ........................ 22

*In re Life Partners Holdings, Inc.*,
　926 F.3d 103 (5th Cir. 2019) ......................................................................... 23, 28

*In re Mobile Steel Co.*,
　563 F.2d 692 (5th Cir. 1977) ............................................................................... 25

*In re Noram Res., Inc.*,
　No. 08-38222, 2011 WL 6936361 (Bankr. S.D. Tex. Dec. 30, 2011) .................... 11

*In re Noram Res., Inc.*,
　No. 08-38222, 2015 WL 2265405 (Bankr. S.D. Tex. May 11, 2015) ..................... 24

*In re Northstar Offshore Grp., LLC*,
  616 B.R. 695 (Bankr. S.D. Tex. 2020) ................................................................... 28

*In re Reagor-Dykes Motors, LP*,
  No. 18-50214-RLJ-11, 2021 WL 2546664 (Bankr. N.D. Tex. June 21, 2021) ....................... 23

*In re Royce Homes, LP*,
  578 B.R. 748 (Bankr. S.D. Tex. 2017) ................................................................... 23

*In re S. Pac. Janitorial Grp., Inc.*,
  586 B.R. 769 (Bankr. C.D. Cal. 2018) ................................................................... 23

*In re Turner Grain Merch., Inc.*,
  557 B.R. 147 (Bankr. E.D. Ark. 2016) ................................................................... 23

*In re U.S. Abatement Corp.*,
  39 F.3d 556 (5th Cir. 1994) ................................................................................ 25

*In re Uplift RX, LLC*,
  625 B.R. 364 (Bankr. S.D. Tex. 2021) ................................................................... 28

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Bacarella Transp. Servs., Inc.*,
  No. 3:19-CV-01364-X, 2021 WL 3372263 (N.D. Tex. Aug. 3, 2021) ................................ 12

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
  442 F.3d 101 (2d Cir. 2006) ............................................................................... 17

*Olivarez v. T-mobile USA, Inc.*,
  997 F.3d 595 (5th Cir. 2021) .............................................................................. 15

*Sinco, Inc. v. Metro-N. Commuter R.R. Co.*,
  133 F. Supp. 2d 308 (S.D.N.Y. 2001) ................................................................... 17

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) .............................................................................. 12

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
  374 F.3d 158 (2d Cir. 2004) ............................................................................... 21

*Sullivan v. Leor Energy, LLC*,
  600 F.3d 542 (5th Cir. 2010) .............................................................................. 11

*Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*,
  771 F. Supp. 63 (S.D.N.Y. 1991) ......................................................................... 17

*U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*,
  817 F. Supp. 2d 934 (N.D. Tex. 2011) ................................................................... 27

*United States v. Inslaw, Inc.*,
    932 F.2d 1467 (D.C. Cir. 1991) ......................................................................... 24

*Villarreal v. Wells Fargo Bank, N.A.*,
    814 F.3d 763 (5th Cir. 2016) ............................................................................... 2

*Walch v. Adjutant Gen.'s Dep't of Texas*,
    533 F.3d 289 (5th Cir. 2008) ............................................................................... 8

**Statutes**

11 U.S.C. § 105(a) ...................................................................................................... 23

11 U.S.C. § 502(d) .......................................................................................... 10, 22, 23

11 U.S.C. § 510(c) .................................................................................................. 10, 25

11 U.S.C. § 542(a) .......................................................................................... 10, 23, 24

11 U.S.C. § 542(b) ...................................................................................................... 23

11 U.S.C. § 548(a)(1)(A) ................................................................................ 10, 26, 29

11 U.S.C. § 550(a) ................................................................................................ 28, 29

**Rules**

Fed. R. Bankr. P. 7012(b) ........................................................................................... 10

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 10

Fed. R. Civ. P. 9(b) ...................................................................................................... 11

Defendants Shell Energy North America (US), L.P. ("Shell Energy") and Shell Trading Risk Management, LLC ("STRM") (collectively, the "Shell Defendants") move under Rule 12(b)(6) to dismiss the Amended Complaint (ECF No. 8) filed by Debtors Entrust Energy, Inc., Entrust Energy East, Inc., and Power of Texas Holdings, Inc. (collectively, the "Debtors").

## **INTRODUCTION**

The Debtors fail to state a claim because their Amended Complaint and documents incorporated therein establish that the Shell Defendants had the right to suspend power delivery on February 14, 2021, because of the Debtors' contractual breaches.

Beginning in 2011, the Shell Defendants and the Debtors were parties to an energy supply facility under which the Shell Defendants sold electricity to the Debtors and provided the Debtors with loans and other extensions of credit—so long as the Debtors complied with the covenants set forth in the facility documents, including a ███████████ intended to minimize the Debtors' exposure to price volatility in the wholesale electricity market. If the Debtors violated that ████ ██████ the Shell Defendants had the immediate right to suspend power delivery. While other contractual remedies must await notice delivered on a business day, the suspension right incorporates no such delay. The industry-standard contractual template that the parties used authorizes immediate suspension because, once the buyer defaults on its ████████████, requiring the seller to continue providing power in a rapidly changing price environment would expose that seller to material harm.

As Winter Storm Uri approached, the Shell Defendants kept in close contact with the Debtors to determine the extent of their exposure to rising wholesale electricity prices. The Debtors provided the Shell Defendants with reports stating that the Debtors were ████████ ███████████████████████████, and the Debtors told the Shell Defendants that they

1

would sustain ████████ in losses as a result of their unhedged exposures.  On Sunday, February 14, the Shell Defendants exercised their contractual right to suspend delivery of electricity to the Debtors, and they terminated all outstanding trades with the Debtors.

All of the foregoing—the Debtors' defaults, Winter Storm Uri, and the Shell Defendants' suspension and termination—occurred before the Debtors filed bankruptcy petitions.  The Debtors then initiated this adversary proceeding against the Shell Defendants, generally alleging that the Shell Defendants had no right to suspend power delivery nor to terminate the outstanding trades, essentially arguing that the Shell Defendants had to continue delivering power to the Debtors even though the Debtors were in default under the Transaction Agreements (defined below).  However, the relevant agreements gave Shell Energy the unambiguous right to "suspend" performance upon the Debtors' material breach, and the Debtors fail to acknowledge that or allege why that right did not apply here.  This and other infirmities in the Debtors' claims require dismissal of all causes of action here under Rule 12(b)(6).

