**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **ENTRUST ENERGY, INC., *et al.*,** | § | **Case No. 21-31070** |
| **Debtors.** | § | **Jointly Administered** |
| **THE ENTRUST LIQUIDATING TRUST,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Adv. Pro. No. 21-03930** |
| **SHELL ENERGY NORTH AMERICA (US), L.P. and SHELL TRADING RISK MANAGEMENT, LLC** | § | |
| **Defendants.** | § | |

**SHELL ENERGY NORTH AMERICA (US), L.P. AND SHELL TRADING RISK MANAGEMENT, LLC'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AMENDED COMPLAINT (ECF NO. 30)**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The Court Should Dismiss All Claims Against STRM Because the Debtors Make No Relevant Allegation Against STRM .......... 2

II. The Debtors' Breach of Contract Claim Should Be Dismissed Because the Shell Defendants Had the Right to Terminate the Agreements and Suspend Power Delivery .......... 5

A. The Debtors Breached the Risk Policy and Did Not Plausibly Allege Otherwise .......... 5

B. The Debtors' Material Breach Justified Immediate Suspension .......... 9

III. The Debtors' Duplicative Extra-Contractual Claims Are Not Viable .......... 11

A. Declaratory Judgment .......... 11

B. Implied Duty of Good Faith and Fair Dealing .......... 13

IV. The Court Should Dismiss the Claims Arising Under Title 11 .......... 14

A. Disallowance of the Shell Defendants' Claims .......... 14

B. Turnover of Estate Property .......... 15

C. Equitable Subordination .......... 17

D. Avoidance of Fraudulent Transfers .......... 20

E. Recovery of Fraudulent Transfers .......... 23

CONCLUSION .......... 23

# TABLE OF AUTHORITIES

**Cases**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Associates)*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994) ........ 18

*Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631 (S.D. Tex. 2016) ........ 22

*ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) ........ 21, 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 7

*Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436 (5th Cir. 2009) ........ 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 7

*Concesionaria DHM, S.A. v. Int'l Int'l Fin. Corp.*, 307 F. Supp. 2d 553 (S.D.N.Y. 2004) ........ 14

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013) ........ 13

*Del Castillo v. PMI Holdings N. Am. Inc.*, No. 4:14-CV-3435, 2015 WL 3833447,at *6 (S.D. Tex. June 22, 2015) ........ 2

*DirectTV Latin Am., LLC v. RCTV Int'l Corp.*, 982 N.Y.S.2d 96 (App. Div. 2014) ........ 10

*DM Arbor Ct., Ltd. v. City of Houston*, No. CV H-18-1884, 2021 WL 4926015 (S.D. Tex. Oct. 21, 2021) ........ 12

*Firefighters' Ret. Sys. V. Grant Thornton, LLP*, 894 F.3d 665 (5th Cir. 2018) ........ 8

*Garcia v. U.S. Bank Tr.,N.A. as Tr. for LSF9 Master Participation Tr.*, No. 7:21-CV-00387,2021 WL 5771928, at *3 (S.D. Tex. Dec. 6, 2021) ........ 7

*Georgia Pacific Corp. v. Sigma Serv. Corp*., 712 F.2d 962 (5th Cir. 1983) ........ 16

*Great Am. Ins. Co. v. Goin*, No. 3:15-CV-75-L, 2017 WL 4238698 (N.D. Tex. Sept. 25, 2017) ........ 12

*Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) ........ 13

*In re Adler, Coleman Clearing Corp.*, 263 B.R. 406 (S.D.N.Y. 2001) ........ 22

*In re Allied Holdings, Inc. v. Volvo Parts NorthAmerica, Inc. (In re Allied Holdings, Inc.)*, No. 05-12518, 2008 WL 7874786 (Bankr. N.D. Ga. July 11, 2008)........................................ 16

*In re ATP Oil & Gas Corp.*, No. 12-36187,2015 WL 1093568 (Bankr. S.D. Tex. Mar. 10, 2015)...................................... 15

*In re Davis*, 889 F.2d 658 (5th Cir. 1989) ........................................................................................ 14, 15

*In re Enron Corp. Sec., Derivative & "ERI*SA" Litig., 2002 WL 32107216 (S.D. Tex. Aug. 12, 2002) ........................................................................ 23

*In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991) ...................................................................................... 19, 20

*In re Granite Partners, L.P.*, 210 B.R. 508 (Bankr. S.D.N.Y. 1997)........................................................................................ 19

*In re IFS Fin. Corp.*, No. 02-39553, 2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008)........................................ 14

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ............................................................................................ 6, 7

*In re Northstar Offshore Grp., LLC*, 616 B.R. 695 (Bankr. S.D. Tex. 2020) ..................................................................................... 3, 4

*In re Odom Antennas, Inc.*, 340 F.3d 705 (8th Cir. 2003) ................................................................................................ 15

*In re Parker N. Am. Corp.*, 24 F.3d 1145 (9th Cir. 1994) ................................................................................................ 15

*In re S. Pac. Janitorial Grp., Inc.*, 586 B.R. 769 (Bankr. C.D. Cal. 2018).......................................................................................... 17

*In re Turner Grain Merch., Inc.*, 557 B.R. 147 (Bankr. E.D. Ark. 2016) ......................................................................................... 17

*In re U.S. Abatement Corp.*, 39 F.3d 556 (5th Cir. 1994) .................................................................................................. 17

*Kham & Nate's Shoes No., Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990) .............................................................................................. 19

*LePatner & Assocs., LLP v. RSUI Grp., Inc.*, No. 21-CV-3890 (JSR), 2021 WL 4555761 (S.D.N.Y. Oct. 4, 2021)...................................... 14

*Lovett v. Cardinal Health, Inc. (In re Diabetes America, Inc.)*, 485 B.R. 340 (Bankr. S.D. Tex. 2012) ........................................................................................ 15

*Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir. 1974) ................................................................................................ 23

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Bacarella Transp. Servs., Inc.*, No. 3:19-CV-01364-X, 2021 WL 3372263 (N.D. Tex. Aug. 3, 2021) ...................................... 4

*Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.*),
264 B.R. 137 (Bankr. S.D.N.Y. 2001) .......... 18, 19

*Olivarez v. T-mobile USA, Inc.*,
997 F.3d 595 (5th Cir. 2021) .......... 6

*Physicians Res. Group, Inc. v. Burch (In re Physicians Res. Group, Inc.)*,
No. 00-30748, 2003 Bankr. LEXIS 2321 (Bankr.N.D. Tex. Mar. 13, 2003) .......... 21

*Seitz v. Frorer (In re Covenant Partners, LP.*,
531 B.R. 84 (Bankr. E.D. Pa. 2015) .......... 14

*Steed v. Parrott Marine Systems, Inc. (In re WeaverDevelopment Co., LLC)*,
No. 06-33059, 2008 WL 5650060 (Bankr.E.D. Tenn. Nov. 5, 2008) .......... 16

*Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*,
771 F. Supp. 63 (S.D.N.Y. 1991) .......... 10

**Statutes**

11 U.S.C. § 502 .......... 14, 15

11 U.S.C. § 542 .......... 15, 16, 17

11 U.S.C. § 548 .......... 20, 22, 23

11 U.S.C. § 550 .......... 23

Defendants Shell Energy North America (US), L.P. ("Shell Energy") and Shell Trading Risk Management, LLC ("STRM") (collectively, the "Shell Defendants") file this reply in support of their Rule 12(b)(6) Motion to Dismiss (ECF No. 30) the Amended Complaint (ECF No. 8) filed by Plaintiff Entrust Liquidating Trust, by assignment of the claims of Entrust Energy, Inc., Entrust Energy East, Inc. and Power of Texas Holdings, Inc. (collectively, the "Debtors").

## INTRODUCTION

The Debtors fail plausibly to allege any viable cause of action. The Amended Complaint and incorporated documents establish that the Debtors had a duty to enter supply purchase transactions for at least 90% of their forecasted load. The Debtors' failure to perform that duty exposed them to massive losses as wholesale electricity prices rose with the arrival of Winter Storm Uri, and that failure gave the Shell Defendants the contractual right to stop delivering electricity to the Debtors. This right to suspend delivery recognizes that the Shell Defendants had no duty to deliver electricity that the Debtors could not pay for because of their own failures to perform their hedging obligations.

The Debtors knew all of this when they filed their Amended Complaint, but they attempted through careful pleading to blame the Shell Defendants for their failures. They now accuse the Shell Defendants of "ignoring the principle that all allegations in a complaint must be taken as true."[1] But that principle applies only to proper factual allegations. There is no presumption of truth for arguments in briefs, conclusory allegations, legal conclusions masquerading as factual conclusions, or allegations that contradict documents incorporated into the complaint by reference. The Court should dismiss the Amended Complaint under Rule 12(b)(6) because the cognizable allegations fail to state any claim for relief.

[1] Debtors' Opp'n Mot. Dismiss at 1, ECF No. 37.

## ARGUMENT

### I. The Court Should Dismiss All Claims Against STRM Because the Debtors Make No Relevant Allegation Against STRM

The Debtors do not deny that the Amended Complaint "specifically refers to Shell Trading [(STRM)] in only three paragraphs."[2] And they do not claim that these three paragraphs are enough to state any claim against STRM.[3] This concession makes sense, given the anodyne allegations against STRM. The only allegation that STRM did anything is the Debtors' statement that STRM "offered the Debtors access to financially settled hedge products"—conduct that no one argues gives rise to any of the claims in this lawsuit.[4]

The Debtors therefore rely entirely on their undifferentiated allegations against the "Shell Defendants." The Debtors argue that the Motion to Dismiss "does not mention that the [Amended] Complaint . . . contains more than two dozen paragraphs that allege facts pertaining to both 'Shell Defendants.'"[5] The Debtors also argue that some of these two dozen paragraphs (the Debtors do not say which) state a claim against STRM. The Court should reject these arguments.

The Shell Defendants explained at length why the "Debtors' repeated references to the 'Shell Defendants'—a term they define to include STRM—do not alter [the] analysis" showing that the Debtors fail to state a claim against STRM.[6] Those references do not alter the analysis, the Shell Defendants explained, because a "complaint does not satisfy the requirements of *Iqbal* and *Twombly* by lumping together all defendants, while providing no factual basis to distinguish their conduct."[7] The Debtors ignore this line of reasoning, claiming that the Shell Defendants

---

[2] *Id*. at 10.
[3] *See id*.
[4] Am. Compl. ¶ 17, ECF No. 8.
[5] Debtors' Opp'n Mot. Dismiss at 10.
[6] Shell Defs.' Mot. Dismiss at 12, ECF No. 30.
[7] *Id*. (quoting *Del Castillo v. PMI Holdings N. Am. Inc.*, No. 4:14-CV-3435, 2015 WL 3833447, at *6 (S.D. Tex. June 22, 2015)).

"do[] not mention" the group-pleading allegations even though the Shell Defendants devoted more than a page of their Motion to explaining why those allegations are insufficient. The Debtors likewise ignore *all five* of the cases the Shell Defendants cited in this section.

Rather than address the Shell Defendants' arguments, the Debtors claim that group "pleading is permitted where 'more than one defendant allegedly committed the same act together [and] a complaint is not defective for the reason that it asserts that all defendants committed the same act, without identifying each individual defendant.'"[8] The Debtors rely on this Court's decision in *In re Northstar Offshore Grp., LLC*, where the trustee "create[d] 'three groups for convenience,' and for 'the specific transactions at issue, each group is addressed separately as to their roles in the events and benefits derived.'" 616 B.R. 695, 722–23 (Bankr. S.D. Tex. 2020). Here, by contrast, there is *no* analysis of STRM's supposed role in any of the events or transactions at issue. The Debtors included them as a defendant and then failed to explain what STRM is alleged to have done that gives rise to any liability.