## BACKGROUND

The Debtors allege that their claims arise from four agreements they entered with one or both of the Shell Defendants: the Second Amended and Restated Global Agreement (the "Global Agreement");[1] and three Second Amended EEI Master Power Purchase and Sale Agreements (the "Master Agreements").[2]  These Global and Master Agreements were part of an overall package of

---

[1] *See* Am. Compl. ¶ 18, ECF No. 8; *see also* ECF No. 3 (sealed Complaint).

[2] *See* Am. Compl. ¶ 19.  The Court may consider the Global and Master Agreements when resolving this motion to dismiss.  While courts are generally "limited to considering the contents of the pleadings and the attachments thereto when deciding a motion to dismiss under Rule 12(b)(6)," the Court "may, however, also consider '[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim.'"  *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (alterations in original) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000)).  "In

agreements, known as the "Transaction Agreements," between the Debtors and the Shell Defendants.[3]  While the Debtors refer to some of those other Transaction Agreements,[4] the Court need not consider those other Agreements to resolve this Motion to Dismiss because the Global and Master Agreements establish that Shell Energy had the contractual right to suspend power delivery and otherwise take the actions alleged here.

### I.     The Global Agreement

The Global Agreement explains that the parties were entering into a "███████████ ████████" under which they would "███████████████████████████████ ████████████████████████████████████."[5]  The Shell Defendants also agreed to provide "████████████████████████" to the Debtors,[6] and Shell Energy provided a loan facility to the Debtors pursuant to a Loan Agreement.[7]

The Global Agreement includes a ██████████████ that required the Debtors to at all times comply with certain ███████ and risk mitigation provisions. Section 3.17 of the Global Agreement provides in part[8]:



so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins*, 224 F.3d at 499.  If the Court determines that consideration of these or any other documents the Shell Defendants attach to this Motion to Dismiss would require conversion of this Motion into one for summary judgment, the Shell Defendants ask the Court to disregard that document and not convert the Motion.

[3] *See* Global Agreement (attached as Exhibit A) at Appendix F (listing the Transaction Agreements).
[4] *See* Am. Compl. ¶ 25.
[5] Global Agreement at Recital C.
[6] *Id.*
[7] *See id.* at Appendix F.
[8] *Id.* § 3.17(a) (emphasis added).



The "Risk Policy" is defined in the Transaction Agreements as the Debtors' "████████████

████," which the Debtors "████████████████████" and "████████████

████████████████████████."[9] The Risk Policy required the Debtors

████████████████████[10]

Compliance with this ████████████ was critical to the Shell Defendants because the Debtors' failure to hedge adequately their price exposure during periods of extreme price volatility could have a devastating impact on the Debtors' financial position. Under the Global Agreement, any breach of the ████████████ is an immediate Event of Default, with no cure period allowed.[11]  Similarly, an immediate Event of Default occurs if a Debtor becomes "Bankrupt," a defined term that applies when a Debtor "become[s] unable, admit[s] in writing its inability or fail[s] generally to pay its debts as they become due."[12]

The Global Agreement states that "[u]pon the occurrence and during the continuance of an Event of Default, the Shell [Defendants] may, in their sole discretion," take three listed actions: (1) terminate any further extensions of credit, (2) accelerate all obligations owing to the Shell Defendants, and (3) exercise any other remedies available under the Transaction Agreements or at law or in equity.[13]  Only the second action (acceleration) requires notice; it provides that the Shell Defendants may accelerate all obligations under the Transaction Agreements "upon notice" to the

---

[9] *Id*. at Appendix A-8 (emphasis added).
[10] *See* Am. Compl. ¶ 34.
[11] *See* Global Agreement § 7.1(f).
[12] *Id*. at Appendix A-1 (defining "Bankrupt"); *see also id*. § 7.1(o).
[13] *Id*. § 7.2.

Debtors. [14]  That notice requirement is irrelevant here because acceleration is not at issue, and notice is not required for any of the other remedies, including remedies available under the other Transaction Agreements.[15]  The "Transaction Agreements" are defined to include the Master Agreements.[16]  And the parties agreed that the Global Agreement and, unless otherwise specified, the other Transaction Agreements would be "governed by and construed in accordance with the laws of the state of New York."[17]

Thus, the parties agreed in the Global Agreement that, if the Debtors violated the ███████ ███████ or if any Debtor became unable to pay its debts as they become due, the Shell Defendants could exercise any or all of the remedies available to them (a) under the Global Agreement, (b) under the Master Agreements, (c) at New York law, or (d) in New York equity.

## II.     The Master Agreements

There are three Master Agreements, each between Shell Energy and one of the three Debtors.  The three Master Agreements are identical; the only difference between them is the parties.

The Master Agreements deal with the purchase and sale of electricity and are "based on the Edison Electric Institute's Version 2.1 (modified 4/25/00)" (the "EEI Master Contract").[18]  Shell Energy and the Debtors used the EEI Master Contract as their contractual template—a standard practice for those participating in the wholesale power purchase and sale industry.  All

---

[14] *Id.*

[15] *Id.*

[16] *See id.* at Appendix A-12 (defining "Transaction Agreements") & Appendix F (listing the Transaction Agreements).

[17] *Id.* § 10.18 (capitalization and emphasis omitted).

[18] Master Agreements Cover Sheet at 1 (attached as Exhibit B).  The template EEI Master Contract is attached separately, as Exhibit C.  Together, the Cover Sheets and EEI Master Contract comprise the Master Agreements.

agreed deviations from the EEI Master Contract template are set forth in the "Cover Sheet" to the Master Agreements.

The Master Agreements provide that an "Event of Default" as defined in the Global Agreement will also constitute an Event of Default under the Master Agreement.[19]   Thus, a violation of the ████████████ in the Global Agreement or a Debtor becoming "Bankrupt" as defined in the Global Agreement are each Events of Default under both the Global Agreement and the Master Agreements.

The occurrence of an Event of Default gives the non-defaulting party the "right" to take three actions under the Master Agreements[20]:

  (i)   designate a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate all, but not less than all, Transactions (each referred to as a "Terminated Transaction") between the Parties,

  (ii)   withhold any payments due to the Defaulting Party under this Agreement and

  (iii)   *suspend performance*.

This right to "suspend performance"—which, unlike the right to declare an Early Termination Date, includes no reference to notice—establishes that the Master Agreements do not require the non-defaulting party to continue performing through any standstill period while waiting for a notice to become effective.  This absence of a pre-suspension notice requirement reflects the fact that, in a market where prices can change rapidly, any delay in suspension could impose significant harm on the non-defaulting party.  The non-defaulting party's right to protect itself from those harms does not depend on whether the underlying Event of Default occurred on a business day.