The Debtors now ask the Court to review 29 paragraphs of the Amended Complaint—paragraphs "1, 2, 4, 5, 17, 18, 23, 27, 32, 33, 34, 53, 57, 58, 59, 69, 79, 80, 91, 92, 93, 95, 96, 97, 98, 99, 102, 103, and 104"—because they contain the phrase "Shell Defendants."[9] But the Debtors do not explain why any of these 29 paragraphs is relevant. The Debtors do not quote from—or even cite—these paragraphs when arguing that they have done enough through group pleading to state a viable claim against STRM. Instead, the Debtors argue without citation that the Amended Complaint "plainly alleges that the two Shell Defendants who are both parties to the Global

---

[8] Debtors' Opp'n Mot. Dismiss at 10 (quoting *In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 723 (Bankr. S.D. Tex. 2020)).
[9] *Id.*

Agreement jointly terminated the Global Agreement and all related contracts and transactions by declaring a non-existent and contrived Event of Default."[10] But that is not what the Amended Complaint says, much less plainly. The Debtors repeatedly allege that "Shell *Energy*" sent "its" termination notice to the Debtors.[11] And while both Shell Energy and STRM were parties to the Global Agreement, the Debtors allege that "Shell *Energy* materially breached the parties' Contracts" because "Shell *Energy* wrongfully terminated the EEI Master Agreement," "Shell *Energy* failed to deliver electric power," "Shell *Energy* contrived and declared a contrived default," and "Shell *Energy* also materially breached the parties' agreements by failing to pay the Invoiced Amount."[12] The Debtors claim to have suffered damages from "Shell *Energy's* breach of the parties' contracts," and they allege that "Shell *Energy* also caused other contractual damages" such as "attorneys' fees [and] interest."[13]

This is not a situation in which Shell Energy and STRM are "addressed separately as to their roles in the events" and then later grouped together for convenience. *In re Northstar Offshore Grp.*, 616 B.R. at 722–23. It is a case where the Debtors made a few generic allegations against STRM, made a series of specific allegations against Shell Energy only, and then asked the Court to permit the claims against STRM to proceed based on unalleged innuendo. That approach is insufficient after *Iqbal*, where the Supreme Court made clear that a complaint "must be particularized and not merely label the defendants collectively as lawbreakers without explaining why each one broke the law." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Bacarella Transp.*

[10] *Id*. at 11.
[11] *See* Am. Compl. ¶¶ 3, 33, 34, 39, 41, 58.
[12] *Id.* ¶ 69 (emphasis added).
[13] *Id.* ¶¶ 70, 71 (emphasis added).

*Servs., Inc.*, No. 3:19-CV-01364-X, 2021 WL 3372263, at *7 (N.D. Tex. Aug. 3, 2021). The Court should dismiss STRM as a defendant in this proceeding.

## II. The Debtors' Breach of Contract Claim Should Be Dismissed Because the Shell Defendants Had the Right to Terminate the Agreements and Suspend Power Delivery

Group-pleading defects aside, the Debtors fail to state any viable cause of action for breach of contract. The Debtors failed to allege compliance with the hedging requirements incorporated into § 3.17 of the Global Agreement, and that lack of compliance is an Event of Default under both the Global Agreement and the Master Agreements. That Event of Default (and the Debtors' mounting losses) gave the Shell Defendants the right to suspend performance and terminate the agreements, and it prevents the Debtors from stating a contract claim against the Shell Defendants.

### A. The Debtors Breached the Risk Policy and Did Not Plausibly Allege Otherwise

A central issue in this case is whether the Debtors breached the Risk Policy, which all agree would be an Event of Default under the Global Agreement. The Debtors' claims are all premised on the idea that the Shell Defendants had no right to suspend power delivery and otherwise terminate the parties' relationship based on that Event of Default.

According to the Amended Complaint, the "Risk Policy stated that the Debtors should have 90% of their forecasted power supply needs contractually covered."[14] The Debtors acknowledge that when their hedges "drop below the 90% threshold," the Risk Policy "requires" that they "receive approval of the Debtors' CEO or V.P. of Finance."[15] Yet, as the Shell Defendants explained in their Motion to Dismiss, the Debtors "never allege that they received CEO or VP of Finance approval—a glaring failure to allege facts necessary to 'nudge[] [the] claims across the

---

[14] *Id.* ¶ 34.
[15] Debtors' Opp'n Mot. Dismiss at 6.

line from conceivable to plausible.'"[16] The Debtors respond by arguing that they "complied with [the Risk Policy] at all times," but there is no citation to the Amended Complaint supporting that argument because the Debtors did not make this blanket compliance-at-all-times allegation.[17] At most, the Debtors allege that they "were not in violation of their own Risk Policy *at the time of the Termination Notice*,"[18] but this allegation is insufficient for two reasons.

First, the Debtors do not state that they complied with the Risk Policy, only that they were not in violation "at the time of the Termination Notice." This allegation does not plausibly allege that the Debtors are entitled to relief because it does address the Debtors' earlier default. Shell Energy explained in the Notice of Default and Termination that the Debtors were in material default based on the "forecast and hedge report provided today by Entrust to Shell."[19] The relevant question is thus whether that forecast and hedge report reveals that the Debtors breached the Risk Policy.

The Debtors are silent on this point. They do not claim to have been in compliance when they sent the report, and they do not claim to have been in compliance at all relevant times. They make only the carefully circumscribed allegation of compliance "at the time of the Termination Notice." That allegation is merely consistent with the Debtors' claim, since it does not address the critical time when the Debtors admitted they were in breach. That approach may have been sufficient when the rule was that "a claim should not be dismissed under Rule 12(b)(6) unless the plaintiff would not be entitled to relief under any set of facts or any possible theory he may prove consistent with the allegations in the complaint." *In re Katrina Canal Breaches Litig.*, 495 F.3d

---

[16] Shell Defs.' Mot. Dismiss at 15 (alterations in original) (quoting *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021)).
[17] Debtors' Opp'n Mot. Dismiss at 5.
[18] Am. Compl. ¶ 34 (emphasis added).
[19] February 14 Termination Notice, ECF No. 30-4.