---

[19] *See* Master Agreements Cover Sheet at 5 (adding Section 5.1(i)).
[20] EEI Master Contract § 5.2 (emphasis and paragraph breaks added) (attached as Exhibit C).

As set forth above, the Master Agreements also allow the non-defaulting party to terminate all outstanding trades by designating an Early Termination Date on which all trades are terminated, effectively making suspension permanent. The Master Agreements then require calculation of a "Settlement Amount" with respect to all terminated transactions, which is defined as "the Losses or Gains, and Costs, expressed in U.S. Dollars, which such party incurs as a result of the liquidation of a Terminated Transaction pursuant to Section 5.2."[21] In some circumstances, a dispute over the Early Termination Date will affect the Settlement Amount. But when, as here, the non-defaulting party has exercised its right to immediately suspend power delivery, the Settlement Amount does not depend on the Early Termination Date because power delivery did not stop on that Date—delivery stopped immediately following the Event of Default. In other words, since termination merely makes suspension permanent, the parties' Losses, Gains, and Costs all depend on when the Event of Default and suspension occurred, not on the Early Termination Date when that suspension became permanent.

### III.    The Debtors' ██████████ Defaults

In early February 2021, the Texas weather forecasts were predicting a winter storm with near record low temperatures, and Shell Energy began a series of calls and discussions with the Debtors to confirm that they were prepared for the increased energy demand that would likely accompany that cold weather. These discussions continued throughout the weekend of February 13, and on Sunday, February 14, the Shell Defendants emailed a "Notice of Default and Termination to the Debtors" (the "February 14 Termination Notice").[22] That Termination Notice states that, "███████████████████████████████████████████████

---

[21] *Id*. § 1.56.
[22] Am. Compl. ¶ 33.



[23] February 14 Termination Notice (attached as Exhibit D).  The Court may consider the February 14 correspondence between the Debtors and Shell Energy because the Debtors have no good-faith basis to question their authenticity and those correspondence "were sufficiently referenced in the complaint to permit their consideration on a motion to dismiss."  *Walch v. Adjutant Gen.'s Dep't of Texas*, 533 F.3d 289, 294 (5th Cir. 2008).  In *Walch*, the plaintiff sued to challenge his discharge from the Texas Air National Guard.  *Id*. at 291.  In affirming the district court's order dismissing the plaintiff's claims, the Fifth Circuit considered two materials not attached to the complaint: a letter in which "the Texas Air National Guard commander informed [the plaintiff] that a recommendation was being sent to The Adjutant General that [the plaintiff] be involuntarily discharged as an Air National Guardsman"; and later letter in which The Adjutant General "informed [the plaintiff] of the acceptance of the recommendation for [the plaintiff's] dismissal." *Id*. at 292.  The Fifth Circuit held that consideration of both letters was "consistent with [its] precedents . . . even under a Rule 12(b)(6) analysis" because "[n]o party questions the authenticity of these two documents and both were sufficiently referenced in the complaint to permit their consideration on a motion to dismiss."  *Id*. at 294.   Consideration of the February 14 correspondence here is appropriate under the Rule 12(b)(6) standard for the same reason.

[24] *See, e.g.*, Email from Michelle Supple, VP Supply & Risk Management for the Debtors, to Ignacio Taveras, account manager for Shell Energy (Feb. 14, 2021 3:47 p.m.) (attached as Exhibit E); *accord* Am. Compl. ¶ 34.

[25] Email from Supple to Taveras (Feb. 14, 2021 3:47 p.m.); *see also id.* (showing similar non-compliance for Power of Texas Holdings).



In addition, the Debtors forecasted "███████" in losses over the four-day period that had begun on Saturday, February 13.[26]

This violation of the Risk Policy, along with the Debtors' admission that they were sustaining company-breaking losses, led Shell Energy to issue the February 14 Termination Notice, whereby Shell Energy immediately terminated all outstanding transactions with the Debtors.[27]  Although the February 14 Termination Notice was sent on a Sunday and the next day was a holiday, the Debtors do not dispute their actual receipt of the notice as soon as it was sent.

## IV.    Procedural History

In March 2021, "the Debtors filed voluntary petitions for relief under Chapter 11."[28]  In October 2021, the Debtors filed this adversary proceeding against the Shell Defendants.  They purport to bring eight causes of action.  Their first claim (Count I) is for breach of contract,[29] and two of their other claims (Counts II and VI) restate that breach-of-contract count as claims for declaratory judgment and breach of the implied duty of good faith and fair dealing.[30]

---

[26] *Id.*
[27] *See* February 14 Termination Notice.
[28] Am. Compl. ¶ 9.
[29] *See id.* ¶¶ 67–71.
[30] *See id.* ¶¶ 72–77, 94–99.

The Debtors' remaining five counts all arise under bankruptcy law, and all assume that the Shell Defendants somehow breached the parties' agreements by suspending power delivery, terminating the agreements, and exercising their rights of setoff.  Count III is a disallowance claim under 11 U.S.C. § 502(d) in which the Debtors assert that the "Shell Defendants' secured claim and right of setoff, recoupment and offset should be disallowed and any money that would otherwise be retained by the Shell Defendants should be paid to the Debtors."[31]  Count IV is a turnover claim under 11 U.S.C. § 542(a) for "amounts to which the Debtors are entitled under Section 4.1(b) of the EEI Master Agreements."[32]  Count V requests equitable subordination under 11 U.S.C. § 510(c) on the ground that the Shell Defendants "wrongfully terminat[ed] their contractual relationship with the Debtors."[33]  Count VII is an avoidance claim under 11 U.S.C. § 548(a)(1)(A) on the theory that the "Shell Defendants set off the amounts of the Transfers"—a capitalized but undefined term—"in direct contravention of the terms of the subject agreements."[34]  Finally, in a claim also labeled Count VII, the Debtors allege under 11 U.S.C. § 550 that they are "entitled to recover from Shell Energy an amount to be determined at trial that is not less than the total amount of the Transfers," again without explaining what those Transfers are.[35]

## ARGUMENT

### I.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) "applies in adversary proceedings."  Fed. R. Bankr. P. 7012(b).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[31] *Id.* ¶ 80.
[32] *Id.* ¶ 82.
[33] *Id.* ¶ 91.
[34] *Id.* ¶ 103.
[35] *Id.* ¶ 108.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Fraud claims must, in addition, meet Fed. R. Civ. P. 9(b)'s heightened pleading requirements." *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287, 2021 WL 346226, at *3 (Bankr. S.D. Tex. Feb. 1, 2021). "To plead fraud adequately, the plaintiff must specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *In re Noram Res., Inc.*, No. 08-38222, 2011 WL 6936361, at *4 (Bankr. S.D. Tex. Dec. 30, 2011) (quoting *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010)).