191, 205 n.10 (5th Cir. 2007). But this rule is no longer "the minimum standard of adequate pleading to govern a complaint's survival." *Id.* The Debtors must now plead "enough facts to state a claim to relief that is plausible on its face." *Id*. at 205 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Debtors cannot satisfy this standard by "plead[ing] facts that are 'merely consistent with' a defendant's liability," because such allegations "'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Under current law, "[t]he complaint must plead every material point necessary to sustain recovery" and "dismissal is proper if the complaint lacks a requisite allegation." *Garcia v. U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr.*, No. 7:21-CV-00387, 2021 WL 5771928, at *3 (S.D. Tex. Dec. 6, 2021). Here, the Debtors failed to make the necessary allegation that they were in compliance with the Risk Policy when they told the Shell Defendants otherwise, and their claims should be dismissed as a result.

Second, the Debtors' claim that they were "not in violation of their own Risk Policy at the time of the Termination Notice" is an impermissible legal conclusion that this Court should disregard when resolving the Motion to Dismiss.[20] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Without those supporting factual allegations, the legal conclusions "are not entitled to the assumption of truth." *Id*. The Debtors make the conclusory allegation that they were complying with the Risk Policy when they received the Termination Notice, but they allege no facts showing that compliance. They do not allege that they had "90% of their forecasted power supply needs contractually covered."[21] They do not allege that their "Short-Term Trading Desk notif[ied] senior

[20] Am. Compl. ¶ 34.
[21] *Id*.

management" of their hedging failure.[22] And they do not allege that the Debtors "receive[d] approval of the Debtors' CEO or V.P. of Finance" for that shortfall.[23] The Debtors make only the unsupported legal conclusion of compliance, but that is insufficient because "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Firefighters' Ret. Sys. V. Grant Thornton, LLP*, 894 F.3d 665, 669 (5th Cir. 2018) (quoting *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009)).

Indeed, the only facts in the record confirm that the Debtors were *not* in compliance with the Risk Policy. The February 14 Notice of Termination states that the Debtors were "in material default of the hedging requirements of Section 3.17 of the Global Agreement, thereby causing an Event of Default."[24] And the Debtors told the Shell Defendants on February 14 that they were hedged well below 90% and were thus "Out of Compliance" with the Risk Policy.[25] The Debtors ask the Court nonetheless to infer compliance with the Risk Policy, but they failed to allege facts supporting that inference. Their conclusory, time-limited allegation of compliance "at the time of the Termination Notice" is insufficient to state a claim.

---

[22] Debtors' Opp'n Mot. Dismiss at 6.

[23] *Id.*; *see also* Am. Compl. ¶ 34 (alleging that the "Debtors' Risk Policy stated that the Debtors should have 90% of their forecasted power supply needs contractually covered unless a lower amount was approved by the Debtors' CEO or Vice President of Finance").

[24] February 14 Termination Notice.

[25] Email from Michelle Supple, VP Supply & Risk Management for the Debtors, to Ignacio Taveras, account manager for Shell Energy (Feb. 14, 2021 3:47 p.m.), ECF No. 30-5. The Debtors have filed a Motion to Strike this email. *See* ECF No. 38. The Shell Defendants explain in their Opposition thereto why that Motion to Strike should be denied, but this Motion to Dismiss does not turn on resolution of that Motion to Strike. The Debtors acknowledge that the other four exhibits to the Shell Defendants' Motion to Dismiss are properly considered at the Rule 12(b)(6) stage. Those four exhibits, when considered alongside the Amended Complaint, show that the Debtors fail to state a claim.

### B. The Debtors' Material Breach Justified Immediate Suspension

The Debtors alleged in their Amended Complaint that, "[e]ven if Shell Energy had a proper basis to terminate the parties' agreements," it "was required to deliver electricity to the Debtors through the worst days of Winter Storm Uri—through at least February 17, 2021."[26] But the Debtors now admit that the "contracts permit suspension of obligations under the contracts under certain conditions."[27] And they do not deny that those conditions include an Event of Default, such as a violation of the Risk Policy.

The Debtors now attempt to add a qualification to this suspension right, claiming that the written notice Shell Energy delivered to the Debtors was ineffective for this purpose because it failed to use some form of the word "suspend."[28] This argument is inconsistent with the contractual language and with governing New York law. The Debtors identify no contractual provision that makes explicit reference to "suspension" in a notice a condition precedent to Shell Energy's right to suspend performance. No such condition is found in § 5.2 of the EEI Master Contract, which provides that, "[i]f an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party (the 'Non-Defaulting Party') shall have the right to . . . (iii) suspend performance."[29] Nor is such a condition precedent found in § 5.7, which provides that "the Non-Defaulting Party, upon written notice to the Defaulting Party, shall have the right (i) to suspend performance under any or all Transactions."[30] Second 5.7 contemplates written notice, but it does not make that written notice a condition precedent for suspension, and

---

[26] Am. Compl. ¶ 35.
[27] Debtors' Opp'n Mot. Dismiss at 8.
[28] *See id*. at 15–16.
[29] EEI Master Contract § 5.2, ECF No. 30-3; *see also* Master Agreements Cover Sheet at 5 (correcting a grammatical error in § 5.2), ECF No. 30-2.
[30] EEI Master Contract § 5.7.

it does not dictate the language used in that notice. Both omissions are fatal to the Debtors' arguments.

First, and as the Shell Defendants explained in their Motion to Dismiss, "a contractual duty will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F. Supp. 63, 67 (S.D.N.Y. 1991); *accord DirectTV Latin Am., LLC v. RCTV Int'l Corp.*, 982 N.Y.S.2d 96, 97 (App. Div. 2014) ("Given the absence of clear language indicating the parties' unmistakable intent to make the provision of written notice a condition precedent to [the counter-defendant's] exercise of its rights under [a contract], no such duty will be construed."). The Debtors make no attempt to distinguish either of these cases, because there is no clear language in the contracts making notice a condition precedent to suspension. The absence of that condition-precedent language is all the more glaring because the parties agreed that other, unrelated duties would be conditions precedent. Section 10.1 of the Global Agreement, for example, is entitled "Conditions Precedent" and provides that the "Shell Parties shall have no obligation to sell any product or financial derivatives to the Customer Parties, or provide any sleeving services to the Customer Parties, until all the conditions precedent as set forth in the Loan Agreement for the initial Drawdown thereunder have been satisfied."[31] There is no similar language in § 5.2 or § 5.7 of the EEI Master Contract.