## II. The Court Should Dismiss All Claims Against STRM Because the Debtors Fail to State a Claim Against STRM

The Amended Complaint does not provide STRM with notice of any claim against it. There are only three allegations in the Amended Complaint that reference STRM.

- "Defendant Shell Trading [i.e., STRM] is a Delaware limited liability company with its principal place of business in Houston, Texas."[36]

- "Defendant Shell Trading is a registered swap dealer with the Commodities Futures Trading Commission and is engaged in the wholesale marketing and trading of derivatives and other financial products across North America."[37]

- ". . . Defendant Shell Trading offered the Debtors access to financially settled hedge products."[38]

These three allegations do not plausibly suggest that STRM breached any obligation to the Debtors or otherwise state any viable claim for relief.

---

[36] *Id*. ¶ 11.
[37] *Id*. ¶ 16.
[38] *Id*. ¶ 17.

The Debtors' repeated references to the "Shell Defendants"—a term they define to include STRM—do not alter this analysis.  To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (emphasis added).  "The Supreme Court's phrasing of 'the defendant' highlights that the [Amended Complaint] must be particularized and not merely label the defendants collectively as lawbreakers without explaining why each one broke the law." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Bacarella Transp. Servs., Inc.*, No. 3:19-CV-01364-X, 2021 WL 3372263, at *7 (N.D. Tex. Aug. 3, 2021).  In other words, a "complaint does not satisfy the requirements of *Iqbal* and *Twombly* by lumping together all defendants, while providing no factual basis to distinguish their conduct."  *Del Castillo v. PMI Holdings N. Am. Inc.*, No. 4:14-CV-3435, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015); *cf. Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 184 (5th Cir. 2019) ("This court does not consider group pleading allegations." (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004))).

The Debtors lump the Shell Defendants together without making any specific allegations against STRM.  Indeed, the Debtors open their Amended Complaint by explaining that this "action arises from Shell *Energy's* failure to provide electric power."[39]  The Amended Complaint then contains over one hundred references to Shell Energy, including dozens of allegations of specific conduct by Shell Energy.  While the Debtors' allegations against Shell Energy are legally insufficient because the Amended Complaint and documents incorporated therein establish that Shell Energy had the right to suspend power delivery and terminate the agreements, the Debtors at least notify Shell Energy of the claims they are trying to bring against it.  The same cannot be

---

[39] *Id*. ¶ 1 (emphasis added).

said for the Debtors' putative claims against STRM; there is no way to tell what claims the Debtors believe they have against STRM or what conduct by STRM allegedly supports those claims.  As such, any such claims should be dismissed.

### III.   All the Debtors' Claims Should Be Dismissed Because the Shell Defendants Had the Right to Terminate the Agreements and Suspend Power Delivery

All the Debtors' claims rest on the premise that "Shell Energy materially breached the parties' Contracts,"[40] which the Debtors define as "the EEI Master Agreements, and other applicable contract documents incorporated therein."[41]   This breach-of-contract claim is foundational because the Debtors' claims all arise from Shell Energy's alleged failures "to meet its contractual obligations to deliver electricity through at least February 17, 2021" and to pay "the settlement amount applicable to termination on February 17."[42]   If the Court rejects those conclusions, then the Debtors have no basis for stating any claim against Shell Energy (or STRM).

In total, the Debtors identify four supposed breaches of contract: (1) "Wrongful and/or early termination"; (2) "Failure to deliver electric power"; (3) "Wrongful offset"; and (4) "Failure to pay invoiced amounts."[43]   None of these alleged breaches states a plausible claim to relief.

#### A.   "Wrongful and/or early termination"

The Debtors fail to state a claim that Shell Energy "wrongfully terminated" the Master Agreements "without the occurrence of a qualifying or legitimate Event of Default."[44]   The documents incorporated in the Debtors' Amended Complaint show that the Debtors were "█

████████████████████████████████████████████████████████ ."[45] 

---

[40] *Id.* ¶ 69.
[41] *Id.* ¶ 68.
[42] *Id.* ¶ 5.
[43] *Id.* ¶ 69 (underlining omitted).
[44] *Id.*
[45] February 14 Termination Notice.

Specifically, the position reports that the Debtors provided to Shell Energy stated that they were "Out of Compliance" with ███████████████████████████████████████ losses due to that material breach.[46]  That ██████ ██████ in violation of Global Agreement § 3.17 is an Event of Default under both the Global Agreement and the Master Agreements.[47]  And the Amended Complaint shows why the parties agreed that this failure would be an Event of Default: the Debtors' failures to adequately hedge their exposure to rising prices caused massive losses and ultimately led to their bankruptcy.  Shell Energy did not have to act as the Debtors' insurer by continuing to provide them with power—which all knew they could not pay for—after the Debtors breached their duties to protect themselves from changes in the electricity supply market.  Nor did Shell Energy have to continue providing the Debtors with credit to purchase that electricity—the Global Agreement provides that, following an Event of Default, the Shell Defendants "██████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████."[48]  The Debtors' ████████████████ gave Shell Energy the right both to terminate the Debtors' credit and to suspend power delivery.