Second, Shell Energy *did* provide notice that it was suspending performance. Shell Energy told the Debtors on February 14, 2021 that "effective immediately . . . Shell will no longer transact with Entrust under the Master Agreements or otherwise."[32] Those Master Agreements incorporate

[31] Global Agreement § 10.1, ECF No. 30-1.
[32] February 14 Termination Notice.

the EEI Master Contract and are the documents that governed Shell Energy's delivery of electricity to the Debtors and that gave Shell Energy the explicit right to "suspend performance" on the Event of Default.[33] And, as the Shell Defendants pointed out in their Motion to Dismiss, the Debtors do not deny that they received the notice. That notice clearly and timely informed the Debtors that, effective immediately, Shell Energy would no longer be providing electricity to them because of their defaults. Even if notice were somehow a condition precedent to suspension, this notice satisfied that condition.

## III. The Debtors' Duplicative Extra-Contractual Claims Are Not Viable

### A. Declaratory Judgment

The Debtors are wrong to argue that their declaratory judgment claim is "not all dependent upon the viability of the breach of contract claim."[34] The Debtors asked for two declarations: (1) "that the effective date of Shell Energy's termination of the EEI Master Agreements was February 17, 2021,"[35] and (2) "that Shell Energy had a contractual obligation to deliver power to the Debtors under the EEI Master Agreement through February 17, 2021, but in no event did Shell Energy have the right to terminate providing electricity any earlier than at least February 16, 2021."[36] Both declarations are restatements of the Debtors' breach of contract claim, in which the Debtors allege that "Shell Energy failed to deliver electric power to the Debtors from at least the period of February 14, 2021 to February 17, 2021 before Shell's improper Notice of Termination became effective."[37] And, as the Shell Defendants explained in their Motion to Dismiss, district courts in this Circuit "regularly reject declaratory judgment claims seeking the resolution of issues that are

---

[33] EEI Master Contract § 5.2.
[34] Debtors' Opp'n Mot. Dismiss at 18.
[35] Am. Compl. ¶ 74.
[36] *Id.* ¶ 76.
[37] *Id.* ¶ 69.

the mirror image of other claims in a lawsuit." *DM Arbor Ct., Ltd. v. City of Houston*, No. CV H-18-1884, 2021 WL 4926015, at *12 (S.D. Tex. Oct. 21, 2021) (collecting cases) (quoting *Great Am. Ins. Co. v. Goin*, No. 3:15-CV-75-L, 2017 WL 4238698, at *4 (N.D. Tex. Sept. 25, 2017)). The Debtors do not address *DM Arbor Court* or the cases collected therein.

The Debtors argue that their declaratory judgment claim is unlike those that courts regularly reject as duplicative because their claim "is pleaded in the alternative to the breach of contract claim."[38] They appear to acknowledge that declaratory judgment claims should be dismissed when they depend on an underlying breach of contract claim, but they argue that this rule does not apply when, "as here, a claim [is] pleaded in the alternative."[39] This argument immediately falters because the Amended Complaint contains no statement that the declaratory judgment claim is an alternative to the breach of contract. The only use of the word "alternative" anywhere in the Amended Complaint is the Debtors' argument that they are entitled to "the settlement amount applicable to termination on February 17, 2021 (or in the *alternative*, at least February 16)."[40] This request for the settlement amount due under a February 16 or 17 termination date refers to the Debtors' breach of contract claim, where the Debtors seek "the settlement value of the hedges on February 17, 2021, but in no event later than February 16, 2021."[41] The Debtors' insistence that they pleaded an alternative claim for declaratory judgment is not borne out in the Amended Complaint.

In any event, the declaratory judgment claim fails no matter how it was pleaded because there is no actual controversy about the date on which the termination became effective, whether

---

[38] Debtors' Opp'n Mot. Dismiss at 18.
[39] *Id.*
[40] Am. Compl. ¶ 5 (emphasis added).
[41] *Id.* ¶ 70.

February 14, 15, 16, or 17. In all of these cases, the settlement amount would be the same because Shell Energy had the right to "suspend performance" on February 14.[42] Once Shell Energy stopped delivering electricity to the Debtors, the Settlement Amount became fixed because that Amount is based on the "the amount that would be incurred . . . to replace or to provide the economic equivalent of the remaining . . . deliveries in respect of that Terminated Transaction."[43] There were no remaining power deliveries after February 14 because Shell Energy stopped those deliveries on February 14 due to the Debtors' defaults. It makes no difference whether that February 14 stoppage was (1) a suspension that became permanent a few days later or (2) a termination with immediate effect—either way, the Settlement Amount would be the same.

**B. Implied Duty of Good Faith and Fair Dealing**

The Debtors' good faith and fair dealing claim is likewise duplicative of their futile breach of contract claim. The Shell Defendants explained in their Motion to Dismiss that "New York law does not permit parties to use the implied covenant to rewrite their contractual relationship,"[44] and the Debtors responded by recasting their good faith and fair dealing claim as "aris[ing] from the Shell Defendants' breach of the existing terms of the contracts."[45] This maneuver cannot save the claim because New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)). This Court should dismiss the claim because "courts routinely dismiss a claim for breach of an implied covenant of good faith as redundant" when, as here, "the conduct allegedly violating the implied covenant is

---

[42] EEI Master Contract § 5.2.
[43] Master Agreements Cover Sheet at 5 (adding § 5.2(ii)).
[44] Shell Defs.' Mot. Dismiss at 21.
[45] Debtors' Opp'n Mot. Dismiss at 19.

also the predicate for breach . . . of an express provision of the underlying contract." *LePatner & Assocs., LLP v. RSUI Grp., Inc.*, No. 21-CV-3890 (JSR), 2021 WL 4555761, at *2 (S.D.N.Y. Oct. 4, 2021) (alteration in original) (quoting *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 564 (S.D.N.Y. 2004)).