The Debtors resist this conclusion by alleging that perhaps the Risk Policy had been changed by the Debtors without Shell Energy's knowledge, stating that Shell Energy had "no knowledge as to whether the Debtors' CEO or Vice President of Finance had approved maintaining a lower percentage" than the "90% ███████████ set forth in the internal Risk Policy."[49]  But not only would such change have required Shell Energy's consent, the position reports that the Debtors

---

[46] Email from Supple to Taveras (Feb. 14, 2021 3:47 p.m.).
[47] *See* Global Agreement § 7.1(f); Master Agreements Cover Sheet at 5 (adding Section 5.1(i)).
[48] Global Agreement § 7.2 (emphasis added).
[49] Am. Compl. ¶ 34.

provided to Shell Energy ███████████████████████████████████████████

███ [50]  And the Debtors never allege that they received CEO or VP of Finance approval—a glaring failure to allege facts necessary to "nudge[] [the] claims across the line from conceivable to plausible."  *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021) (alterations in original) (quoting *Twombly*, 550 U.S. at 570).  Further, even if the Debtors had received CEO or VP of Finance approval to amend the Risk Policy so that it allowed the Debtors ████████████

████████████████████████—an odd action to take during a rising price environment, since it would cause the Debtors to sustain more losses from price exposure—that amendment would have required written approval from Shell Energy. [51]

The Debtors also ignore the fact that they told Shell Energy that they would incur ███

████████████████████████████████████████ [52]  These extreme losses meant the Debtors would be unable to pay Shell Energy for any power it delivered, and the losses rendered the Debtors unable to pay their debts as they came due, meaning that the Debtors had become "Bankrupt" under the Global Agreement. [53]  A Debtor becoming "Bankrupt" was itself an immediate Event of Default under the Global Agreement and the Master Agreements. [54]

---

[50] Email from Supple to Taveras (Feb. 14, 2021 3:47 p.m.).
[51] *See* Global Agreement § 3.17(a) ("████████████████████████████████████████

████████████████████████████████████████████████████."); *id*. at Appendix A-8 (providing that the Risky Policy "████████████████████████████████████

████████████████████").
[52] *See* Email from Supple to Taveras (Feb. 14, 2021 3:47 p.m.).
[53] *See* Global Agreement at Appendix A-1 (defining "Bankrupt" to include any Debtor that shall "become unable, admit in writing its inability or fail generally to pay its debts as they become due").
[54] *See id*. § 7.1(o); Master Agreements Cover Sheet at 5 (adding Section 5.1(i)).

### B.  "Failure to deliver electric power"

The Debtors cannot establish that Shell Energy breached any agreement by "fail[ing] to deliver electric power to the Debtors from at least the period of February 14, 2021 to February 17, 2021."[55]  The parties to the Global Agreement agreed that, upon the occurrence of an Event of Default, the Shell Defendants could, "in their sole discretion, . . . exercise any or all of the remedies available to the Shell [Defendants] under any of the Transaction Agreements, or at law or in equity."[56]  Shell Energy had the right—under both the Master Agreements and New York law—to suspend performance on February 14.

The Master Agreements provide that Shell Energy's remedies following an Event of Default include the right to "suspend performance,"[57] and the Global Agreement authorizes the Shell Defendants to "forthwith terminate"[58] any extensions of credit to the Debtors for electricity sales.  Nothing in the Master or Global Agreements, respectively, limits the Shell Defendants' rights to make that suspension or credit-extension termination immediate.  The Debtors argue that, because February 14 was a Sunday and the following day was a holiday, Shell Energy had to continue power  delivery to the Debtors until at least the close of the next business day, when any notice to the Debtors could be "effective."[59]  But the Global and Master Agreements impose no such requirement, and New York law does not permit the Debtors to read that condition precedent into either contract.  *See DirectTV Latin Am., LLC v. RCTV Int'l Corp.*, 982 N.Y.S.2d 96, 97 (App. Div. 2014) ("Given the absence of clear language indicating the parties' unmistakable intent to make the provision of written notice a condition precedent to [the counter-defendant's] exercise

---

[55] Am. Compl. ¶ 69.
[56] Global Agreement § 7.2.
[57] EEI Master Contract § 5.2.
[58] Global Agreement § 7.2.
[59] Am. Compl. ¶ 35.

of its rights under [a contract], no such duty will be construed."); *Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F. Supp. 63, 67 (S.D.N.Y. 1991) ("Under New York law, a contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition.").  Shell Energy acted within its contractual rights to immediately suspend delivery of electricity on credit to the Debtors upon the occurrence of the above-described Events of Default.

Likewise, Shell Energy had the "common-law right to declare [the Debtors] in default and suspend performance." *Sinco, Inc. v. Metro-N. Commuter R.R. Co.*, 133 F. Supp. 2d 308, 312 (S.D.N.Y. 2001).  Under New York law, a "breach may excuse the nonbreaching party from further performance if the breach is 'material.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006); *see also E. Profit Corp. Ltd. v. Strategic Vision US LLC*, No. 18-CV-2185 (LJL), 2021 WL 2554631, at *38 (S.D.N.Y. June 22, 2021) (rejecting counterclaim based on the plaintiff's "failure to provide the proper termination notice under the Agreement," which "indicates that termination would be effective only 30 days after notice of termination," because "when a party materially breaches a contract, the other party is relieved of its future obligations," and thus the plaintiff "was permitted to terminate the Agreement without giving 30 days' notice").  The parties agreed that a breach of Global Agreement § 3.17 or any Debtor becoming "Bankrupt" as defined in the Global Agreement would be a material breach of both the Global Agreement and the Master Agreements.  As such, Shell Energy was entitled under New York law to suspend performance immediately.

### C.  "Wrongful offset"

The Debtors claim that Shell Energy breached the Master Agreements by "set[ting] off obligations of the parties due under the subject various agreements between the parties in an effort

to reduce obligations due and owing by Shell Energy to the Debtors,"[60] but they do not explain why that setoff was improper.  The premise of the Debtors' claim appears to be that Shell Energy had no right to terminate the Master Agreements because "Shell Energy contrived and declared a contrived default,"[61] but that is just a restatement of the Debtors' defective allegation of wrongful termination.  There is no allegation in the Amended Complaint suggesting that it was improper for Shell Energy to account for the debts that the Debtors owed Shell Energy.  Indeed, § 5.6 of the Master Agreements provides that Shell Energy, as the non-defaulting party, is entitled to "set off against [a] Termination Payment any amounts due and owing by the Defaulting Party or any of its Affiliates to the Non-Defaulting Party or any of its Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or any of its Affiliates and the Non-Defaulting Party or any of its Affiliates."[62]  The Debtors do not plausibly allege that Shell Energy's conduct was inconsistent with that right.

### D.  "Failure to pay invoiced amounts"

The Debtors' final breach-of-contract allegation is that Shell Energy "fail[ed] to pay the Invoiced Amount and/or all other amounts to which the Debtors are entitled under Section 4.1(b) and Article 5 of the EEI Master Agreements."[63]  The Debtors define "Invoiced Amount" to mean $124,282,817 that they requested on August 18, 2021, under § 4.1(b) of the Master Agreements.[64]

---

[60] *Id*. ¶ 69.

[61] *Id*.