## IV. The Court Should Dismiss the Claims Arising Under Title 11

### A. Disallowance of the Shell Defendants' Claims

The Debtors do not dispute that, if the Court dismisses Counts IV (Turnover of Estate Property) and VII (Avoidance of Fraudulent Transfers), then the Court should also dismiss Count III in which it seeks the disallowance, under 11 U.S.C. § 502(d), of the Shell Defendants' proofs of claim. Indeed, in their Opposition the Debtors cite *In re IFS Fin. Corp.*, No. 02-39553, 2008 WL 4533713 (Bankr. S.D. Tex. Oct. 2, 2008), in which this Court held that § 502(d) "operates to enforce orders and judgments, not to disallow claims based on theoretically avoidable transfers when no liability has been established and when no liability can be established." *Id*. at *5. In *IFS Fin. Corp.,* this Court dismissed the § 502(d) claim after concluding that the plaintiff's claim under § 544 should be dismissed. *Id*. Here, as explained below, the Court should dismiss the Debtors' claims under Counts IV and VII and, accordingly, the § 502(d) claim must also fail.

Moreover, the Court should dismiss the Debtors' § 502(d) claim because it is premature. The Debtors rely on *Seitz v. Frorer (In re Covenant Partners, LP.)*, 531 B.R. 84 (Bankr. E.D. Pa. 2015) for the proposition that the Court should not dismiss a § 502(d) claim until it has ruled on its avoidance claims. However, the *Seitz* decision was rendered by a court in the Third Circuit, not the Fifth Circuit, and the court in *Seitz* expressly declined to follow the Fifth Circuit's decision in *In re Davis*, 889 F.2d 658, 662 (5th Cir. 1989), as well as decisions in the Eighth and Ninth Circuits, in which the courts held that it is premature to plead a § 502(d) claim before the avoidance claims have been adjudicated. *Seitz*, 531 B.R. at 100 (citing *In re Davis*, 889 F.2d 658, 661–62

(5th Cir. 1989); *In re Odom Antennas, Inc.*, 340 F.3d 705, 708 (8th Cir. 2003); *In re Parker N. Am. Corp.*, 24 F.3d 1145, 1155 (9th Cir. 1994)).

The Debtors also rely on this Court's decision in *Lovett v. Cardinal Health, Inc. (In re Diabetes America, Inc.)*, 485 B.R. 340 (Bankr. S.D. Tex. 2012) for their contention that the § 502(d) claim is not premature. The issue this Court addressed in *Lovett* was whether the plan agent under a confirmed Chapter 11 plan had standing to prosecute avoidance actions as well as a § 502(b) claim. The Court did not address whether the § 502(d) claim was premature. *Lovett*, 485 B.R. at 360.

The Fifth Circuit has clearly stated that § 502(d) is "designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate." *In re Davis*, 889 F.2d at 662. Here, this lawsuit has only been recently filed, the Court has not ruled that the Shell Defendants are holding any funds that belong to the estate and, if through this proceeding it is determined that the Shell Defendants owe funds to the estate, there is no basis to assert that the Shell Defendants would withhold payment from the estate. The Court should dismiss the § 502(d) claim.

**B. Turnover of Estate Property**

As a threshold matter the Debtors do not dispute the well-settled law articulated by this Court in *In re ATP Oil & Gas Corp.*, No. 12-36187, 2015 WL 1093568, at *3 (Bankr. S.D. Tex. Mar. 10, 2015) that § 542(a) cannot be used to liquidate contract disputes. Instead, they claim that, rather than using §542(a) to liquidate their dispute, they only seek to recover the "undisputed portion" of the "Invoiced Amount and/or all other amounts to which the Debtors are entitled under Section 4.1(b) of the EEI Master Agreements."[46]

[46] Debtors' Opp'n Mot. Dismiss at 21.

The Debtors' response is fundamentally flawed because they fail to identify, either in the Amended Complaint or in their Opposition, the amount of the claim that they contend is undisputed. Plainly, the Debtors are seeking to liquidate their claim, rather than recover undisputed funds that the Shell Defendants are holding.

The three cases the Debtors cite in support of their argument all deal with actions to compel the turnover of specific amounts in dispute. *Georgia Pacific Corp. v. Sigma Serv. Corp*., 712 F.2d 962 (5th Cir. 1983) involved a dispute over whether a specific sum, $63,187.30, constituted property of the bankruptcy estate, which could be recovered under § 542, or whether the funds were subject to a constructive trust in favor of other creditors. The amount at issue was not in dispute and it did not need to be liquidated. *Id*. at 965. Likewise, *In re Allied Holdings, Inc. v. Volvo Parts North America, Inc. (In re Allied Holdings, Inc.)*, No. 05-12518, 2008 WL 7874786 (Bankr. N.D. Ga. July 11, 2008) involved whether $561,743.77 in overpayments made post-petition by the debtor constituted property of the debtor's estate and should be repaid to the debtor or whether Volvo could exercise its right of recoupment as to the overpayments. *Id*. at *2. Again, the amount at issue was not in dispute and did not need to be liquidated. Instead, the issue was whether the sum belonged to the debtor's estate or whether Volvo could exercise its right of recoupment. Lastly, *Steed v. Parrott Marine Systems, Inc. (In re Weaver Development Co., LLC),* No. 06-33059, 2008 WL 5650060 (Bankr. E.D. Tenn. Nov. 5, 2008) involved whether $94,836 that the debtor paid as a deposit constituted property of the debtor's estate and should be repaid. *Id*. at *6. As in the other cases the Debtors relied on, the parties did not dispute the amount of the deposit and the amount did not need to be liquidated. Rather, the issue the court addressed was whether the deposit belonged to the debtor's estate and should be paid to the estate.

Although the Debtors do not contest that a § 542(a) claim is not an appropriate means to liquidate contract disputes, they are, in fact, impermissibly attempting to use § 542(a) to liquidate their disputed contract claim against the Shell Defendants.