[62] EEI Master Contract § 5.6 Option B; *see also* Master Agreements Cover Sheet at 2 (selecting Option B).

[63] Am. Compl. ¶ 69.

[64] *Id*. ¶ 59.  The Debtors' definition of "Invoiced Amounts" is precluded by the clear language of the Master Agreements themselves.  Having failed to allege that they objected to Shell Energy's Termination Statement by providing the Shell Defendants a "detailed written explanation of the basis for [the Debtors'] dispute" within two business days of the Termination Statement, the Debtors cannot now argue that a different valuation should be used.  EEI Master Contract § 5.5; *compare* Am. Compl. ¶ 57 (alleging that, "[o]n March 9, 2021, the Shell Defendants submitted

This claim fails because § 4.1(b) entitles the Debtors to payment only if Shell Energy fails to deliver power "*and such failure is not excused under the terms of the Product or by Buyer's failure to perform.*"[65]  If that condition is met, then Shell Energy must pay the Buyer "████████████ ██████████████████████████" the "█████████████████████████████ ████████████████████████████" and the "███████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████."[66]  But that condition was never triggered because Shell Energy's decision to stop delivering power to the Debtors was excused by the Debtors' failure to perform their obligations under the Global and Master Agreements.

### E. Extra-Contractual Claims

The Debtors' "failure to state a plausible breach of contract claim" means that their extra-contractual claims—for "breach of duty of good faith and fair dealing" and "declaratory judgment"—"also fail as a matter of law.  *Frosch Holdco, Inc. v. Travelers Indem. Co.*, No. 4:20-CV-1478, 2021 WL 1232777, at *6 (S.D. Tex. Feb. 11, 2021) (collecting cases).

### i. Declaratory Judgment

The Debtors' first extra-contractual claim is a request for declaratory judgment regarding "(a) the effective date of Shell Energy's termination of the EEI Master Agreements and Confirmations thereunder, and (b) Shell Energy's contractual obligation to deliver power to the Debtors following delivery of a Notice of Default and Termination on Sunday, February 14, 2021."[67]  The Court should dismiss this claim because, in the Fifth Circuit, "district courts . . .

---

their proposed 'settlement calculations' to the Debtors"), *with* Am. Compl. ¶ 59 (alleging that the Debtors invoiced Shell Energy "[o]n August 18, 2021").

[65] Master Agreements Cover Sheet at 4 (adding § 4.1(b)).

[66] *Id.*; *see also id.* at 2 (checking the "Accelerated Payment of Damages" box).

[67] Am. Compl. ¶ 77.

regularly reject declaratory judgment claims seeking the resolution of issues that are the mirror image of other claims in a lawsuit." *DM Arbor Ct., Ltd. v. City of Houston*, No. CV H-18-1884, 2021 WL 4926015, at *12 (S.D. Tex. Oct. 21, 2021) (collecting cases) (quoting *Great Am. Ins. Co. v. Goin*, No. 3:15-CV-75-L, 2017 WL 4238698, at *4 (N.D. Tex. Sept. 25, 2017)). This practice applies with particular force here, where the Debtors' declaratory judgment claim duplicates its futile contractual claim.

There is no actual dispute about Shell Energy's obligation to deliver electricity or the effective date of the termination because Shell Energy had the right to "suspend performance" following the Debtors' defaults.[68] Nothing in the Master Agreements—or under New York law— required Shell Energy to provide any kind of notice before that suspension.

That right to suspend power delivery also means *a fortiori* that there is no real dispute over the effective termination date. As noted above, § 5.2 of the Master Agreements allows the non-defaulting party to terminate all outstanding trades with the defaulting party by designating an Early Termination Date on which all trades are terminated, and to calculate a Settlement Amount for each terminated transaction as of such Early Termination Date. The termination notice that the Shell Defendants delivered to the Debtors on February 14 stated that all transactions were immediately terminated. But the Settlement Amount would be no different even if the termination were not effective until the next business day, because Shell Energy had the right to immediately suspend delivery to the Debtors. No matter when that suspension became permanent—whether on February 14 or otherwise—Shell Energy was not obligated to deliver electricity to the Debtors after February 14, and they cannot claim any loss as a result of not receiving delivery from Shell Energy after that date. In other words, any "Losses, or Gains, and Costs" that the Debtors incurred

---

[68] EEI Master Contract § 5.2.

20

are economically identical under a scenario where termination of the transactions became effective on February 14, and under a scenario where termination of the transactions became effective on some later date, as the Debtors assert.

### ii. Breach of Implied Duty of Good Faith and Fair Dealing

The Debtors' second extra-contractual claim is that the Shell Defendants "breached their implied duty of good faith and fair dealing owed to the Debtors when the Shell Defendants improperly terminated transactions between the parties and Shell Energy refused to provide electricity to the Debtors."[69]

This claim fails because New York law does not permit parties to use the implied covenant to rewrite their contractual relationship.[70] "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004) (quoting *1-10 Indus. Assocs., LLC v. Trim Corp. of Am.*, 747 N.Y.S.2d 29, 31 (App. Div. 2002)). "Nevertheless, the duties imposed by an implied covenant of good faith and fair dealing are 'not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship.'" *Id*. at 170 (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 292 (N.Y. 1995)).

The Debtors' good faith and fair dealing claim purports to impose obligations on Shell Energy that are inconsistent with the Global and Master Agreements. Those Agreements gave

---

[69] Am. Compl. ¶ 97.

[70] New York law applies under the governing law provision found in § 10.18 of the Global Agreement. But the same analysis would apply under Texas law, except that in Texas "a duty of good faith is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in bargaining power." *Fed. Deposit Ins. Corp. v. Coleman*, 795 S.W.2d 706, 708–09 (Tex. 1990). "The Texas courts have not applied this duty to ordinary contractual relationships." *Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 208 (5th Cir. 1991).

Shell Energy the right to terminate the Master Agreements and suspend the delivery of power.  The Court should therefore dismiss this claim as foreclosed by the explicit terms of the Agreements.

## IV.     The Court Should Dismiss the Claims Arising Under Title 11

The Debtors' remaining claims are bankruptcy-specific claims that depend on the premise that the Shell Defendants somehow acted improperly by exercising their rights under the governing agreements.  The Court should dismiss these bankruptcy claims for the same reasons that it should dismiss the underlying breach-of-contract claim and for the additional reasons given below.