Lastly, the Debtors do not dispute that they have sued the Shell Defendants under the wrong subsection of § 542. As the Shell Defendants noted in their Motion to Dismiss, "[w]hile Section 542(a) applies to property of the estate generally and to property the debtor may exempt, Section 542(b) applies specifically to debts that are property of the estate." *In re Turner Grain Merch., Inc.*, 557 B.R. 147, 150 (Bankr. E.D. Ark. 2016). Here, "the [Amended] Complaint specifically cites § 542(a), not § 542(b), which is fatal to the Court's ability to grant the relief requested." *In re S. Pac. Janitorial Grp., Inc.*, 586 B.R. 769, 770 (Bankr. C.D. Cal. 2018). In the Opposition, the Debtors respond that "it would be a simple amendment for the Debtors to make" to state a claim under § 542(b) rather than under § 542(a).[47] The Court should dismiss the Debtors' § 542(a) claim.

**C. Equitable Subordination**

The Fifth Circuit has "largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *In re U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994). The Debtors do not allege in their Amended Complaint, or contend in their Opposition, that any of these three paradigms applies here. Indeed, the Debtors fail even to address this test that the Fifth Circuit articulated in *In re U.S. Abatement Corp.* and applied in subsequent cases.

Rather than address the Fifth Circuit standard, the Debtors look outside the Fifth Circuit for a more lenient standard that they might be able to meet. The standard they claim they can meet

[47] Debtors' Opp'n Mot. Dismiss at 22 n.5.

is that a substantial breach of contract when coupled with inequitable conduct, or with a violation of the implied covenant of good faith and fair dealing, can establish a sufficient basis to equitably subordinate a non-insider's claim. The Debtors cite no opinions from courts in the Fifth Circuit that have applied this broader, more lenient, standard. Moreover, courts from other jurisdictions that apply this standard would still dismiss the Debtors' equitable subordination count because, even under this more lenient standard, the Debtors' still fail to state a claim.

The Debtors first cite *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Associates)*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994), in support of their contention that this Court should apply a broader standard to permit their equitable subordination claim to proceed. In *Nassau* the Court summarized the standard it applied as follows:

> Hence, the standard of inequitable conduct that justifies subordination of a non-insider/non-fiduciary's claim can be summarized in the following manner: unless the creditor has dominated or controlled the debtor to gain an unfair advantage, his claim will be subordinated, based upon inequitable conduct, only if the claimant has committed some breach of an existing, legally recognized duty arising under contract, tort or other area of law. In commercial cases, the proponent must demonstrate a *substantial* breach of contract and advantage-taking by the creditor.

*Id.* at 840 (emphasis added). The court in *Nassau* found that the plaintiff had failed to allege the breach of a duty that would warrant equitable subordination, and it dismissed the lawsuit. It further found that the complaint failed to allege a legally sufficient injury to the creditor body to justify equitable subordination noting that the filing of a bankruptcy petition, without more, is a legally insufficient allegation of injury to satisfy the requirements of equitable subordination. *Id.* at 843.

In *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.*), 264 B.R. 137 (Bankr. S.D.N.Y. 2001), which the Debtors also cite, the court explained the standard set forth in *Nassau* stating that the degree of wrongful conduct that would warrant the equitable subordination of a non-insider/non-fiduciary's claim must be "'gross and egregious,' 'tantamount to fraud, misrepresentation, overreaching or spoliation' or

'involving moral turpitude.'" *Id.* at 135 (quoting *In re Granite Partners, L.P.*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997)). The court noted that the types of actions that would justify subordinating a non-insider's claim include (i) the exercise of control over the operations of the debtor in such a manner as would benefit the non-insider at the expense of other creditors, (ii) where a non-insider makes major decisions for the debtor such as hiring or firing employees, or (iii) where the non-insider determines what bills will be paid. *Id*. at 136. The Court in *Lois/USA* dismissed the equitable subordination claim.

The Debtors also rely on *Kham & Nate's Shoes No., Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990) in which the Seventh Circuit reversed and remanded a bankruptcy court order that equitably subordinated a bank's claims. In rendering its decision, the Seventh Circuit did not articulate a test for subordination. Instead, it noted that "[c]ases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between." *Id*. at 1356. It further noted that "[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of "good faith.'" *Id*. at 1357. Lastly, it concluded that "The [Defendant] was entitled to advance its own interests, and it did not need to put the interests of Debtor and Debtor's other creditors first." *Id.* at 1358.

*In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991), which the Debtors also cite, does not support the Debtors' claim for a broader standard for equitable subordination claims against non-insiders/fiduciaries. *In re Fabricators* involved an equitable subordination action against an insider of the debtor and, as the court recognized, "[a] claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts." *Id*. at 1465. As the Court stated, "[a]ccordingly, whether a claimant is an insider of the debtor can be fundamentally important in an equitable subordination case in that it effects the standard of scrutiny a court will

apply." *Id*. Here, the Debtors have not alleged and cannot allege that the Shell Defendants are insiders and the standard that the Fifth Circuit applied in *In re Fabricators* does not apply here.

Even under the standard articulated in the cases that the Debtors cite, a breach of contract is not sufficient for a court to equitably subordinate a claim—only actions that are "gross and egregious" or involve moral turpitude could justify subordination. The Debtors identify in the Opposition the allegations of the Amended Complaint they contend are sufficient to state a claim against the Shell Defendants.[48] In sum, the Debtors claim that the Shell Defendants breached their contracts with the Debtors when they terminated the contracts and ceased delivering electric power to the Debtors, which enabled the Shell Defendants to sell the power at higher rates to third parties and caused the Debtors to file petitions in bankruptcy.[49] But the Shell Defendants were non-insiders/fiduciaries that complied with their contractual obligations at all times and they enforced their legitimate contract rights—nothing more.

The equitable subordination count should be dismissed under the standard applied by the Fifth Circuit. Moreover, the Debtors have failed to allege any facts that would lead any court to conclude that the Shell Defendants engaged in gross and egregious conduct or that their actions rose to the level of moral turpitude, and the equitable subordination count should be dismissed under any standard applied by courts in other circuits.