### A.  Disallowance of the Shell Defendants' Claims

The Debtors allege that "any and all Claims of the Shell Defendants and/or its assignee against the applicable Debtors' estate" should be disallowed under 11 U.S.C. § 502(d) "until such time as the Shell Defendants pay to the Debtors all amounts sought" in this adversary proceeding.[71] Section 502(d) provides that "the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of [Title 11] or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of [Title 11], unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of [Title 11]."  11 U.S.C. § 502(d).  This provision is "designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate."  *In re Davis*, 889 F.2d 658, 662 (5th Cir. 1989).  It "operates to enforce orders and judgments, not to disallow claims based on theoretically avoidable transfers when no liability has been established and when no liability can be established."  *In re IFS Fin. Corp.*, No. 02-39553, 2008 WL 4533713, at *5 (Bankr. S.D. Tex. Oct. 2, 2008).

---

[71] Am. Compl. ¶ 80.

The Court should dismiss the disallowance claim as "derivative of and dependent on" the Debtors' other claims. *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 122 (5th Cir. 2019); *see also In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2021 WL 2546664, at *6 (Bankr. N.D. Tex. June 21, 2021) ("The Trustee's causes of action . . . for recovery under § 550 and disallowance of claims under § 502(d) depend upon viable avoidance claims; if such claims are dismissed, so too must these remaining causes.").

### B.  Turnover of Estate Property

The Debtors purport to bring a turnover claim under "11 U.S.C. §§ 105(a), 541, and 542(a)" against Shell Energy.[72]   The Debtors seek recovery of the "Settlement Amount,"[73] which the Master Agreements define as "the Losses or Gains, and Costs, expressed in U.S. Dollars, which [the non-defaulting] party incurs as a result of the liquidation of a Terminated Transaction pursuant to Section 5.2."[74]

Section 542(a) is the substantive provision under which the Debtors attempt to state a claim.  The other sections that the Debtors cite generally define the powers of the Court, *see* 11 U.S.C. § 105(a), and the property of the estate, *see id.* § 541. Section 542(a) provides that, "[e]xcept as provided in subsection (c) or (d) of [§ 542], an entity, other than a custodian, in

---

[72] *Id*. at 23.  The Debtors do not rely on § 542(b).  Among other differences, "[§] 542(a) involves turnover (i.e., recovery) of tangible property of the estate, and § 542(b) involves turnover (i.e., recovery) of one type of intangible property of the estate—namely, a debt owed to the estate such as an account receivable or a note receivable." *In re Royce Homes, LP*, 578 B.R. 748, 758 (Bankr. S.D. Tex. 2017).  "While Section 542(a) applies to property of the estate generally and to property the debtor may exempt, Section 542(b) applies specifically to debts that are property of the estate." *In re Turner Grain Merch., Inc.*, 557 B.R. 147, 150 (Bankr. E.D. Ark. 2016).  Here, "§ 542(b) takes precedence in application over § 542(a) because § 542(b) specifically concerns a 'debt that is property of the estate,' while § 542(a) concerns 'property of the estate' in general." *In re Calvin*, 329 B.R. 589, 596 (Bankr. S.D. Tex. 2005).  Yet "the [Amended] Complaint specifically cites § 542(a), not § 542(b), which is fatal to the Court's ability to grant the relief requested." *In re S. Pac. Janitorial Grp., Inc.*, 586 B.R. 769, 770 (Bankr. C.D. Cal. 2018).
[73] Am. Compl. ¶ 83.
[74] *Id*. ¶ 66 (alteration in original) (quoting EEI Master Contract § 1.56).

possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of [Title 11], or that the debtor may exempt under section 522 of [Title 11], shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." *Id.* § 542(a).  A trustee may bring a claim under § 542(a) "provided they satisfy the following elements: 1) during the case; 2) an entity other than a custodian; 3) was in possession, custody or control; 4) of property that the trustee could use, sell or lease; 5) that such property is not of inconsequential value or benefit to the estate." *In re Noram Res., Inc.*, No. 08-38222, 2015 WL 2265405, at *6 (Bankr. S.D. Tex. May 11, 2015).

The Court should dismiss the Debtors' turnover claim because the Amended Complaint "nowhere alleges that [Shell Energy] is in 'possession, custody or control' of any identifiable property that [it] could 'deliver' to the Trustee." *In re Aikens*, 623 B.R. 303, 307 (Bankr. E.D. Mich. 2020), *aff'd sub nom.*, *Aikens v. Miller*, No. 20-13257, 2021 WL 2949496 (E.D. Mich. July 14, 2021).  In addition, the Debtors cannot maintain an action under § 542(a) here because it "is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." *In re ATP Oil & Gas Corp.*, No. 12-36187, 2015 WL 1093568, at *3 (Bankr. S.D. Tex. Mar. 10, 2015) (quoting *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991)).  "Clearly, Congress envisioned the turnover provision of § 542 of the Code, 11 U.S.C. § 542 (1988), to apply to tangible property and money due to the debtor *without dispute* which are fully matured and payable on demand." *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990) (emphasis added).  The Debtors are impermissibly attempting to use § 542(a) to pursue a disputed contract claim against the Shell Defendants.

### C.  Equitable Subordination

In Count V, the Debtors attempt to state a claim under 11 U.S.C. § 510(c) for equitable subordination, "a remedial, not penal, measure which is used only sparingly."  *In re U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994).  "The proponent seeking to establish equitable subordination must satisfy three conditions: (i) the claimant must have engaged in some type of inequitable conduct, (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code."  *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287, 2018 WL 889355, at *4 (Bankr. S.D. Tex. Feb. 12, 2018) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)).  While this "three-pronged test appears to be quite broad," the Fifth Circuit has "largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors."  *In re U.S. Abatement Corp.*, 39 F.3d at 561.

None of those three paradigms applies here.  At most, the Debtors allege that the Shell Defendants "created economic hardship" for the Debtors by exercising their "contractual right[s]" to suspend power delivery, terminate the agreements, and set off mutual debts.  *Id.* at 562.  "Yet this economic leverage, asserted by [the Shell Defendants] pursuant to the terms of the contracts, did not give [the Shell Defendants] inequitable control over [the Debtors]."  *Id.*  Thus, "dismissal of [the Debtors'] equitable subordination claim for failure to state a claim [is] proper" because "the behavior of [the Shell Defendants] which [the Debtors] complain[] of would not support a finding of inequitable conduct." *Id.*

Indeed, the Debtors' equitable subordination claim is all the more implausible because the transactions here were at arm's length.  The "typical case of equitable subordination based on

25

creditor control of the debtor involves a corporate insider," but courts have sometimes "found that a creditor exerted such dominance over the debtor as to warrant subordination of the creditor's claims," typically involving "some egregious misconduct by the creditor." *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *see also In re First All. Mortg. Co.*, 471 F.3d 977, 1006 (9th Cir. 2006) ("Where non-insider, non-fiduciary claims are involved, as is the case here, the level of pleading and proof is elevated: gross and egregious conduct will be required before a court will equitably subordinate a claim."). There is no allegation of egregious misconduct here.