**D. Avoidance of Fraudulent Transfers**

The Debtors fail to state a claim under 11 U.S.C. § 548(a)(1)(A) for avoidance of fraudulent transfer. This claim should be dismissed for three reasons.

---

[48] *Id.* at 23.
[49] *Id*.

First, the Debtors allege in Count VII that "the Transfers are avoidable," but they do not define "Transfers." In the Opposition, the Debtors state that the "allegations in the [Amended] Complaint leave little doubt as to the nature of the Transfers."[50] They then proceed to state that "any further detail concerning the Transfers" is in the exclusive control of the Shell Defendants. *Id*. at 26. Yet the Amended Complaint provides no context that would allow the Shell Defendants or the Court to determine what Transfers are at issue.

Second, the Amended Complaint fails to allege that the Debtors fraudulently intended to make the Transfers and, instead, improperly focuses on the Shell Defendants' intent. In the Opposition, the Debtors contend that "when a transferee is in a position to dominate or control the debtor's disposition of the property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor."[51] Although, as the Shell Defendants noted in the Motion to Dismiss, the "control rule" can provide a basis under limited circumstances for a court to impute the transferee's intent to the transferor, the control rule is almost always restricted to transfers among affiliated entities. Indeed, the cases the Debtors cite in their Opposition prove this point. In *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008), the transfers which were the subject of the fraudulent transfer action had been made by the debtor to its parent company. *Id*. at 369. In *Physicians Res. Group, Inc. v. Burch (In re Physicians Res. Group, Inc.)*, No. 00-30748, 2003 Bankr. LEXIS 2321 (Bankr. N.D. Tex. Mar. 13, 2003), the transfers which were the subject of the fraudulent transfer action had been made by the debtor to an insider/affiliate. *Id.* at *47.

[50] *Id*. at 25.
[51] *Id*. at 26.

As the Shell Defendants noted in their Motion to Dismiss, courts consider the following facts in determining whether a basis exists to impute the transferee's intent to the Debtor: "(1) whether the transferor and transferee are affiliated companies, or alternatively, are independent and unaffiliated; (2) the extent to which the relationship between transferor and transferee was at arm's length and their interests potentially hostile; (3) the existence of a 'continuous institutional channel through which the transference of fraudulent intent simultaneous with a disposition of property could be effected;' and (4) whether an agency relationship existed between transferor and transferee." *ASARCO LLC*, 396 B.R. at 369 n.105 (quoting *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 448–49 (S.D.N.Y. 2001)). Here, the Debtors did not allege, and cannot allege, any of these factors. The Debtors and the Shell Defendants were not affiliated in any manner, and their relationship was that of an arm's length commercial relationship.

Third, even if the Shell Defendants were the proper focus, the Debtors have failed to allege any facts supporting their claim that the Shell Defendants acted with actual fraudulent intent to hinder, delay, or defraud the Debtors' creditors. The Debtors do not dispute that Rule 9(b), which requires that allegations of fraud be pleaded with particularity, must be observed in a § 548 action alleging the defendant acted with the actual intent to hinder, delay, or defraud creditors. The Debtors also do not dispute that the allegations in the Amended Complaint are not sufficient to meet the Rule 9(b) standard. Instead, the Debtors contend that the Court should apply a relaxed standard for Rule 9(b) because they require additional discovery from the Shell Defendants to plead sufficient facts.[52] In support of their argument they rely on three cases that, although they do not involve fraudulent transfer claims, state generally that, when information is peculiarly within the defendant's knowledge, less detail is required. *See Allstate Ins. Co. v. Benhamou*, 190

[52] Debtors' Opp'n Mot. Dismiss at 28.

F. Supp. 3d 631 (S.D. Tex. 2016) (RICO litigation); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2002 WL 32107216 (S.D. Tex. Aug. 12, 2002) (securities fraud litigation); *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674 (6th Cir. 1974) (RICO litigation).

Here, the Amended Complaint lacks any detail that supports an allegation that the Shell Defendants sought, with actual intent, to hinder, delay, or defraud the Debtors' creditors. Even applying a relaxed standard for Rule 9(b), the Amended Complaint is insufficient. Moreover, the Debtors have not alleged and cannot allege that they were affiliated in any manner with the Shell Defendants or that the transactions between the Debtors and the Shell Defendants were anything other than arm's length. The fraudulent conveyance count fails as a matter of law and should be dismissed.

### E. Recovery of Fraudulent Transfers

The Debtors' final cause of action is a claim under 11 U.S.C. § 550(a) that they "are entitled to recover from Shell Energy . . . the total amount of the Transfers," plus interest and costs. This § 550(a) claim presumes that the Debtors are entitled to avoid the "Transfers" pursuant to 11 U.S.C. § 548(a)(1)(A). Because the Debtors have failed to show that they satisfy the requirements of § 548(a)(1)(A), their final claim should be dismissed.

## CONCLUSION

The Court should dismiss for failure to state a claim the Debtors' causes of action against the Shell Defendants.

Dated: February 7, 2022

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Todd A. Atkinson*
Paul B. Turner (TX Bar No. 24053638)
Todd A. Atkinson (TX Bar No. 24121426)
811 Main Street, Suite 3130
Houston, Texas 77002

Telephone: (346) 998-7801
Facsimile: (346) 998-5901
Email: paul.turner@wbd-us.com
todd.atkinson@wbd-us.com

Christopher W. Jones (admitted *pro hac vice*)
Samuel B. Hartzell (admitted *pro hac vice*)
555 Fayetteville Street, Suite 1100
Raleigh, NC 27601
Telephone: (919) 755-8173
Facsimile: (919) 755-6771
Email: chris.jones@wbd-us.com
sam.hartzell@wbd-us.com

*Counsel for Defendants Shell Energy North America (US), L.P. and Shell Trading Risk Management, LLC*

**CERTIFICATE OF SERVICE**

I certify that on February 7, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Todd A. Atkinson*
Todd A. Atkinson