### D. Avoidance of Fraudulent Transfers

The Debtors fail to state a claim under 11 U.S.C. § 548(a)(1)(A) for avoidance of fraudulent transfer. This claim should be dismissed for three reasons.

First, the Debtors allege in Count VII that "the Transfers are avoidable,"[75] but they do not define "Transfers." The first use of the capitalized term "Transfers" is in paragraph 101, where the Debtors allege that they "are informed and believe" that "one or more of the Transfers were made within two (2) years prior to the [March 30, 2021] Petition Date."[76] The Amended Complaint provides no context that would allow the Shell Defendants or the Court to determine what those Transfers are.

Second, the Amended Complaint "improperly focuses on the *Defendants'* intent as opposed to the *Debtor*[*s'*] intent." *In re Dual D Health Care Operations, Inc.*, No. 17-41320-ELM, 2021 WL 3083344, at *14 (Bankr. N.D. Tex. July 21, 2021). The Debtors allege that the "*Shell Defendants* set off the amounts of the Transfers in direct contravention of the terms of the

---

[75] *Id*. ¶ 104.
[76] *Id*. ¶ 101; *see also id.* ¶ 9.

subject agreements with the actual intent to hinder, delay or defraud creditors of the Debtors."[77] This allegation about the Shell Defendants' supposed intent cannot state a "claim for the avoidance of an actual fraudulent transfer" because the "plaintiff must establish that the *debtor transferor* intended to hinder, delay or defraud its creditors in making the transfer, not that the *recipient transferees* intended such outcome." *In re Dual D Health Care Operations, Inc.*, 2021 WL 3083344, at *14 (collecting cases).

The Debtors nonetheless ask the Court to "impute[]" the Shell Defendants' alleged intent to the Debtors "by reason of the Shell Defendants' dominion and control over such assets."[78]  This allegation appears to be a reference to the so-called control rule, under which a "transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor" when "a transferee is in a position to dominate or control the debtor's disposition of . . . property." *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 941 (N.D. Tex. 2011) (alteration in original) (quoting *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 369 (S.D. Tex. 2008)).  Factors relevant to this analysis include "(1) whether the transferor and transferee are affiliated companies, or alternatively, are independent and unaffiliated; (2) the extent to which the relationship between transferor and transferee was at arm's length and their interests potentially hostile; (3) the existence of a 'continuous institutional channel through which the transference of fraudulent intent simultaneous with a disposition of property could be effected;' and (4) whether an agency relationship existed between transferor and transferee." *ASARCO LLC*, 396 B.R. at 369 n.105 (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 448–49 (S.D.N.Y. 2001)). "Whatever its conceptual underpinnings, at the heart of the doctrine is a culpable act committed

---

[77] *Id*. ¶ 103 (emphasis added).
[78] *Id*.

by the debtor, actively or passively, for the purpose of keeping particular assets out of the reach of creditors." *In re Adler*, 263 B.R. at 448.  The Debtors have alleged no basis here for imputing the Shell Defendants' intent to the Debtors.

Third, even if the Shell Defendants were the proper focus, the Debtors have failed to allege they acted with fraudulent intent.  "[T]he requirement of Rule 9(b), that allegations of fraud be pleaded with particularity, must be observed in a section 548 action alleging the debtor acted with the actual intent to hinder, delay or defraud creditors."  5 Collier on Bankruptcy ¶ 548.11[1][a][ii] (16th ed. 2021); *accord In re Uplift RX, LLC*, 625 B.R. 364, 380 n.16 (Bankr. S.D. Tex. 2021).  The Debtors have failed to observe those requirements because they have not pleaded, as they must, "the who, what, when, where, and why as to the fraudulent conduct."  *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020) (quoting *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019)).  The Debtors fail to allege the "who" because they do not identify which of the two "Shell Defendants" allegedly acted with fraudulent intent.[79]  They fail to allege the "what" because they claim that "the Transfers are avoidable" without defining the term Transfers.[80]  They fail to allege the "when, where, and why" for the same reason and also because the Debtors do not explain why the Shell Defendants' conduct under the governing agreements was objectively or subjectively improper.[81]

### E.  Recovery of Fraudulent Transfers

The Debtors' final cause of action is a claim under 11 U.S.C. § 550(a) that they "are entitled to recover from Shell Energy . . . the total amount of the Transfers," plus interest and costs.[82]  This

---

[79] *Id*. ¶¶ 102–04.
[80] *Id*. ¶ 104.
[81] *See id*. ¶ 103.
[82] *Id*. ¶ 108.

§ 550(a) claim presumes that the "Debtors are entitled to avoid the Transfers pursuant to 11 U.S.C. § 548(a)(1)(A)."[83]  *See* 11 U.S.C. § 550(a) (authorizing recovery "to the extent that a transfer is avoided under section . . . 548").  As discussed above, because the Debtors have failed to show that they satisfy the requirements of § 548(a)(1)(A), their final cause of action should be dismissed.

## CONCLUSION

The Court should dismiss for failure to state a claim the Debtors' causes of action against the Shell Defendants.

Dated: December 13, 2021          Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Todd A. Atkinson*
Paul B. Turner (TX Bar No. 24053638)
Todd A. Atkinson (TX Bar No. 24121426)
811 Main Street, Suite 3130
Houston, Texas 77002
Telephone:     (346) 998-7801
Facsimile:     (346) 998-5901
Email:         paul.turner@wbd-us.com
               todd.atkinson@wbd-us.com

Christopher W. Jones (admitted *pro hac vice*)
Samuel B. Hartzell (admitted *pro hac vice*)
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone:     (919) 755-8173
Facsimile:     (919) 755-6771
Email:         chris.jones@wbd-us.com
               sam.hartzell@wbd-us.com

*Counsel for Defendants Shell Energy North America (US), L.P. and Shell Trading Risk Management, LLC*

---

[83] *Id*. ¶ 106.