## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO.: 21-31070 |
| ENTRUST ENERGY, INC.,[1] | CHAPTER 11 |
| **Debtors** | Jointly Administered |
| ANNA PHILLIPS, as trustee of the ENTRUST LIQUIDATING TRUST, | ADV. PROC. NO.: 21-ap-3930 |
| **Plaintiff,** | |
| v. | |
| SHELL ENERGY NORTH AMERICA (US), L.P., | |
| **Defendant.** | |

### THIRD AMENDED COMPLAINT

Anna Phillips, solely in her capacity as Liquidating Trustee (the "Trustee") of the Entrust

Liquidating Trust (the "Trust"), plaintiff by assignment of claims from Entrust Energy, Inc. (*fka*

Retail OPCO of Texas, Inc.) ("Entrust Energy"), Entrust Energy East, Inc. (*fka* North Eastern

States, Inc.), ("Entrust East") and Power of Texas Holdings, Inc. ("POTX") (collectively,

"Entrust"), by and through its undersigned counsel, files this third amended complaint (the

"Complaint") against Shell Energy North America (US), L.P. ("Shell"), stating as follows:

---

[1] The Debtors in these chapter 11 cases that are subject to the Plan and the Trust Agreement are: Entrust Energy, Inc.; Entrust Treasury Management Services, Inc.; Entrust Energy East, Inc.; Power of Texas Holdings, Inc.; Akyta Holdings, Inc.; Enserve, Inc.; Akyta, Inc.; Energistics, Inc.; NGAE, Inc.  The Trustee's mailing address is P.O. Box 500787, Atlanta, Georgia 31150.

The chapter 11 cases of the following Debtors have been dismissed: Knocked, Corp.; SPH Investments, Inc.; Akyta IP, Inc.; Surge Direct Sales, Inc.; Entrust Energy Operations, Inc.; and Strategic Power Holdings, LLC.

## I.   SUMMARY OF THE ACTION

1.      This action arises from Shell's wrongful termination of energy supply transactions and other contract rights under a series of related contracts with Entrust. Debtors Entrust Energy, Entrust East, and POTX were among parties to various agreements with Shell and certain of its affiliates under which Shell and its affiliate(s) provided comprehensive services, including commitments to sell physical electric power to Entrust on a continuous, long-term basis at specified prices and quantities. In February 2021, Shell immediately and without legal justification terminated all of Entrust's energy transactions and other contract rights on the eve of Winter Storm Uri, a major winter and ice storm that left millions across Texas without power. Shell's actions forced Entrust to buy replacement energy at record-high real-time prices, which, in turn, forced Entrust into bankruptcy and liquidation.

2.      As temperatures plummeted in advance of Winter Storm Uri, weather forecasts turned increasingly bleak for the week of February 15, 2021. Estimates of electric power consumption across Texas escalated sharply, and forward market prices for electric power skyrocketed to levels far higher than the prices at which Shell had contractually committed to sell power to Entrust. In particular, market prices for electricity in the real-time energy markets administered by the Electric Reliability Council of Texas ("ERCOT") rose from prices typically below $50 per megawatt hour ("MWh") to the market-capped price of $9,000/MWh. The market prices remained at these exponentially high levels for days during Winter Storm Uri.

3.      On Saturday, February 13, 2021, Shell was informed by one of its major suppliers of natural gas used to generate electrical energy for the ERCOT market that it was declaring a force majeure under their contract, and might not provide Shell with all of the contracted natural gas supply during Winter Storm Uri.  Shell did not declare a force majeure under its contracts with Entrust, likely in part because the contracts forbid declaration of a force majeure arising from

Shell's own supply issues.   The next day, Shell demanded that Entrust agree to a mutual termination of their contracts with Entrust, which would have freed up the massive volume of energy that Shell was obligated to supply to Entrust at low prices, and would have permitted Shell to use the energy for its obligations to other customers or for resale in the spot market at a massive profit without any adverse implications for Shell.   Entrust did not consent to Shell's proposal, but Shell was not deterred.   That evening, on Sunday, February 14, 2021, just hours before the full effects of Winter Storm Uri were felt across Texas, Shell sent a notice by electronic mail purporting to unilaterally terminate with immediate effect all transactions and contractual obligations between Entrust and Shell and its affiliates, including transactions under contracts that obligated Shell to deliver electrical power to Entrust. Shell then immediately ceased its deliveries of physical electricity to Entrust, thereby obtaining control of a massive volume of energy that Shell could provide to other customers to address its own supply issues or sell in the spot market at a huge profit.

4.      However, pursuant to the terms of the contract documents that governed the parties' relationship, no Event of Default had arisen that would have permitted Shell to terminate or suspend such contracts/transactions.  Shell's claimed Event of Default was a violation of Entrust's internal Risk Policy on Sunday, February 14, 2021, because historically unprecedented and rapidly changing weather had caused Entrust's hedging rate to fall below 90 percent hedged for that Sunday's forecast.  But Shell's claim was a misrepresentation of Entrust's Risk Policy, as the policy merely provides that when hedging falls below 90 percent hedged for a particular day, the data must be sent to upper management so that upper management can exercise its business judgment and decide whether to purchase additional day-ahead transactions, or rely on the real-time market.  The Risk Policy was not violated merely by the existence of a hedging rate falling

below 90 percent because of rapidly changing weather conditions and resulting demand.  Shell knew or should have known that its claim of a Risk Policy default was incorrect, but its precipitous decision to terminate energy transactions was driven by events other than an Event of Default on the part of Entrust.  Within hours of Shell's termination of all Transactions, actions taken by ERCOT forced down statewide demand for energy which meant that Entrust was "long" on its hedged energy on February 15, 2021.

5.     Even if Shell could have properly terminated or suspended its contractual obligations to Entrust, Shell's termination notice delivered on Sunday, February 14, 2021, could not have become effective under the parties' contracts until the close of business on February 16, 2021, and Shell would not have been entitled to terminate or suspend any transactions until after the effectiveness of such notice, and until Shell had designated an "Early Termination Date" under the parties' EEI Master Agreements (defined below).  Shell remained obligated to deliver contracted energy until such permissible termination.

6.     Shell's wrongful attempt to terminate its contractual obligations just hours before Winter Storm Uri's arrival, and Shell's consequent refusal to provide electricity to Entrust in conformity with Shell's contractual obligations, forced Entrust to purchase electricity (to meet its customers' needs) at dramatically elevated ERCOT day-ahead and real-time spot market prices that Entrust could not afford.[2] Shell's precipitous actions had the immediate and foreseeable effects of putting Entrust in default in the ERCOT market and forcing Entrust into bankruptcy.

7.     Entrust was not in violation of its Risk Policy on Sunday, February 14, 2021.  Even if Shell could have identified a breach of the Risk Policy or other breach of contract by Entrust,

---

[2] ERCOT administers a day-ahead and real-time energy market in which electric power is purchased and sold the day before and the day of flow, respectively. The Debtors entered into bilateral forward contracts with Shell for the vast majority of their projected energy needs and, accordingly, would only be subject to day-ahead and real-time ERCOT spot market prices for the balance of their requirements, if any.

applicable New York law provides that Shell's immediate termination of all energy transactions and immediate repudiation of all contractual obligations before its termination notice could have become effective was a material breach that superseded any prior contract breach by Entrust. Shell's material breach rendered Entrust the "Non-Defaulting Party" under the parties' EEI Master Agreements, and under applicable New York law.  As a result, whether or not there was an Entrust Event of Default that preceded Shell's wrongful termination, Shell was the breaching party under the EEI Master Agreements, while Entrust was the "Non-Defaulting Party" with the right to select the Early Termination Date from which termination-related damages are calculated.  Shell's termination was an intentionally wrongful breach of contract, violated the covenant of good faith and fair dealing, and raises various remedies under federal and state law pertaining to setoff, equitable subordination, and avoidance of fraudulent transfers.

8.     The Trust, as assignee of Entrusts' claims, seeks recovery of the damages and costs that Entrust incurred due to Shell's improper termination of its contractual obligations on February 14, 2021, and incurred due to Shell's other actions and violations of applicable laws described herein.  On August 18, 2021, as the Non-Defaulting Party, Entrust provided Shell with a pre-litigation calculation of the Termination Payment due to Entrust under the EEI Master Agreements based on Entrust's selection of February 17, 2021, as the Early Termination Date, plus applicable default interest as defined in the EEI Master Agreements, which continues to accrue at Libor plus ten percent, and attorney's fees and costs.

9.     On November 30, 2022, the Court entered an Order in this Action on a motion for partial summary judgment filed by the Trust, finding that Shell's termination notice delivered on February 14, 2021, in which Shell claimed a right of "immediate" termination, would be effective notice at the close of business on February 16, 2021, presuming there was a contractual basis for

Shell's delivery of such notice (the "MSJ Ruling"). Such date marks the first possible Early Termination Date from within a twenty-day range, to be chosen by the Non-Defaulting Party, but does not impact the Trust's claims that Entrust was the Non-Defaulting Party with the right to designate February 17, 2021, as the Early Termination Date. The Trust seeks further damages arising from Shell's bad faith termination of the parties' contractual relationship and all obligations thereunder in violation of the covenant of good faith and fair dealing, and in connection with related claims pleaded herein, as well as interest on the foregoing amounts, all calculated in accordance with the terms of the agreements. The Trust further seeks certain declarations as to Entrust's rights under the contract documents that governed the parties' relationship, and various forms of equitable relief and avoidance of transfers as permitted under the Bankruptcy Code and described more fully below.

## II.   THE PARTIES

10.     The Trustee as Plaintiff in this adversary proceeding represents the interests of the Trust, having been duly appointed in the above-captioned Chapter 11 Cases pursuant to the plan of liquidation confirmed therein (the "Plan"). The Plan and the order confirming the Plan provide for the establishment of the Trust on the Effective Date according to the terms and conditions of that certain *Liquidating Trust Agreement and Declaration of Trust* dated January 6, 2022 (the "Trust Agreement"), at which time the Trustee was appointed to administer the Trust. Pursuant to the Trust Agreement and the Plan, the Trustee has the authority to pursue the claims asserted in this amended complaint, first filed by the Entrust debtors prior to plan confirmation.

11.     Entrust Energy is a Texas corporation with its principal place of business in Houston, Texas. Prior to filing bankruptcy, Entrust Energy, together with its debtor affiliates, was a retail energy company headquartered in Houston, Texas that, for more than a decade, sold and delivered electricity and natural gas commodities to residential and commercial customers in

deregulated utility markets across the United States, including Texas, Illinois, Maryland, New Jersey, New York, Ohio, and Pennsylvania.

12.     Entrust East is a Delaware corporation with its principal place of business in Houston, Texas.

13.     POTX is a Texas corporation with its principal place of business in Houston, Texas.

14.      On March 30, 2021 (the "Petition Date"), the Entrust entities filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"). The Entrust bankruptcy cases are jointly administered under the lead case *In re Entrust Energy, Inc.*, Case No. 21-31070-MI (the "Chapter 11 Cases").

15.     Defendant Shell is a Delaware limited partnership with its principal place of business in Houston, Texas.

### III.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding. 28 U.S.C. § 157(b)(2).

17.     Pursuant to Rules 7008 and 9027(a) of the Federal Rules of Bankruptcy Procedure, the Trust consents to entry of final orders by this Court in this adversary proceeding.

### IV.     FACTUAL BACKGROUND

**A.     The Parties**

18.     The Entrust entities were retail energy marketers that sold and delivered electricity and natural gas commodities to residential and commercial customers in deregulated utility markets across the United States.

19.     Shell is a wholesale supplier of physical electric power and natural gas in the markets in which Entrust provided retail supply to their customers.

20.     Shell and its affiliates provided to Entrust and many other retail energy suppliers a comprehensive package of services. Shell explained in its online marketing directed at retail suppliers that, upon entering into arrangements similar to the one at issue in this Complaint, Shell and its affiliates would provide retail energy providers (who were smaller and less creditworthy than Shell) with comprehensive services comprised of "access to the capital and credit, energy expertise, and commodity supply you need—all under one roof."[3] Shell and Entrust entered into such a comprehensive arrangement in 2019, under which Shell sold physical energy products on a wholesale basis to Entrust, thereby providing a hedge to Entrusts' physical delivery and sales obligations.

**B.     The Parties' Contractual Relationship**

21.     Effective July 31, 2019, Shell and Shell Trading Risk Management, LLC ("STRM"), on the one hand, and Entrust Energy, Entrust Treasury Management Services, Inc., Entrust East, POTX, Knocked, Corp., Enserve, Inc., Akyta, Inc., Akyta Holdings, Inc., Entrust Energy Operations, Inc., SPH Investments, Inc., Akyta IP, Inc., Surge Direct Sales, Inc., and Energistics, Inc. (collectively, the "Entrust Contract Parties"), on the other hand, entered into a Second Amended and Restated Global Agreement (the "Global Agreement"). The Global Agreement governed the relationships that were set forth in the various related contracts between Shell and/or STRM and the Entrust Contract Parties. For example, under the Global Agreement, Shell agreed to provide credit and loans to the Entrust Contract Parties under a separate Loan Agreement (defined below).[4]

---

[3] https://www.shell.us/business-customers/shell-energy-north-america/energy-retailers.html.
[4] Pursuant to the Second Amended and Restated Loan Agreement ("Loan Agreement") between Shell and the Entrust Contract Parties, under which Shell agreed to establish a revolving credit facility in a specified amount upon which the Entrust Contract Parties could borrow, prepay, and reborrow, and to make certain drawdowns or advances, including letters of credit or guarantees on behalf of the Entrust Contract Parties, and under which the Entrust Contract Parties agreed to pay certain Interest.

22.     Contemporaneously with or prior to execution of the Global Agreement, Entrust Energy, Entrust East, and POTX each entered into a Second Amended EEI Master Power Purchase and Sale Agreement with Shell (the "EEI Master Agreements"). The EEI Master Agreements are form contracts used throughout the energy industry to create a contractual framework to govern the physical sales of electric power, in this case, sales from Shell to Entrust. As is also typical in the electric power industry, the purpose of using the EEI Master Agreements was to reduce transaction costs and facilitate the efficiency of entering into multiple individual transactions with the same party for the purchase and sale of physical electric energy.

23.     Utilizing the framework and general terms and conditions supplied by the EEI Master Agreements, each of the Entrust entities entered into various arrangements with Shell under which Entrust agreed to purchase, and Shell agreed to deliver electric power on a long-term basis at prices and quantities specified and agreed to in Confirmations[5] between Entrust and Shell (the "Transactions").[6]  Pursuant to Section 2.2 of the EEI Master Agreements, each of the EEI Master Agreements and all Transactions thereunder form a single integrated agreement between that Entrust entity and Shell.  By purchasing anticipated future energy needs from Shell at fixed prices, Entrust was able to reduce the risk that future daily power requirements would lead to excessive purchase costs from the ERCOT day-ahead and real-time markets.

24.     Appendix D-1 of the Global Agreement required the Entrust Contract Parties to report an extensive amount of information to Shell on a regular, ongoing basis, including, among other things: ████████████████████████████████████████████████

---

[5] Confirmation" under the EEI Master Agreement is a document substantially in the form of Exhibit A to the EEI Master Agreement sent by Seller to Buyer or Buyer to Seller shortly after a Transaction has been entered into, summarizing the key terms, including the quantity, price, delivery point, and delivery period to which the parties have agreed to for purposes of that specific Transaction.
[6] "Transaction" is defined under Section 1.60 of the EEI Master Agreements to mean "a particular transaction agreed to by the Parties relating to the sale and purchase of a Product pursuant to this Master Agreement."

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████.

25.   ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████.

26.     The parties entered into the Global Agreement because they had developed, and intended to continue to develop a substantial business relationship under which the Entrust Contract Parties would buy physical and financial power and related products from Shell, and Shell and/or its affiliates would provide certain credit support to the Entrust Contract Parties.

27.     In addition to the EEI Master Agreements, the parties entered other agreements contemporaneously with or prior to the Global Agreement, including:



28.     The Entrust Contract Parties simultaneously provided a promissory note to Shell

under which ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████.

29.     Collectively, these agreements gave Shell nearly complete control over many aspects of Entrust's businesses, including their financing, risk exposure, operating budget, ability to contract with third parties, and ability to pay debts as they came due.

C.     **The ERCOT Market and the Effect of Winter Storm Uri on Retail Energy Suppliers**

30.     ERCOT is an independent system operator that has operational control of the electric transmission grid in most of Texas. For purposes of this complaint, ERCOT served two crucial roles during the days in question: maintaining the electrical transmission grid and administering the real-time and day-ahead markets by which entities purchased and sold physical electric power products and related services.

31.     With respect to the former responsibility, in order to maintain the integrity of the grid, ERCOT was faced with the task of balancing energy consumption (load) with energy generation on a real-time basis. In order to ensure sufficient energy supplies for retail energy customers served by retail electricity suppliers such as Entrust, the retail supplier is required to purchase enough physical power from the ERCOT system at ERCOT market prices to meet the ever-changing consumption of its customer base at all times. By entering into the Transactions for long-term continuous physical delivery of electric power from Shell at prices fixed well in advance of the date of delivery, Entrust hedged against the physical delivery obligations and price volatility inherent in the operation of the ERCOT system and the day-ahead and real-time market model.

D.     **As Winter Storm Uri Approached Texas, Shell Preemptively Attempted to Terminate Its Contractual Obligations to Entrust**

32.     During the month of February 2021, including, but not limited to, the week of February 14-18, a record-setting winter storm named Uri engulfed the State of Texas. As a result of freezing conditions and a rapid surge in energy usage, there was a cascade of failures in the

Texas power grid, leading to widespread blackouts, property loss, and business interruptions across the state.

33.     In order to ensure that Entrust was regularly prepared for changes in weather conditions and resulting demand for energy from its customers, Entrust enacted its internal Financial Risk Management Policy (the "Risk Policy"), a true and correct copy of which is attached hereto as Exhibit A, and which is discussed more fully, below.  The Risk Policy established a variety of procedures for determining when and how to acquire future short-term and long-term energy Transactions in order to hedge against future price increases in the day-ahead and real-time markets administered by ERCOT (aka "the spot market"), as well as procedures for monitoring hedging percentages during changing weather and demand conditions.  As weather forecasts worsened for the week of February 14-18, 2021, estimated energy consumption across Texas increased rapidly and market prices for electric power skyrocketed.  By entering into the Transactions with Shell pursuant to the EEI Master Agreements, and in compliance with its internal Risk Policy, Entrust had insulated its business from much of this increasing price risk by securing continuous long-term supplies of physical electric power from Shell at fixed prices sufficient to meet most of Entrust's needs.  And, as Winter Storm Uri approached, Entrust engaged in continuous monitoring of its anticipated demand, changing weather conditions, and prices for additional supply, and further protected its business by entering into further Transactions with Shell. Shell was contractually obligated to deliver these continuous supplies of electric power to Entrust at the hedged prices, pursuant to their respective contracts, but which were now thousands of dollars per MWh below forward market prices for the week of February 14-18. In short, if Shell had not fully hedged its own needs as an energy wholesaler, but complied with its contractual obligations to deliver power to Entrust at the prices agreed to in advance by the parties, Shell stood

to lose a large sum of money. But if it could somehow terminate its obligations to Entrust and instead sell the energy to third parties at then prevailing market prices, Shell had an opportunity to make a large sum of money.[7]

34.     The entire purpose of the hedging business model that Shell offers to retail suppliers such as Entrust, as a one-stop-shopping support service, is to protect the retailer from sudden and massive shifts in energy prices that might arise from extreme weather or unanticipated demand changes.  The purpose of the Risk Policy is to monitor that process internally and ensure that the proper level of management is addressing the company's hedging strategy as price and risk levels fluctuate.  Such fluctuations in pricing are built into the model and are the risk that Shell is supposed to protect retailers from having to address at high real-time prices.  Such short-term price fluctuations are not an excuse or means for Shell to terminate such dependent contractual relationships at the very moment when retailers are relying on this critical insurance that Shell's contractual relationship is supposed to provide.  Shell builds such financial risks into its own business model, obtains profits during the vast majority of time when energy prices are stable, and cannot legitimately use potential losses during high-price scenarios such as Winter Storm Uri as an excuse to terminate a contractual relationship designed to deal with such high-price scenarios.

35.     The extreme cold temperatures brought by Winter Storm Uri were beyond forecasts, and the resulting dramatic increase in demand for energy caught the entire Texas energy industry off-guard.  Each energy provider in the wholesale and retail chain engages in hedging to protect its supply obligations against unforeseen price increases in the real-time market.  The Trust is informed and believes, and based thereon alleges, that Shell faced supply issues leading into

---

[7] Even if Shell had fully hedged its own needs as an energy wholesale, it stood in position to profit handsomely from surging prices if it could relieve itself of its sales obligations to Entrust and capture the substantially higher ERCOT sport market prices instead.

Winter Storm Uri, including from a failure to fully hedge against the unforeseen temperatures and resulting demand.  A failure to sufficiently hedge its own needs would have forced Shell to acquire energy through its contracts with various peaker plants (generating plants that only operate during peak price periods and typically charge substantially higher prices than generating plants running more regularly), and from the ERCOT-administered spot market, in order to meet its own contractual obligations to provide power to retail suppliers such as Entrust.  The more power that Shell would have had to acquire from the ERCOT spot market and peaker plants to meet its own energy obligations, the greater the loss that Shell faced from Winter Storm Uri.

**Compliance with the Entrust Risk Policy:**

36. Entrust's Risk Policy is an internal policy that contains industry-standard provisions for companies that, like Entrust, engage in the purchase and sale of electrical energy in the Texas energy market.  Among its many terms, the Risk Policy includes provisions that measure the degree to which Entrust hedged its projected energy needs at specific moments in time.  A company's risk policy in the energy market, and the hedging percentage that is deemed normal compliance, rests in large part on that company's willingness to take greater risk for greater profit, or lesser risk for a lesser return.  Entrust's Risk Policy reflects a relatively conservative approach.  Because the degree to which Entrust had hedged its energy needs was a measurement that was in constant flux, given constantly changing weather forecasts, customer additions and deletions, customer demand, and market prices for electrical energy, the Risk Policy provides that Entrust would measure its hedged percentage against the next-day load forecast once each weekday, and requires that approval of Entrust's CEO or VP of Finance was required if the resulting Net Open Position (the "Daily NOP") fell outside of a 90% - 120% hedging range during certain winter or summer months (the "Hedging Range").  If the Daily NOP fell outside of the Hedging Range, it

did not mean that the Entrust entity was in violation of the Risk Policy or in default, but merely that their upper management was required to analyze the company's energy needs to determine in their business judgment whether additional hedges were required or appropriate to protect against spot prices, or whether the existing contracts were sufficient under the circumstances, such as when they expected real-time prices to fall below day-ahead prices, or where changing weather conditions might reduce future demand.  A decision to purchase, or not purchase, additional day-ahead energy transactions in order to address or maintain a hedging percentage that fell outside of the approval band was not an Event of Default if Entrust's upper management exercised their business judgment in making such a decision.  At all times relevant to this litigation, Entrust complied with this requirement of the Risk Policy.  In particular, during the week of February 8-12, 2021, Entrust sought and obtained the approval of Entrust's CEO (in his acting capacity) or VP of Finance on each weekday through Friday, February 12, 2021, for the projected NOP for each day through Monday, February 15, 2021, when required, and for Entrust's plans to adjust any hedging as necessary by purchasing additional hedges from Shell.  Under the express terms of the Risk Policy, no further approvals of Entrust's hedging status and strategy were required until Monday, February 15, 2021, when any request for approval of the next day load forecast for Tuesday, February 16, 2021, was required to be sent to upper management by 9:45 a.m. on February 15, 2021.  Further, though such oversight was not required under the Risk Policy over weekends, Entrust's acting CEO, its VP of Finance, and its VP of Supply remained active throughout the weekend preceding Winter Storm Uri to analyze and adjust as appropriate Entrust's power supplies.

37.     The Risk Policy also provides that, during winter and summer months, Entrust was required to measure the 14-day load forecast on a twice-weekly basis, and that if the 7-day load

forecast ("7-Day NOP") fell outside of the 90% - 120% Hedging Range, then the approval request of Entrust's acting CEO or VP of Finance was required.  Unlike the requirement to obtain written approval by management oversight pertaining to the Daily NOP, the Risk Policy does not require written approval of any variance in the 7-Day NOP.  As with the Daily NOP discussed in the preceding paragraph, Entrust was not in immediate default of the Risk Policy each time the 7-Day NOP might fall outside the Hedging Range.  Rather, if the 7-Day NOP fell outside the Hedging Range during the twice-weekly reporting that was carried out under the Risk Policy, then the acting CEO and/or VP of Finance were required to analyze the companies' respective energy needs to determine in their business judgment whether additional hedges were required or appropriate to protect against spot market prices, or whether the existing contracts were sufficient under the circumstances.  Such circumstances might include situations in which they expected day-ahead and real-time prices to be lower than the price of additional hedges, or where changing weather conditions might have reduced future demand. At all times relevant to this litigation, Entrust complied with this requirement of the Risk Policy.  In particular, during the week of February 8-12, 2021, to the extent that Entrust's 7-Day NOP fell outside of the required hedging range in the Risk Policy's required reports, Entrust sought and obtained the approval of Entrust's acting CEO or VP of Finance for Entrust's continued operations and strategy for addressing such status, which was typically a strategy to purchase further energy Transactions from Shell.  This included Entrust's hedging position as of Friday, February 12, 2021, and Entrust's strategy for addressing its hedging status in light of the approaching Winter Storm Uri and the dramatic increase in market prices for electrical power.

38.     For example, Entrust's 7-Day NOP as of Friday, February 12, 2021, fell outside of the Hedging Range in the report issued on the morning of February 11, 2021, requiring the

approval of Entrust's CEO or VP of Finance for Entrust's proposed strategy, which was to purchase additional energy hedges by submitting bids through Shell for purchases on the day-ahead market.  Entrust's acting CEO and/or VP of Finance applied their reasonable exercise of business judgment to this recommendation in light of available supplies, prices in the day-ahead market, and changing weather conditions, and approved the proposed strategy in writing.  Entrust's VP of Supply shared the 7-Day NOP for Entrust with Shell on Friday, February 12, 2021, and acquired additional energy to bring Entrust's hedging percentage closer to 100% based upon weather and demand forecasts at that time.  In response, Shell did not allege that an Event of Default had arisen under any of the parties' contractual agreements.

39.    The Risk Policy did not require any action by Entrust over the holiday weekend of February 13-15, 2021.  Rather, in accordance with the Risk Policy, Entrust prepared hedging analyses on February 12, 2021, for each day through to Monday, February 15, 2021, a statutory bank holiday, and forwarded such analyses to upper management in the manner described above. The internal approvals given under the Risk Policy on Friday, February 12, 2021, fully satisfied Entrust's obligations under the Risk Policy for the week February 8, 2021, through February 15, 2021.  The next day on which Entrust's hedging compliance would be measured for compliance with the Risk Policy would be the first non-holiday "weekday" of the following week, February 16, 2021.  Nevertheless, because of the extreme nature of the approaching Winter Storm Uri, Entrust's acting CEO, VP of Finance, and VP of Supply—the management who are required to exercise their business judgment whenever next-day hedging falls outside of the Risk Policy's range—continued to exercise their business judgment respecting Entrust's hedging status, stayed in close and repeated contact with each other and Shell during the long weekend of February 13-15, 2021, and responded to various requests from Shell for updated information.

**Shell's Supply Issues Begin, Followed by the Termination Notice:**

40.     On Saturday, February 13, 2021, Shell received notice from Nextera Energy Marketing, LLC ("Nextera"), a natural gas supplier that provided natural gas for the Kiamichi generating facility, stating that Nextera had declared Winter Storm Uri a force majeure, and stating that it might result in a full or partial suspension of energy delivery obligations to Shell.  The Kiamichi generating facility is located in Oklahoma, but provides Shell with electrical energy for the ERCOT market.  The Trust is informed and believes, and based thereon alleges, that the Nextera notice did not ultimately lead to substantial supply problems for Shell, as Shell is alleged in litigation to have failed to accept all of the natural gas that was made available to it in subsequent days.  But on February 13, 2021, as Winter Storm Uri rapidly worsened, the threat of supply problems led Shell to precipitous action.  Shell did not declare a force majeure under its Contracts with Entrust, likely due in part to the contract terms that forbid a force majeure on the basis of Shell's own supply shortfalls.[8]

41.     Also on February 13, 2021, at Shell's request, Entrust's VP of Supply provided Shell with updated financial and hedging information for February 14, 2021, based on the most recent information concerning market prices for electrical energy, weather forecasts, and anticipated demand.  The email informed Shell that Entrust had submitted further bids to acquire additional energy supply to address further changes to weather and demand conditions that had increased overnight.  Shell did not declare that an Event of Default had occurred.

42.     On February 14, 2021, at Shell's request, Entrust's VP of Supply provided Shell with further updated hedging information, including the 7-Day NOP using the same template used by Entrust during their regular weekday compliance with the Risk Policy, although this ad hoc

---

[8] Section 1.24 of the EEI Master Agreement expressly ████████████████████████████ ███████████████

update for Shell was not covered by the Risk Policy as it was not a weekday report, nor one of the twice-weekly 14-day forecasts (the "Ad Hoc Update").  Because Entrust's VP of Supply provided the Ad Hoc Update using the standard template for hedging reports, it contained a chart showing the 7-Day NOP and stating that Entrust was out of compliance with the Risk Policy's hedging requirement.  As addressed above, this language meant that – if it had been a regular Monday-Friday report – the report would have needed to be delivered to Entrust's acting CEO or VP of Finance for an exercise of business judgment.  But because this Ad Hoc Update fell outside of the Risk Policy, the language claiming that approval was required was meaningless, as the Risk Policy only created such an obligation for reports prepared on a weekday schedule.  And, to whatever extent, if any, such language could be deemed to create a new obligation, or create an expectation on the part of Shell that approval was required, Entrust's VP of Finance and acting CEO demonstrated a proper exercise of their business judgment by monitoring the status of Entrust's energy needs and supplies throughout the weekend, and making their own determination as to whether additional energy hedges should be procured at then-prevailing prices.

43.    At no time on February 14, 2021, did Shell ever inquire of Entrust whether the Ad Hoc Update, or any earlier analyses, had or had not been the subject of senior managements' exercise of business judgment.  Shell never made such an inquiry because Shell was in possession of the Risk Policy, had two years of course-of-conduct experience pertaining to how the Risk Policy was implemented, and understood by its plain terms that the Risk Policy had no application to the parties' weekend discussions.  Shell also never made such an inquiry because it was in frequent contact on multiple occasions on February 13 and 14, 2021, with the Entrust management team whose business judgment would apply to any hedging that would fall outside of the Hedging Range.

44.     The purpose of the Risk Policy's 90%-120% Hedging Range is not to force the company to cease operations when hedging falls outside of this band, but to cause senior management to focus on the companies' hedging positions and their various options in situations when weather conditions, consumer demand, or other factors drive the hedging position outside of the Hedging Range.   On Friday, February 12, 2021, and throughout the following weekend, Entrust's senior management exercised prudent business judgment in the course of managing Entrust's hedging risks, even though the standard reporting/approval requirements of the Risk Policy had already been satisfied by Friday, February 12, 2021, for the period until the following weekday.   Winter Storm Uri and actions taken by ERCOT drove the market price of electrical energy to prices as high as $9,000/MWh, compared to an average price within ERCOT in 2020 of $22/MWh.   Entrust's senior management made prudent decisions concerning any need for further hedging at such prices.   For example, Entrust submitted further bids for energy on Saturday, February 13, 2021, at a time when prices were estimated to be $3,000/MWh, in recognition of the concern that future real-time prices could be even higher.

45.     Nevertheless, in conference calls between Shell management and Entrust's senior management on Sunday, February 14, 2021, Shell encouraged Entrust to agree to a mutual termination of the parties' contracts, and all pending energy Transactions thereunder that required Shell to deliver energy to Entrust at ordinary pre-storm market prices.   Any such agreement would have terminated Entrust's business immediately, would have insulated Shell from termination damages owing to Entrust, and would have provided Shell a tremendous windfall in the form of instantly available volume of energy that it could sell on the real-time market at a massive profit or use to fulfill its obligations to other customers without having to purchase its own wholesale supply shortages from the real-time market.   Entrust's senior management did not agree to a mutual

termination of the parties' contracts.  During these calls, a Shell representative informed Entrust that Shell believed it could declare a technical default by Entrust under the contracts, and unilaterally terminate if Entrust did not agree to a mutual termination.  Shell has indicated since in a brief filed in this action that this technical default was its own misinterpretation of the phrase "out of compliance" appearing in the weekend Ad Hoc Update, which was not an Event of Default, either technical or material.

46.     Unable to secure an agreement for mutual termination, and facing increasing risks to its own energy supplies caused by weather-related outages across the state, and Nextera's force majeure notice, Shell then attempted to unilaterally terminate all pending Transactions and all other obligations arising under Shell's and its affiliates' contractual relationships with Entrust, without just cause, without an Event of Default having arisen under any of the parties' agreements, and before the onset of extreme weather conditions and the resulting significant strain on Texas' power grid.  At 10:55 p.m. Central Time on Sunday, February 14, 2021, Shell issued a document entitled Notice of Default and Termination to Entrust ("Termination Notice") on behalf of both Shell and STRM, alleging material default under Section 3.17 of the Global Agreement, which requires compliance by Entrust with its Risk Policy, and stating that among other things, ***effective immediately***, (1) Shell and STRM would no longer transact with Entrust under their respective EEI Master Agreements or otherwise; (2) Shell was "immediately" terminating all outstanding energy Transactions under the EEI Master Agreements; (3) Shell was terminating all Scheduling Coordinator Agreements (which obligated Shell to schedule electricity deliveries); and (4) Shell was terminating all lending commitments to the Entrust Contract Parties under the Loan Agreement.

47.     Shell asserted in the Termination Notice that the Ad Hoc Update constituted an Event of Default under Section 3.17 of the Global Agreement, without having inquired of Entrust whether Entrust's senior management had exercised its business judgment with respect to the hedging position, without having explained how such an update during the weekend could implicate the Risk Policy, and without having explained how its discussions with Entrust's acting CEO, VP of Finance, and VP of Supply concerning Entrust's hedging status was not a reflection of their exercise of business judgment with respect to Entrust's ongoing operations.  Shell did not provide such explanations because Shell understood that there was no Event of Default under the Risk Policy.

48.     The Termination Notice states that the alleged violation of Section 3.17 of the Global Agreement was "an Event of Default."  Shell then states in the Termination Notice that "Due to the current extreme weather event, Entrust's failure to maintain hedges as required by the Global Agreement has resulted in, or will result in, expected losses to Entrust in excess of $40 million, making Entrust deeply insolvent and no longer financially viable, and Shell can no longer risk increasing its exposure to Entrust."  But Shell did not declare that such alleged insolvency was an Event of Default, as Shell went on to state that it would terminate certain agreements and transactions as a result of the singular "Event of Default" already described as an alleged violation of the Risk Policy.  Nor could Shell's allegations of Entrust's insolvency have qualified as an Event of Default under the Global Agreement as of February 14, 2021.  Section 7.1(o) of the Global Agreement defines an Event of Default ██████████████████████████████

████████████████████████████████████████████████████████████

███████████  The term "Bankrupt" is a defined term in the Global Agreement, and its terms were not satisfied by the projections stated in the Ad Hoc Update.  Such projections had yet to arise, did

not arise, and did not render Entrust "Bankrupt" under the Global Agreement. Shell was aware of this, and for this reason did not claim in the Termination Notice that a second Event of Default had arisen by reason of "Bankrupt" status.

49. The Termination Notice is flawed in multiple respects, and failed to serve as a valid notice of an event of default or right to terminate Transactions under the EEI Master Agreements, or under applicable law. Shell delivered the Termination Notice by email to Entrust's acting CEO and Managing Director, Shoichiro Osawa, at the email address shoichiro.osawa@entrustenergy.com, with the listed physical address of 1301 McKinney St #2950, Houston, TX 77010, and to Entrust's General Counsel at the email address legal@entrustenergy.com, and at the same physical address for Mr. Osawa. This physical mailing address and email address are the requirements for notice under the terms of the Global Agreement. However, the Termination Notice claims that it is not only providing notice of an Event of Default under the Global Agreement, but also terminating or repudiating Shell and STRM's respective obligations and transactions under the EEI Master Agreements, the parties' Scheduling Coordinator Agreements, and all lending commitments under the Loan Agreement. The Termination Notice does not purport to terminate the Global Agreement. Rather, because an Event of Default under the Global Agreement is also an Event of Default under the EEI Master Agreements and related contracts, Shell was attempting to notice an Event of Default under the Global Agreement as grounds for termination of all Transactions under the EEI Master Agreements, and related contracts. Such notice was ineffective.

50. Section 10.12 of the Global Agreement provides that ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████   The definition of Transaction Agreements includes the EEI Master Agreements, the Scheduling Coordinator Agreements, and the Loan Agreement, among others, and therefore Shell could only give notice of termination of those agreements, or Transactions under those agreements, by complying with any notice requirements stated in those agreements.

51.    The EEI Master Agreements provide in Section 10.7 that notice requirements will be as stated in each agreement's corresponding Cover Sheet.  The Cover Sheets for each of the Entrust Parties' EEI Master Agreements state that a notice of an event of default must be delivered to: (i) Entrust, at 1301 McKinney, Suite 2950, Attn. Contract Administration (Tori Plouffe), at the email address Shell.notice@entrustenergy.com; **and** (ii) Entrust's General Counsel, Michele Pilibosian, by facsimile to 713-338-2602, or telephone at 713-338-2610.  Shell did not deliver its Termination Notice purporting to terminate the EEI Master Agreements and the Transactions thereunder pursuant to these Notice requirements stated in the EEI Master Agreements. Even if Shell could have claimed that an Event of Default had arisen under the Global Agreement, and therefore, had also arisen under the EEI Master Agreements, Shell failed to give effective notice of its intent to terminate all Transactions under the EEI Master Agreements by failing to follow the EEI Master Agreements' notice requirements.  At no time did Shell correct its failure to deliver its Termination Notice to the required notice addresses.

52.    Section 5.2 of the EEI Master Agreements, entitled ████████████████████ ████████████████████████████████ provides a non-defaulting party with certain rights upon a properly noticed Event of Default, and upon the non-defaulting party's

declaration and notice of an "Early Termination Date." Section 5.7 of the EEI Master Agreements further provides a non-defaulting party with the right to ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ The terms of the EEI Master Agreement, and applicable law interpretating swap agreements with similar terms, do not permit an Early Termination Date to be triggered by ineffective notice, nor by a close-enough effort to imply a date in the future. The Termination Notice did not give Entrust notice of a designated Early Termination Date, but instead improperly and ineffectively purported to declare termination of contractual obligations on an immediate basis contrary to the terms of the EEI Master Agreements.

53.    Despite failing to deliver an effective Termination Notice, failing to give notice of a designated Early Termination Date, and failing to effectively exercise any right to terminate all Transactions under the EEI Master Agreements, Shell immediately terminated its performance under the EEI Master Agreements and all related contracts, and immediately cancelled all pending energy Transactions. Shell's actions constituted a material breach of the EEI Master Agreements and related contracts, which superseded any prior actual or alleged breach of contract by Entrust, and rendered Entrust the non-breaching party for purposes of designating an Early Termination Date.

54.    Shell's Termination Notice also stated that Shell and STRM would immediately "no longer transact" business with Entrust under the EEI Master Agreements, but such terms did not qualify as a suspension of Shell's obligations. Section 5.7 of the EEI Master Agreements provides that Shell could suspend its performance upon "written notice" of an Event of Default. No Event of Default had arisen, no notice had been given in compliance with the EEI Master

Agreements, and no separate notice of suspension was provided.  The terms "suspension" or "suspend" do not appear in the Termination Notice.  Instead, Shell attempted to give notice that all outstanding Transactions were immediately "terminated," not suspended, even though such notice was ineffective for all purposes.  And, as Shell did not comply with the terms of Section 5.7 requiring that any party that suspends transactions must either restore the transactions within ten (10) NERC Business Days or deliver a subsequent notice designating an Early Termination Date in compliance with Section 5.2, Shell thereby demonstrated that it did not contend or believe that it had suspended Transactions.  Even if Shell's Termination Notice could be read as an implicit notice of suspension rights, Section 10.7 of the EEI Master Agreements provides that such notice would only become effective at the close of the next Business Day, which would be February 16, 2021, and therefore any suspension commencing February 14, 2021, would have been a breach of contract even if Shell had given proper notice.

55.     Within a few hours of the delivery of Shell's Termination Notice, it became clear that Entrust senior management had prudently decided not to purchase additional hedges on February 14.  By the early hours of Monday, February 15, 2021, in part due to actions taken by ERCOT, demand for electrical energy had plummeted, and Entrust would have been hedged beyond its energy needs if Shell hadn't terminated all Transactions just hours before.  But because Shell had terminated all Transactions, Entrust was not adequately hedged, but instead had no available energy transactions to meet its customers' needs, and was forced to acquire all of its customer's needs from the ERCOT spot market.

56.     On Monday, February 15, 2021, ERCOT real-time market prices reached and remained for several days at $9,000/MWh, a 10,000% increase from pre-storm prices. Shell's Sunday evening termination, and Shell's decision to immediately cease all deliveries to Entrust

before its Termination Notice could have become effective, had a debilitating and catastrophic effect on Entrust's business that made it impossible for Entrust to pay for the energy that Entrust was forced to procure from ERCOT. This resulted in almost immediate action from ERCOT (carrying out ERCOT's published protocol) to force Entrust to send active customers back to ERCOT so that ERCOT could reassign the customers and they could be serviced by Entrust's competitor (non-defaulting) retail energy providers. This action permanently destroyed Entrust's business operations.

57.     Shell's termination of all Transactions and its termination or repudiation of its other contractual obligations was improper and constituted an attempt to circumvent both contractual and common law obligations to the Entrust Contract Parties. Shell's Termination Notice was a contrivance to serve Shell's commercial goal of extricating itself from its contractual obligations to sell massive amounts of power at sharply lower prices to the Entrust Contract Parties, and to profit from (and/or eliminate losses it would incur due to) surging spot market prices. Shell sought to do so on the pretext that Entrust had breached Section 3.17 of the Global Agreement by violating Entrust's own internal Risk Policy. Shell was wrong. In fact, the Entrust entities were in full compliance with their Risk Policy by either operating within the Risk Policy's Hedging Range, or obtaining any energy needs outside of the Hedging Range from the real-time market with all requisite approvals following an appropriate exercise of business judgment according to the Risk Policy's reporting terms. When Shell sent its Termination Notice to Entrust, it had no idea whether the Entrust Contract Parties had violated their own Risk Policy. Having no legitimate basis for termination, Shell gambled on its ability to allege a hypothetical violation of the Risk Policy based on an Ad Hoc Report that fell outside of the Hedging Range but nevertheless received all requisite approvals and exercise of business judgment from Entrust's senior management by continuing

oversight throughout the weekend. Shell had <u>no basis</u> for alleging a violation of the Risk Policy and no knowledge as to whether Entrust's acting CEO or VP of Finance had exercised their business judgment with respect to further day-ahead transactions or had approved the lower hedging percentage to be addressed by real-time purchases to meet all retail obligations during this unusual time. To the contrary, Shell's ongoing discussions with Entrust's acting CEO, VP of Finance and VP of Supply during the weekend of February 13-14, 2021, concerning Entrust's continuing operations put Shell on notice that Entrust was operating with the full oversight of its senior management, and all required approvals and exercise of business judgment by its acting CEO and VP of Finance. Entrust was not in violation of the Risk Policy at the time of the Termination Notice.

58.     Even if Shell had a proper basis to terminate the Transactions and parties' other agreements, had delivered effective notice to the proper parties, and could be said to have designated an Early Termination Date, such termination would not have been effective until the close of business on February 16, 2021, pursuant to the Court's MSJ Ruling.  But as Shell actually terminated all pending energy Transactions under the EEI Master Agreements on February 14, 2021, and ceased delivering such energy in the earliest hours of February 15, 2021, Shell materially breached the EEI Master Agreements by terminating all Transactions before its notice became effective.

59.     Although Shell issued its Termination Notice under the Global Agreement, it failed to issue a Notice of an Event of Default or Termination under the EEI Master Agreements. Importantly, there had been no actual Event of Default under the Global Agreement or any of the EEI Master Agreements.  As a result, even after Shell attempted to wrongfully terminate certain

Transactions, Shell remained obligated to continue to provide electric power to Entrust under the EEI Master Agreements.

60.    Thus, after issuing the improper Termination Notice, Shell's immediate failure to provide power to Entrust before the Termination Notice became effective, or could have become effective, constitutes a material breach of contract.

**E.    Even if Shell Had a Contractual Basis to Issue a Notice of Default and Termination, Shell's Notice of Default and Termination Was of No Legal Effect Until Close of the Business Day on February 16, 2021**

61.    Section 5.2 of the EEI Master Agreements provides in material part that:



62.    Designation of the Early Termination Date is critical to a proper calculation of damages, as Sections 5.3 through 5.6 of the EEI Master Agreements ██████████████ ███████████████████████████████████████████████████████████████.

63.    If Shell could demonstrate that it delivered its Termination Notice on Sunday evening, February 14, 2021, in connection with an actual and pre-existing Event of Default arising from a violation of the Risk Policy (the sole alleged Event of Default noticed in the letter), it remained contractually obligated to continue deliveries of electric power to Entrust until its Termination Notice would have become effective, which the Court has determined in its MSJ Ruling is the close of business on February 16, 2021.  But by actually terminating its performance under the EEI Master Agreements, and all related contracts, and by immediately terminating all energy Transactions on February 14, 2021, Shell materially breached the EEI Master Agreements.

64.     Section 10.12 of the Global Agreement provides that █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ (emphasis added).   Section 10.7 of the EEI Master

Agreements is substantially identical.

65.     "Business Day" is defined under the Global Agreement to mean ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████     The Global Agreement does not define the meaning of "close of

business."  Under applicable law, the close of a "business day" is the end of a twenty-four-hour

weekday on which business is conducted.

66.     Shell sent its Termination Notice at 10:55 p.m. on Sunday, February 14, 2021,

stating that it was terminating all Transactions immediately.

67.     The following day, Monday February 15, was Presidents' Day, a legal holiday for

commercial banks under the laws of the State of Texas.  It was not a Business Day.  Shell did not

perform its obligations under the EEI Master Power Agreements on February 15, 2021.

68.     Therefore, under Section 10.12 of the Global Agreement and Section 10.7 of the

EEI Master Agreements, even if Shell could demonstrate that Entrust had violated the Risk Policy

on Sunday, February 14, 2021, and even if Shell could demonstrate that its delivery of its

Termination Notice to the incorrect notice address was somehow sufficient service of notice,

Shell's Termination Notice could be of no legal effect until at the earliest, the close of the next

Business Day (Tuesday, February 16, 2021) at midnight, Central time.

69.     Effectiveness of the notice, alone, is not the effective date for purposes of terminating or cancelling pending energy transactions.  Section 5.2 of the EEI Master Agreements provides █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ Shell's Termination Notice does not select an Early Termination Date. Instead, Shell incorrectly claims under its Termination Notice that it was terminating its contractual obligations immediately, though no such right exists under the parties' contracts.

70.     Section 7.2 of the Global Agreement does not grant Shell the right to terminate its contractual obligations to deliver electric power to Entrust when there is an Event of Default under the Global Agreement. Rather, Section 7.2 simply states that ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

71.     Because the Termination Notice was sent in the absence of an actual Event of Default having arisen, Shell terminated all Transactions without cause.  Under Section 5.1(c) of the EEI Master Agreements, a ████████████████████████████████████████████

██████████████████. Because Shell terminated all Transactions without a pending Event of Default under Entrust's Risk Policy, and because Shell terminated all Transactions before any proper notice of termination could have become effective, Entrust is the Non-Defaulting Party with the right to select the Early Termination Date.

72.     Even if Shell could demonstrate that there had been an actual breach of Entrust's Risk Policy on February 14, 2021, either technical or material, Shell's complete repudiation of all contractual obligations and termination of all Transactions before Shell had the right to do so upon effectiveness of its Termination Notice was a material breach that supersedes any earlier breach by Entrust under applicable New York law.  Under either scenario – with or without a Risk Policy default – Shell committed a material breach of the parties' contracts, rendering Entrust the Non-Defaulting Party entitled to select the Early Termination Date under the EEI Master Agreements.

73.     Even if the Court were to read Shell's Termination Notice as an implicit designation of the earliest possible Early Termination Date, such a date would be February 17, 2021.  Under applicable common law, and in the absence of Shell's selection of an Early Termination Date, rights of termination follow-in-time the effectiveness of a notice of an event of default.  Thus, even if the Termination Notice had been properly served on the basis of an existing Event of Default for violation of the Risk Policy such that notice was effective at the end of the "business" day on February 16, 2021, by which time all Transactions for delivery on that date would have been scheduled with ERCOT for delivery, would have been already delivered, and could not be terminated.  The earliest that Shell could have begun to terminate Transactions, without violating the EEI Master Agreements and as a practical matter with respect to ERCOT procedures and timing, would have been February 17, 2021, and therefore February 17, 2021, would be the earliest possible Early Termination Date that Shell could be deemed to have implicitly selected.

**F.     Shell Failed to Pay Deficiency and Presentment of Claim**

74.     Section 4.1(b) of the EEI Master Agreements between Entrust and Shell provides that in the event of any unexcused failure by Shell to deliver all or part of the electric power that it is required to provide to Entrust under the Confirmations, Shell must "settle" with Entrust by paying ███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

75.     Replacement Price is defined under the EEI Master Agreements as ████████

████████████████████████████████████████████████████████

████████████████████████████████████     Thus, if Shell were to take the

position that its immediate termination of all Transactions contracted for several years into the

future could be characterized as a mere failure to deliver under Article IV of the EEI Master

Agreements, it is plain by the fact that Shell did not pay any Replacement Price to Entrust that

Shell did not take the position at the time of its Termination Notice that it had done anything other

than attempt to terminate all Transactions immediately, on February 14, 2021.

76.     Indeed, on March 9, 2021, Shell, purporting to act as the Non-Defaulting Party,

delivered an email to Entrust stating the amount of the Termination Payment that Shell proposed

to pay to Entrust pursuant to Article V of the EEI Master Agreements (the "Shell Calculation").

Under Section 5.4 of the EEI Master Agreements, the party providing notice of a Termination

Payment must include ████████████████████████████████████████

████     The Shell Calculation contains minimal information to explain the basis for the

calculated Termination Payment, and does not designate an Early Termination Date.  The Shell

Calculation does reveal, however, that Shell calculated its proposed Termination Payment in a

self-serving way that was clearly contrary to the terms of the EEI Master Agreements, and

presumed effective and immediate termination of Transactions, rather than suspension or a mere failure to deliver.

77.     Under Section 5(2)(ii) of the EEI Master Agreements, Gains and Losses for each Terminated  Transaction ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ Because Shell transmitted its Termination Notice at 10:55 p.m. Central Time on February 14, 2021, the earliest that Entrust could possibly have entered into agreements with third parties to replace the deliveries Shell had contracted to make under the Terminated Transactions would be February 15, 2021. Yet, Shell used replacement prices in its calculation that were unachievable in reality and thus pure fiction: specifically, Shell used February 14, 2021 forward pricing curves to determine the replacement value of their balance-of-month sales to Entrust, and February 12, 2021 forward pricing curves to determine the replacement value of their remaining forward sales to Entrust.[9] Because forward prices were escalating steeply and rapidly due to worsening weather forecasts, Shell's use of February 14 and February 12 pricing curves was not just commercially unreasonable but a blatant attempt to insulate Shell from the deleterious economic effects of ERCOT spot market prices far in excess of the price at which they had committed to sell power to Entrust. There was simply no way that Entrust replaced (or could have replaced) Shell's sales commitments at prices based on February 12 or February 14 forward pricing curves, and Shell knew that the actual replacement cost on February 15, 2021, or thereafter was far greater. But use of such fictional replacement prices allowed Shell to grossly understate

---

[9] A forward pricing curve is a function graph in finance that defines the prices at which a contract for future delivery or payment can be concluded today.

the amount Shell owed to Entrust when valuing replacement cost in a commercially reasonable manner as expressly required by the EEI Master Agreements.

78.     On March 10, 2021, Entrust replied to Shell asking for more detail to explain the basis for the Shell Calculation, particularly as the Shell Calculation lacked any clear indication of the most critical piece of information – the date from which Shell calculated all Transaction values, and how such date would have been determined.  Shell did not take the position that Entrust had waived any right to challenge the Shell Calculation, or to challenge any basis or claim upon which it had been delivered, but instead responded on March 16, 2021, by delivering some of the information requested by Entrust.  If Shell were to have taken the position that Entrust's March 10 email had failed to preserve challenge rights, and had rendered the Shell Calculation final, then Shell would have been obligated under Section 5.4 of the EEI Master Power Agreements to pay the calculated Termination Payment to Entrust within two Business Days after delivering its notice.  Shell did not make any such payment to Entrust.  Instead, Shell continued to engage in discussions and information sharing with Entrust in a negotiation process that continued for several months.

79.     On March 30, 2021, each of the Entrust entities filed petitions for relief under chapter 11 of Title 11 of the U.S. Code.  On that same day, Entrust filed its Declaration of C. Alexis Keene in Support of Chapter 11 Petitions and First Day Motions, in which Ms. Keene stated that:

> The Debtors have been actively communicating with Shell for weeks regarding an accounting of the funds collected and application of those funds. Preliminary reports from Shell indicate that Shell owes the Debtors well in excess of $8 million, but despite numerous efforts to seek more definitive documentation around mark-to-market valuations and evidence of each liquidating trading settlement activity, Shell has not yet provided complete backup documentation requested by the Debtors to verify the initial accounting reconciliation of the funds provided by Shell. The Debtors are still investigating Shell's termination of

the Global Agreement and related agreements as well as the amounts they are owed in connection with the early and unilateral termination of their hedges at the onset of the extreme weather event in Texas.

80.     On August 18, 2021, following the parties' protracted negotiations and information sharing, Entrust invoiced Shell for $124,282,817 ("Invoiced Amount") in accordance with Section 4.1(b) of the EEI Master Agreements. The Invoiced Amount is Entrust's calculation of the Termination Payment that is due from Shell based upon a designated Early Termination Date of February 17, 2021, by Entrust in its capacity as the true "Non-Defaulting Party," including the sum of: (a) the amount that Shell owes Entrust under Section 4.1(b) of EEI Master Agreements for Shell's unexcused failures to deliver electric energy through Wednesday, February 17, 2021, (b) the Settlement Amount (as defined in the EEI Master Agreements) for each Terminated Transaction (including a netting of amounts owed to Shell or its affiliates for purchased power and under the Loan Agreement) as of Wednesday, February 17, 2021, and (c) accrued interest on the foregoing amounts through August 20, 2021 in accordance with Section 6(d).  The Invoiced Amount does not address other damages such as those described herein arising from Shell's breach of the covenant of good faith and fair dealing, or other such damages and remedies arising from Shell's wrongful termination of the parties' contracts.  The Trust understands that Shell disputes the Invoiced Amount, requiring resolution of the dispute by this litigation.

81.     The Invoiced Amount – Entrust's calculation of the Termination Payment owed to it by Shell – was due within two Business Days of the Business Day on which Shell received the invoice from Entrust pursuant to Section 5.4 of the EEI Master Agreements.  Shell failed to pay the Invoiced Amount, and has continued to refuse to pay any amounts to Entrust, or the Trust, even though the initial Shell Calculation reflects an undisputed minimum amount due from Shell to the Trust.

82.     Section 6.3 of the EEI Master Agreements establishes terms for a party's dispute of invoiced amounts due, and provides ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ Shell has been obligated to pay the Shell Calculation to Entrust, and now the Trust, as the undisputed minimum amount due, pending resolution of the final Termination Payment, but has refused to do so.

## G.    Shell's Wrongful Termination and Breach of the Covenant of Good Faith and Fair Dealing

83.     By February 14, 2021, Shell was determined to terminate all Transactions owed to Entrust on the pretense of a non-existent Risk Policy Event of Default.  By terminating all Transactions owed to Entrust, Shell freed up a substantial amount of energy that Shell could have used to offset any reductions in its energy supplies, or address its own hedging shortfalls.  If Shell were properly hedged for its own needs, its destruction of Entrust's business would have provided Shell with additional available power to liquidate on the spot market at a massive profit.

84.     Yet Shell's ongoing behavior suggests that Shell had either failed to prepare its own hedging strategy for Winter Storm Uri, or was using the storm to reap windfall profits by selling its procured energy supplies at the rapidly escalating spot market prices at the expense of its contract parties.  For example, in order to obtain energy supplies at times of high real-time prices, Shell had entered into several contracts with plants that only operate at times of peak demand, known in the industry as "peaker plants."  Shell entered into contracts with such peaker plants, including under the umbrella of the same form EEI Master Agreements that governed Shell's relationship with Entrust.  But as Winter Storm Uri unfolded, Shell did not merely seek to obtain the power it was entitled to obtain under such contracts, but – according to certain peaker plants in pending litigation – forced the peaker plants to operate beyond their contractual obligations to

provide Shell with excess power.  The Trust is informed and believes, and therefore alleges, that one of three scenarios was unfolding for Shell.  Either Shell was inadequately hedged to address its own power needs during Winter Storm Uri, and Shell's termination of all Transactions due to Entrust on the pretense of a non-existent Risk Policy Event of Default was an intentional and knowing wrongful termination of the Transactions designed to provide Shell with its most readily available source of inexpensive energy.  Or, alternatively, Shell was acting not out of a desperate need for energy, but out of a recognition that taking actions that destroyed the businesses of certain customers and contract parties was nevertheless extremely profitable if it provided Shell with excess energy to sell on the real-time market.  Or some combination of those two: Shell was inadequately hedged to insulate itself fully from the spike in spot market prices and not only eliminated that exposure but reaped windfall profits by terminating its deliveries to Entrust and selling at spot market prices instead.  The Trust anticipates that discovery will demonstrate whether, and to what extent, Shell's actions with respect to Entrust and other contract parties were driven by a desperate need for energy supply, greed to re-sell power for a massive profit, or both, no matter what the consequences were to its contract parties.

## H.    Interest and Attorney's Fees

85.    Default interest due under the parties' Transaction Agreements is governed by Section 10.2 of the Global Agreement, which provides ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

86.    While the EEI Master Agreements include terms providing that a defined "Interest Rate" shall apply to invoiced and unpaid amounts, and is due and owing to Entrust by Shell, the parties amended this term in the Cover Sheets such that ████████████████████████████████

████████████████████████████████████████████████████████████████████████

The parties further amended terms related to interest in the EEI Master Agreements via Section 5.4 of the Cover Sheets to add that the Termination Payment shall bear interest at the defined "Interest Rate" – which means the Default Rate – from the date upon which notice is effective. The amended provision is in addition to other terms in the EEI Master Agreements that provide for the Trust's right to interest at the Default Rate.  To whatever extent there is any contradiction between Section 5.4's reference to accrual from the date of notice and the Global Agreement's accrual from an Event of Default, it is a contradiction that would have minimal impact, if any— especially in light of the fact that Entrust's entitlement to interest under the EEI Master Agreements is not to the exclusion of similar rights under the parties' other contracts.

87.     Because New York law provides that Entrust did not need to give any notice of Shell's Event of Default when Shell wrongfully repudiated all contractual obligations on February 14, 2021, the actual date of Shell's notice and the date of the relevant Event of Default are identical, and interest accrues from February 14, 2021, although the first terminated Transactions generating damages were in the early hours of February 15, 2021.  If Shell is deemed the Non-Defaulting Party, then pursuant to this Court's MSJ Ruling, the accrual of interest at the Default Rate would be delayed to February 16, 2021.  Thus, any dispute over the proper commencement of interest accrual is a one-day dispute, as interest either began to accrue at the Default Rate on February 15, 2021, or February 16, 2021.  The Default Rate under the parties' contracts is LIBOR plus 10% per annum.

88.     Under Section 5.4 of the EEI Master Agreements, interest accrues on the "Termination Payment," which by definition is a calculated amount that precedes setoff of other amounts due between the parties under any of the parties' other Contracts.  Thus, to whatever

extent, if any, that Shell would be entitled to net the loan balance against the Termination Payment, the calculation of Default Interest is carried out on the Termination Payment prior to such netting.

89.     The Trust is contractually entitled to recover attorneys' fees and expenses from Shell in connection with Shell's breaches of contract. One of the calculations that must be carried out to determine the Termination Payment is each "Settlement Amount" defined by Section 1.56 of the EEI Master Agreements. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ emphasis added).  As reasonable attorney's fees and expenses are a cost incorporated into the Termination Payment prior to netting, interest accrues on such fees and expenses at the Default Rate.

## V.     CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)

90.     The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

91.     Entrust and Shell were parties to the EEI Master Agreements, and other applicable contract documents incorporated therein or related thereto, each of which constitutes a valid, enforceable contract (the "Contracts").

92.     Shell materially breached the Contracts, as described above. For example, and without limitation,

> Wrongful and/or early termination: Shell wrongfully terminated the EEI Master Agreement with Entrust (including all Transactions that were an integrated part thereof), the EEI Master Agreement with Entrust East (including all Transactions and Confirmations that were an integrated part thereof), and the EEI Master Agreement with POTX (including all Transactions that were an integrated part thereof) without the occurrence of a qualifying or legitimate Event of Default. Shell knew or should have known that its asserted "technical" default was not a legitimate breach of Entrust's Risk Policy, and would not qualify as a legitimate and material Event of Default that could justify termination of all Transactions and all obligations under the parties' Contracts. The Trust is informed and believes, and based thereon alleges, that Shell's actions arose from its own failure to hedge sufficient supply in anticipation of Winter Storm Uri, and from mounting risks to its own energy supply sources, leading Shell to conclude that a concocted Event of Default to justify termination of all Transactions in order to secure a vast supply for other customers and/or for profit in the spot market was a worthwhile risk to take.

> Failure to deliver electric power: Shell failed to deliver electric power to Entrust from at least the period of February 14, 2021, to February 16, 2021, before Shell's improper Termination Notice became effective, and before an Early Termination Date had been designated by the Non-Defaulting Party.

> Wrongful Setoff: As discussed, *supra*, Shell contrived and declared a contrived Event of Default, which in reality did not exist under the Global Agreement or any other of the parties' Contracts and, based thereon, improperly terminated the Transactions under the EEI Master Agreements, such other Contracts, and the parties' respective rights and obligations thereunder. Following the purported termination, and in direct contravention of the express terms of the agreements between the parties, Shell purportedly set off obligations of the parties due under the subject various Contracts between the parties, but did so in an incorrect and self-serving manner in an effort to reduce obligations due and owing by Shell to Entrust (the "Wrongful Setoff") in violation of the terms of the Contracts, including, without limitation, the provisions granting exclusive authority to calculate the Early Termination Payment (including any applicable setoffs) to the Non-Defaulting Party and requiring that any Early Termination Payment calculation be conducted in a commercially reasonable manner.

> Failure to pay invoiced amounts: Shell also materially breached the parties' Contracts by failing to pay the Invoiced Amount and/or all other amounts to which Entrust, and now the Trust, is entitled under Section 4.1(b) and Article 5

of the EEI Master Agreements as the undisputed minimum amount due under the EEI Master Agreements.

93.     As a direct and proximate result of Shell's breaches of the parties' Contracts, Entrust was forced to bear the cost of purchasing equivalent quantities of electric power in the real-time market administered by ERCOT at dramatically higher prices than agreed to in the Contracts, and thus suffered damages, including but not limited to:

- the difference between the higher ERCOT real-time market prices and the forward contract price for electricity that Shell was contractually obligated to provide to Entrust under such contracts as well as the associated fees and costs, as described above; and

- the settlement value of the hedges on February 17, 2021, but in no event later than February 16, 2021.

94.     By acting in the manner alleged herein, Shell materially breached the parties' Contracts, rendering Entrust the Non-Defaulting Party thereunder with the exclusive right to select the Early Termination Date from which a Termination Payment due to the Trust is calculated and calculate the Early Termination Payment, including any setoffs.  Entrust has provided Shell with notice of its selection of February 17, 2021, as the Early Termination Date.  Even if Shell had the right to select such a date, or this Court were to impose its judgment to select such a date, the effectiveness of Shell's Termination Notice at the close of business on February 16, 2021 (assuming a prior Event of Default justifying such notice) forecloses any actual termination of Transactions that same day, as all such Transactions had been fully scheduled by the close of business.  Thus, as a practical matter, an Early Termination Date of February 17, 2021, is the same for all outcomes on issues pertaining to status of the Non-Defaulting Party.

95.     Shell also caused other contractual damages (*e.g.*, attorneys' fees, interest) as outlined herein and as the Trust will prove upon the trial of this matter.

## COUNT II
### (Declaratory Judgment)

96.     The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

97.     There exists an actual and present controversy between the parties concerning the effective date of Shell's Termination Notice, and resulting terminations of Contracts and Transactions thereunder by Shell.

98.     If Shell gave proper notice of an existing Event of Default when it served its Termination Notice on February 14, 2021, such notice could not be effective until the end of the business day on February 16, 2021.  And because Shell did not properly declare an Early Termination Date, and because termination must follow in time any effective notice of an event of default under applicable law, the earliest termination date that could apply to Shell's contractual obligations **if** Shell gave proper notice of an existing Event of Default for violation of the Risk Policy would be February 17, 2021.

99.     If no Event of Default had arisen under the Global Agreement or EEI Master Agreements from a violation of the Risk Policy, or if Shell failed to give proper or effective notice of an Event of Default by failing to follow the required notice provisions of the EEI Master Agreements or declaring a concocted or erroneous Event of Default, then Shell's arbitrary termination of its contractual obligations to Entrust was a breach of contract.  The earliest termination date that could arise under such circumstances—whether because Shell's breach would have had the effect of creating a subsequent Event of Default at the end of the business day on February 16, 2021, but because Entrust is the Non-Defaulting Party entitled to the full benefit of its bargain under the Contracts with Shell—Entrust's selection of February 17, 2021, as the Early Termination Date is determinative.

100.    There also exists an actual and present controversy between the parties as to whether Shell had a contractual obligation to deliver electricity to Entrust under the EEI Master Agreements following its delivery of the Termination Notice on Sunday, February 14, 2021, and whether its failure to deliver power pending effectiveness of any Termination Notice and its repudiation of all contractual obligations constitutes a material breach of contract that supersedes any alleged or existing Entrust Event(s) of Default.  Shell did not give notice of an intent to suspend transactions, nor would a proper exercise of such right erase Shell's contractual obligations to provide electricity between the delivery of any such notice and the effectiveness of a termination notice, as such suspension rights hinge on effective written notice.  Even if Shell could be said to have suspended its performance, it remains liable to the Trust for all amounts due arising from unfulfilled deliveries under the terms of the EEI Master Agreements, and each of the Parties' Contracts terminated or repudiated by Shell.

101.    There also exists and actual and present controversy between the parties as to whether Shell or Entrust waived rights under the EEI Master Agreements related to any actual or implicit designation of the Early Termination Date, and the Shell Calculation.  Shell was not the Non-Defaulting Party when it delivered its Shell Calculation, had no contractual right to deliver a calculation of the Termination Payment, and therefore there were no rights related to the Shell Calculation, including any alleged designation of an Early Termination Date contained therein, that could have been waived by any actions or omissions of Entrust following its receipt.  In response to Entrust's timely request for sufficient background information to study the Shell Calculation, Shell entered into a six-month period of information sharing, and thereby waived any right to demand that the Shell Calculation had become final within two days of its delivery to Entrust.  Shell did not pay the Undisputed Portion (as defined below) within the time required

under the EEI Master Agreements upon a Termination Payment calculation becoming final, and thereby demonstrating that Shell did not believe that the Shell Calculation had become final, and thereby waiving any right to demand that the Shell Calculation was final.  And, conversely, by requesting additional information to explain the Shell Calculation, Entrust did not waive any rights to challenge the Shell Calculation, nor acquiesce in Shell's assertion that the Shell Calculation was correct or that Shell is the Non-Defaulting Party entitled to calculate the Early Termination Payment.

102.    Accordingly, the Court should issue declaratory judgment: (i) that Shell had a contractual obligation to deliver power to Entrust under the EEI Master Agreements that was not affected by the February 14, 2021 Termination Notice, (ii) that Shell's actual termination or alleged suspension of Transactions on February 14, 2021, which directly caused the cessation and collapse of Entrust's business and harm to all other creditors was a material breach of contract that supersedes any prior alleged or actual Entrust Event of Default, and renders Entrust – and now the Trust – the Non-Defaulting Party; (iii) that Entrust did not waive its rights to challenge the Shell Calculation by requesting more information, (iv) that Shell's delivery of its Shell Calculation could not lead to a waiver of any rights by Entrust because Shell was not the Non-Defaulting Party when it delivered the Shell Calculation; and (v) that Shell waived any claim that the Shell Calculation was final, or that the Shell Calculation designated an Early Termination Date, by entering into a period of negotiation and information sharing with Entrust, by not formally declaring the Shell Calculation to be unchallenged, and by failing to pay the Undisputed Amount within the time required by the EEI Master Agreements for final Termination Payment calculations.

103.    Pursuant to this Court's MSJ Ruling, the Court has resolved the issue described herein concerning the effective date of Shell's Termination Notice.   Judicial determination

concerning all other issues described above remains necessary, and once issued, will terminate existing disputes of contractual interpretation between the parties.

<b><u>COUNT III</u></b><br>
<b>(Disallowance of the Shell Proofs of Claim Pursuant to 11 U.S.C. §502(d))</b>

104.    The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

105.    Shell and its affiliates (the "<u>Shell Creditors</u>") have filed proofs of claim numbered 89-118, as may be supplemented or amended in which the Shell Creditors seek, inter alia, unspecified amounts due under the Contracts as well as various setoff rights, and other reservations of rights (collectively, the "<u>Shell Claims</u>").

106.    The Trust is informed and believes, and therefore alleges, that the obligations addressed in each of the Shell Claims arise from the Contracts described in this Complaint between Shell and its affiliates, on the one hand, and one or more of the Entrust Contract Parties, on the other hand, under the umbrella terms of the Global Agreement. The Trust is informed and believes, and therefore alleges, that each of Shell's affiliates that is a party to a Contract with one or more of the Entrust Contract Parties operated as the alter ego, agent, and an instrument of Shell at all relevant times.

107.    Pursuant to Section 502(d) of the Bankruptcy Code, any and all Shell Claims of the Shell Creditors and/or their assignee(s) against the applicable Entrust debtors' estate must be disallowed until such time as Shell pays to the Trust all amounts sought herein. The Shell Creditors' secured claims and right of setoff, recoupment and offset should be disallowed and any money that would otherwise be retained by the Shell Creditors should be paid to the Trust.

## <u>COUNT IV</u>
### (Turnover of Estate Property by Shell Pursuant to
### 11 U.S.C. §§ 105(a), 541, and 542(a) and (b))

108.    The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

109.    The parties do not dispute that Shell owes the Trust a fixed sum represented by the Shell Calculation, which reflects the amount that Shell claims to owe the Trust (plus interest), and the undisputed minimum portion of a proper Termination Payment as calculated by the Trust (the "<u>Undisputed Portion</u>").  This Undisputed Portion equals $8,267,036.  Section 6.3 of the EEI Master Agreements provides that whenever the parties have a dispute over amounts due, "payment of the undisputed portion of the invoice shall be required to be made when due."  Shell has refused to pay the Undisputed Portion to Entrust or the Trust in fulfillment of its obligations under Section 6.3 of the EEI Master Agreements.  The Undisputed Portion and/or all other amounts to which the Trust is entitled under Section 4.1(b) of the EEI Master Agreements constitute assets of the Estates pursuant to section 541(a) of the Bankruptcy Code.

110.    The Trust is informed and believes, and based thereon allege, that Shell remains in possession, custody, or control of the Undisputed Portion.

111.    Shell is not a "custodian" for purposes of section 542(a) of the Bankruptcy Code but is holding proceeds of trades which are undisputed and are property of the Entrust debtors' estates, and now of the Trust on behalf of all creditors.

112.    The Undisputed Portion is not of inconsequential value or benefit to the Entrust debtors' estate(s).

113.    Shell has received actual notice of the commencement of the Chapter 11 Cases and, as such, section 542(c) of the Bankruptcy Code is inapplicable.

114.    Shell is not a life insurance company and, as such, section 542(d) of the Bankruptcy Code is inapplicable.

115.    To the extent that the Undisputed Portion constitutes "property that the trustee may use, sell, or lease under section 363 of this title," Shell is obligated under section 542(a) to turn over such funds to the Trustee, in furtherance of its obligations under Section 6.3 of the EEI Master Agreements.  To the extent that the Undisputed Portion constitutes "a debt that is property of the estate and that is matured, payable on demand, or payable on order," Shell is obligated under section 542(b) to turn over such funds to the Trustee, in furtherance of its obligations under Section 6.3 of the EEI Master Agreements.

## COUNT V
### (Equitable Subordination under 11 U.S.C. § 510(c))

116.    The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

117.    Section 510(c) permits the bankruptcy court to subordinate, on equitable grounds, all or part of a lender's allowed claim or interest, to transfer any lien securing a subordinated claim to the bankruptcy estate, or to disallow the claim entirely in the appropriate circumstances, even if no preferential or fraudulent conveyance has occurred, and even if the creditor is not an insider. Such relief is available where a contract party has engaged in a substantial breach of contract for its own benefit. Such relief is particularly appropriate where, as here, the wrongful actions of the defendant destroyed a debtor's business for the benefit of the defendant, but to the detriment of all other creditors.

118.    As more fully set forth herein, Shell engaged in inequitable conduct by, among other things, wrongfully terminating its contractual relationships with Entrust when it knew or should have known that its alleged Event of Default was false and fabricated, as well as damaging

Entrust's creditors, constituting substantial advantage-taking in an effort to profit from Winter Storm Uri at Entrust's and all other creditors' expense, and giving Shell an unfair advantage (*e.g.*, causing Entrust to expend substantial funds that should have gone to payment of creditors in order to buy electricity Shell had a contractual obligation to provide).  As more fully set forth herein, the Trust is informed and believes, and therefore alleges, that Shell was facing hedging shortfalls of its own as Winter Storm Uri approached, which were exacerbated by increasing threats to the energy supply that Shell had managed to hedge, all of which led Shell to conclude that it could avoid greater losses and potentially make windfall profits by terminating all Entrust Transactions, and using the energy that Shell was contractually obligated to deliver to Entrust as a source of energy for unfulfilled transactions with other customers, and for resale on the ERCOT day-ahead and real-time markets at a massive profit.  Such conduct, should it be proven at trial, is conduct that should shock the conscience and entitle the Trust to the full relief sought hereunder.

119.   The Trust is informed and believes, and therefore alleges, that the obligations addressed in each of the Shell Claims arise from the Contracts described in this Complaint between Shell and its affiliates, on the one hand, and one or more of the Entrust Contract Parties, on the other hand, under the umbrella terms of the Global Agreement. The Trust is informed and believes, and therefore alleges, that each of Shell's affiliates that has filed one or more of the Shell Claims operated as the alter ego, agent, and an instrument of Shell at all relevant times.

120.   Equity dictates that the Court should equitably subordinate below the claims of unsecured creditors the Shell Claims and any and all other amounts that Shell would seek to recover or offset against the Trust as set forth in the Shell Claims, including amounts owed to Shell for actual power deliveries under EEI Master Agreements, and amounts owed to Shell under the

Loan Agreement, both of which amounts would ordinarily be netted against the far larger amount Shell owes to the Trust.

121.    Subordination of the Shell Claims is consistent with the Bankruptcy Code.

## COUNT VI
### (Breach of Implied Duty of Good Faith and Fair Dealing)

122.    The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

123.    Shell and Entrust had a special relationship—one that was premised on the superior bargaining power of Shell, the commercial relationship between the parties in which Shell was given regular access to Entrust's confidential business plans, trading positions, and financial information, and based upon the trust of Entrust and its reliance on Shell to provide Entrust's core service offerings to consumers.

124.    Shell had the implied duty of good faith and fair dealing in the performance of its obligations under the parties' Contracts including its obligation to provide electric power to Entrust under the EEI Master Agreements, pursuant to a common law duty of good faith and fair dealings in their contract performance.

125.    Shell breached their implied duty of good faith and fair dealing owed to Entrust when Shell improperly terminated all obligations under the parties' Contracts on the basis of an alleged Event of Default that did not exist and that Shell knew did not exist, and for the wrongful purpose of securing contracted energy supplies for resale at massive profits or to fulfill Shell's own under-hedged contractual obligations, as more fully alleged above and incorporated herein. By acting in such manner, Shell deprived Entrust of the entirety of the fruits of its Contracts and put Entrust out of business, to the detriment of Entrust's entire creditor body.

126.    Shell's breaches were intentional, knowing, and malicious.

127.    As a proximate result of Shell's breaches, Entrust incurred substantial monetary damages as well as attorneys' fees and costs.

## <u>COUNT VII</u>
**(Avoidance of Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A))**

128.    The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

129.    As of February 14, 2021, Shell was in the possession of substantial sums that were property of the Entrust estates and/or were owed to Entrust upon a proper calculation of the settlement amounts due and any proper setoff affecting such amounts.  As of the Petition Date, such sums included but were not limited to the Shell Calculation, as it represented the undisputed minimum amount owed by Shell to Entrust, and therefore was due and owing under the EEI Master Agreements.  By improperly calculating the Shell Calculation, and by unilaterally carrying out the Wrongful Setoff described above, Shell wrongfully reduced the Shell Calculation from the amount that should have been recognized as the undisputed amount owed to the estate, and intentionally by Wrongful Setoff caused a transfer of property of the Entrust estates over which Shell had control (the "<u>Transfers</u>") to themselves, with the intent to defraud the estates' other creditors. The Trust is informed and believes, and based thereon alleges, that one or more of the Transfers were made within two (2) years prior to the Petition Date.[10]

130.    Through the Wrongful Setoff described above, *supra*, Shell caused Entrust to make the Transfers to, or for the benefit of, Shell by their direct control and possession of the assets subject to the Transfers.

---

[10] The exact date on which Shell caused the Transfers to be made to themselves is not yet known by the Trust, and may have occurred after the Petition Date.  The Trust reserves all rights to amend this Complaint to add claims arising under 11 U.S.C. § 549 should evidence demonstrate that such claims are appropriate.

131.    Shell set off the amounts of the Transfers in direct contravention of the terms of the subject Contracts with the actual intent to hinder, delay or defraud creditors of Entrust, by causing an involuntary transfer by Entrust, of assets over which Shell had dominion and control. Such intent may be imputed to Entrust or any other transferor for purposes of Section 548(a)(1)(A) by reason of Shell's dominion and control over such assets, and can be inferred from the circumstances surrounding the Transfers, including, without limitation, (a) the lack of, or inadequate, consideration as the "setoff" was improper and in contravention of the terms of the subject Contracts, (b) the close business association and relationship between Entrust and Shell, and (c) the improper conduct of Shell in manufacturing a basis to declare the purported Event of Default and terminate or repudiate the subject Contracts, and subsequent efforts to deny Entrust proper compensation for Shell's misconduct in contravention of the express terms of the subject Contracts.

132.    Based on the foregoing, the Transfers are avoidable, and the Trust is entitled to an order and judgment against Shell avoiding the Transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

## <u>COUNT VII</u>
### (Recovery of Avoided Transfers under 11 U.S.C. § 550)

133.    The Trust restates and incorporates each preceding paragraph of the Complaint as if fully stated herein.

134.    The Trust is entitled to recover the Transfers avoided pursuant to 11 U.S.C. § 548(a)(1)(A).

135.    Shell was the initial transferee of the Transfers to the extent each received funds or the benefit of any setoff, the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Transfers were made.

136.    Pursuant to 11 U.S.C. § 550(a), the Trust is entitled to recover from Shell an amount to be determined at trial that is not less than the total amount of the Transfers, plus interest thereon to the date of payment and costs of this adversary proceeding.

## VI.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trust prays the Court enter judgment in favor of the Trust on all claims asserted and:

A.  Award the Trust all damages to be proven at trial plus attorneys' fees, costs and expenses, plus interest accruing at the Default Interest rate from February 14, 2021, through and including the payment of any and all amounts owing under the Contracts or awarded herein to the Trust;

B.  Award the Trust additional pre- and post-judgment interest as applicable and to the extent permitted by law;

C.  Order and declare that Entrust was the Non-Defaulting Party under the EEI Master Agreements with the right to select the Early Termination Date of February 17, 2021, whether due to the lack of an Event of Default under Entrust's Risk Policy, or due to Shell's material and superseding breach of the EEI Master Agreements as described herein;

D.  Order and declare that Shell had a contractual obligation to deliver power to Entrust under the EEI Master Agreements through the effective termination of the Transactions, which could not have occurred any earlier than the close of the business day on February 16, 2021;

E.  Order and declare that the Shell Claims are disallowed to the extent and in the manner requested herein;

F.  Order and declare the equitable subordination of the Shell Claims and all amounts previously offset by Shell to the extent and in the manner requested herein;

G.  Order turnover of the Undisputed Amount by Shell to the Trust;

H.  Order and declare that the Transfers are avoided pursuant to 11 U.S.C. § 548(a)(1)(A), and

the Trust is entitled to recover the Transfers or the value thereof, plus interest and costs,

pursuant to 11 U.S.C. § 550; and

I.  Award the Trust all other and further relief which the Court deems just and proper.

Respectfully Submitted,

BAKER & HOSTETLER LLP

By: /s/ David J. Richardson
David J. Richardson *(admitted pro hac vice)*
drichardson@bakerlaw.com
Eric W. Kristiansen
TX State Bar No. 24027428
ekristiansen@bakerlaw.com
Thomas Donaho
TX State Bar No. 24078435
tdonaho@bakerlaw.com
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 751-1600
Facsimile: (713) 751-1717

Elizabeth A. Green
Fed ID No. 903144
egreen@bakerlaw.com
Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

Jorian L. Rose
jrose@bakerlaw.com
Glenn S. Benson
gbenson@bakerlaw.com
45 Rockefeller Plaza
New York, New York
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

ATTORNEYS FOR PLAINTIFF, ANNA
PHILLIPS, as trustee of the ENTRUST
LIQUIDATING TRUST.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 29, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ David J. Richardson*
David J. Richardson

# **<u>EXHIBIT A</u>**

**Financial Risk Management Policy**



**May 15, 2019**
**V1.7**

## Table of Contents

1.  Introduction....................................................................................3
    1.1.  Scope.....................................................................3
    1.2.  Objective of Risk Policy............................................3
2.  Financial Risk Management Committee..............................3
3.  Individual Responsibilities.................................................4
    3.1.  Supervisor Responsibility:  Personnel Changes............................ 5
    3.2.  All Employees...........................................5
4.  Organizational Model.......................................5
    4.1.  Sales & Marketing...................................................6
    4.2.  Supply.......................................................6
    4.3.  Finance/Risk Management.........................................6
5.  Transaction Control Procedure...........................................7
    5.1.  Objective of Procedure................................................7
    5.2.  Scope of Procedure.......................................................8
    5.3.  Sources of Transaction Verification.............................8
    5.4.  Required Transaction Documentation.........................................9
6.  Retail Load Forecasting.......................................9
    6.1.  General Objective......................................................9
    6.2.  Committed Load..........................................9
    6.3.  Projected Load..........................................9
    6.4.  Weather Assumptions.........................................9
7.  Risk Limits.......................................10
    7.1.  Portfolio Commodity Price Risk.................................................10
    7.2.  Exceptions and Violations........................................... 10
8.  Credit Risk Management...................................10

Appendix A:  Trade Execution Authorization................................................11
Appendix B:  Volumetric and Tenor Compliance Limits...................................12
Appendix C:  Short Term Desk Procedures (ERCOT)...........................................13
Appendix D:  Approved Trading Instruments and Markets...............................14
Appendix E:  Authorized Retail Products.............................................15
Appendix F: Entrust Supply Transaction Authority Limits...................................16

# 1.    Introduction

## 1.1.   Scope

Entrust Energy, Inc. and Entrust Energy East, Inc. ("Entrust") are retail energy marketers engaged in the supply of power to customers in the ERCOT, PJM, and NYISO.  The following summarizes Entrust's core business activity:

- **Retail Power Sales** – Entrust's retail business operations include marketing power to residential and commercial customers.  Currently, Entrust sells power to its customers under a variable rate, index, or fixed rate basis.

## 1.2.   Objective of Risk Policy

The Entrust Energy Financial Risk Management Policy ("Risk Policy") provides an overall framework for management of major financial risk relating to energy commodity products in the company's business.

# 2.    Financial Risk Management Committee

The purpose of the Financial Risk Management Committee ("FRMC") is to develop, implement, and enforce risk management procedures for Entrust consistent with the Risk Policy.

The following guidelines have been developed in order to fulfill the responsibilities of the FRMC.  The FRMC guidelines are intended to be a working document that will be updated on an ongoing basis to reflect the changing business environment.

As an overarching principle, Entrust will conduct its operations with the objective of appropriate risk mitigation and never for the purposes of financial speculation.  Hedging will be conducted with a clear recognition of the hierarchy of energy risk management objectives stated in order of priority:

Tier 1:  Business Objectives:  The primary objective of this Risk Policy is to constrain financial outcomes to acceptable levels and to control risk management activities to govern transactional risk.  Under no circumstances shall transactions be executed which are not related to the Entrust's core business objectives.

Tier 2:  Risk Mitigation Objectives:  Given volatile energy markets, manage input costs (and energy-related margin where controllable) toward the mitigation of potentially unfavorable results and the promotion of results that fall within acceptable, favorable boundaries as established by the Entrust Board of Directors.

Tier 3:  Enhancement Objectives:  Where achievable and with deference to Tier 1 & 2 objectives, reduce costs and/or improve Entrust's net margins.

FRMC Operating Guidelines

The FRMC is chaired by the Entrust Chief Executive Officer ("CEO").  The membership of the FRMC is determined by the CFO. The current membership is:

- Chief Executive Officer ("CEO")
- Vice President of Finance
- Chief of Staff
- Vice President of Supply & Risk Management
- Vice President of Strategy
- East's Sr. Supply Analyst

A quorum of at least three voting committee members must be present to conduct a FRMC meeting.  All decisions that require FRMC approval require the affirmative vote of at least three members of the FRMC.

The Entrust FRMC meets monthly and on an ad hoc basis as required and is scheduled by the Chair.  The agenda for the meeting is managed by the Chair.

<u>Delegations of Authority</u>

The FRMC is charged with administration of this Risk Policy and is granted authority and responsibilities as follows:

- Provide management oversight  for the energy  risk management activities of Entrust.
- Approve all new retail and wholesale products.
- Ratify and memorialize *Appendix A: Trade Execution Authorization.* Key employees are those who are authorized  to  execute  trades.
- Review and resolve all reported compliance issues or any other issue regarding the proper administration of the Risk Policy.
- Ensure that all energy hedging activities of Entrust are in accordance with the Risk Policy.
- Determine and from time to time review Entrust's tolerance for exposure to energy price volatility and determine risk boundaries consistent with that tolerance.
- Delegate prescribed authorities to authorized Entrust staff for execution of risk management activities.
- Prescribe controls and review the effectiveness of all aspects of the R i s k  Policy on a periodic as well as on an as needed basis.
- Approve all changes to the Risk Policy.  Changes to the Risk Policy are effective on the day of approval and shall not be applied retroactively.
- The Entrust FRMC is required to review this Risk Policy annually.  The purpose of the review is to modify this Risk Policy for major changes in strategic direction in Entrust's risk management objectives, refine the Risk Policy, or affirm that there have been no changes.

## 3.    Individual Responsibilities

The Risk Policy has specific requirements of individuals.  It is the personal responsibility for every employee who has the potential to take, create, measure or manage major financial risk to read, understand and sign off on this Risk Policy at the commencement of their employment with Entrust.

## 3.1.    Supervisor Responsibility:  Personnel Changes

Changes to personnel include cases where an existing employee changes positions within Entrust, resigns from their position at Entrust, or is terminated from employment at Entrust.

Aside from the usual Human Resources procedures, supervisors must take other actions to ensure that correct systems permissions and commercial authorities are maintained.  It is critical that these actions take place as soon as possible (preferably within 1 business day) to prevent losses due to inadvertent or intended misuse of Company permissions/systems.

## 3.2.    All Employees

The execution of risk management instruments and implementation of management controls will require delegation of authority to individuals.  Such authorities may be delegated by the FRMC.

Only those employees designated in *Appendix A: Trade Execution Authorization,* as amended from time to time by the FRMC, will be authorized to enter into energy transactions for the account of Entrust. The transaction limits for individuals authorized to execute trades are included in *Appendix F: Entrust Supply Transaction Authority Limits and Appendix B: Volumetric and Tenor Compliance Limits..*  Approved Trading Instruments are included in *Appendix D: Trading Instruments and Markets.*

Employees authorized to execute energy transactions shall be accountable for the following:

- A thorough understanding of the Risk Policy and the importance of strict compliance with its provisions.
- Observance of the non-speculative nature of the program.
- Observance of the authorized transaction limits (i.e. *Appendix B: Volumetric and Tenor Compliance Limits, Appendix F: Entrust Supply Transaction Authority Limits*)
- Timely documentation and reporting of transactions (day of transaction).
- Provide records of Entrust's estimated future load obligations and hedging activity.
- Notify the FRMC in the event that any Risk Policy violations are observed.
- All supply purchases and sales are to be transacted in accordance with Entrust's supply relationship.

Employees charged with control functions of this Risk Policy shall be accountable for the following:

- A thorough understanding of the Risk Policy and the importance of strict compliance with its provisions.
- Proactive disclosure to the FRMC of any material issues that may arise in the course of business that may encroach on policy restrictions or carry implications for the effective administration of this Risk Policy.
- Are prohibited from trading any energy or energy related commodity traded by Entrust for their personal account or the account of another party.

## 4.    Organizational Model

Effective risk management requires the collaboration across different functions and departments.  Execution of the business plans within the risk framework of the company demands a clear articulation of the roles, responsibilities and restrictions for employees covered under this Risk Policy, creating a level of accountability essential to achieve its objectives.  The following is a list of the various functions across the Company and their high level deliverables.

FRONT OFFICE

## 4.1.    Sales & Marketing (S&M)

As all hedge activities emanate from customer numbers and load forecasts it is critical that the information used to project forward customer load forecasts is accurate and timely.

- **Sales and Marketing** – Front-line responsibilities for marketing, promotion, sales and pricing programs for residential customers.
- **Scope** – Target residential customers who have the option to choose their energy suppliers.
- **Data** – S&M is providing sales forecast count details and retail customer attrition that will both be used as an input to the load forecast.
- **New Retail Products** – All new retail products, including changes to pricing structures, will need to be co-coordinated with Supply, Finance/Risk Management, and Operations.  In addition FRMC approval is required for new retail products.

## 4.2.    Supply

Traders on the Supply desk are part of the traditional Front Office organizational structure.  They are authorized to commit the company to buy and sell energy commodity transactions in order to execute hedge strategies.

- **Supply Agreement** – All transactions must take place with the approved Supplier or with an approved third party that can be sleeved through the Supplier.
- **Authorized Traders** – The FRMC determines which employees within the Supply team are allowed to transact on the company's behalf.
- **Limits** - Traders must comply with the limitations detailed in the Trading Limits section of this Risk Policy.
- **Round Trip Trades** – Buying and selling commodity at the same price, the same day, same location and same non-internal counterparty is strictly prohibited, and is considered a violation of this Risk Policy.
- **Price Discovery/Media** – Traders will not provide any pricing and trade volume information to outside parties for the creation of published index prices.
- **Financial Tools** – Preparation of requests for approval of the use of new financial instruments originates with the trader and requires approval from the FRMC.
- **Price Curve Validation** – Acting as "custodian" for the company's forward curves, independently verifies the validity of the pricing curves used to value the company's portfolio.
- **Confirmations** –Receives and verifies all confirmations originated from Supplier.
- **Exception Reporting** – Provides a list of unconfirmed transactions with Entrust Energy's Supplier that are outside of the normal response period and follows up on them in order to ensure that confirmations are ultimately received.
- **Trade Reconciliations** – Reconciles differences between trade confirmation responses and the risk system of record by working with the Front Office and the outside Supplier.  If the issue cannot be resolved or the circumstances surrounding the transaction are questionable, the CEO must be notified.

MIDDLE and BACK OFFICE

## 4.3.    Finance/Risk Management

The Finance/Risk Management team is responsible for executing the directives of the FRMC.  The role maintains organizational independence by reporting to both the CFO and FRMC.

- **FRMC Agendas** – Prepares the agenda for the FRMC meetings.
- **Process Development** – Develops, recommends, and administers corporate risk management and /or middle office processes and procedures.

- **Risk Reporting** – Measures and reports on the company's risk profiles and portfolios.
- **Risk Limits** – Recommends specific risk limits to the FRMC that are consistent with the Company's risk management objectives, risk tolerance, and risk management policy.
- **Risk Evaluation** – Evaluates proposed transactions and new retail product introduction with respect to their potential impact on the Company's risk profile, consistency with risk management objectives and risk tolerance, and compliance with Risk Policy.
- **Policy Implementation** – Develops and monitors the implementation of provisions of the Risk Policy and oversees other risk management processes and procedures established by the Risk Policy or determined otherwise by the FRMC.
- **Control Assessment** – Assesses the appropriateness of the controls for the trading and retail sales operations, periodically reviewing risk controls, modifying these controls as required, and incorporating the modifications into the Risk Policy to meet changing business needs.
- **Risk Management Systems** – is considered the owner for the company's electronic risk management system when one is established and in place.
- **Risk Policy Updates** – is the owner of this Risk Policy and is responsible for all edits to the document as well as its annual update.
- **Collateral management** – Administer the collateral given in support of the company's market activities.
- **Compliance** – Generates all price risk management compliance reporting against all established limits and oversees adherence to risk policies, procedures, and limits.
- **Budgeting and Planning** – Prepares budgets and forecasts including comparison of actual results with expectations.
- **Reconciliations** – Reconciles general ledger and cash positions.  Also, responsible for shadow settlement of ISO charges and monitoring and if necessary, filing disputes.
- **Invoicing** – Resolves all billing disputes.
- **Payables** – Guarantees compliance with delegation of authority, reviewing, executing and properly accounting for all company disbursements.
- **Records** – Record realized and unrealized gains and losses for all portfolio positions on a monthly/quarterly/annual basis.
- **Documentation** – Develop and maintain proper documentation outlining standard process and procedures for conducting their activities.  Also, includes the maintenance of Financial records (management reports, journal entry documentation, etc.)
- **Performance Management** – Analyzes performance of various lines of business using historical data (prices, output, etc.) as well as in-depth reviews of key drivers of business performance.
- **Accounting Standards** – Follow and develop recommended procedures under generally recognized accounting standards.
- **Management Reporting** – Provides timely management reporting regarding business unit profit and loss performance.

## 5.   Transaction Control Procedure

### 5.1.   Objective of Procedure

The objective of the transaction control procedure is to:

- Achieve accuracy of energy transaction data (e.g. volume, tenor, price, peak period, etc.) and assist in the compliance checking with regard to this Risk Policy.
- Properly segregate duties for employees engaging in execution, confirmation and settlement of energy transactions.

## 5.2.    Scope of Procedure

The procedures in this section apply to all transactions executed by the Supply desk relative to authorized trading instruments listed in the Risk Limits section of this Risk Policy.  The Supply team employees have been granted general delegated authority to transact these authorized trading instruments within limits.  These procedures do not apply to transactions with retail customers.

## 5.3.    Sources of Transaction Verification

The accuracy and validity of transaction data is established by various means, described below.  In descending order of validity, these data sources generally are:

- Confirmation signed by both parties
- Confirmation prepared by Entrust and signed by approved Supplier
- Proof of fax receipt by counterparty of confirmation prepared by Entrust without affirmative response or dispute
- Voice recording of both parties
- Trader's deal sheet
- Trader's personal log

The ranking of the validity of these data sources is provided as a general guideline.

## 5.4.    Required Transaction Documentation

All transactions will be executed directly or sleeved with an approved Supplier.  Generally, nearly all confirmations are sent to Entrust from the Supplier.  Only Finance/Risk employees designated as authorized signatories are allowed to sign confirmations.

Power, Natural Gas, Ancillary Service, Capacity, CRR, and ARR Trades:  These trades are entered into the Supply System by the trader on the day of execution.

# 6.    Retail Load Forecasting

## 6.1.    General Objective

The objective of the Retail Load Forecasting process is to achieve accurate volume forecasts for customer load obligations.  It is this forecast that forms the basis by which the Supply desk manages its supply obligations and by which forecasted gross margin is calculated.

## 6.2.    Committed Load

Committed Load comprises the part of the forecast that is due to customers already on an Entrust Energy contract for the term of their contract.

Variable-priced customers are on a product whose price is set at the beginning of each month of flow.  At the time the price is set for a particular month, that month's load obligation becomes fixed price exposure to Entrust Energy and is included as part of the Committed Load forecast.

The FRMC requires Committed Load to be hedged.  Hedging strategies that leave Committed Load unhedged beyond existing volumetric limits require approval by the FRMC.

Retail customer attrition will be applied to our forecasted Committed Load to ensure accurate position reporting.  Supply will review the attrition assumptions on a regular basis with Sales & Marketing and make appropriate revisions to the load forecast.

Forecasting error reporting, which involves the comparison of actual versus forecasted load will be performed on at least a weekly basis.

## 7.    Risk Limits

### 7.1.    Portfolio Commodity Price Risk

The objective of the trading activity in the retail book is to minimize the variability of gross margins to changes in commodity prices.  This is accomplished by hedging the most volatile parts of our commodity cost structure with the most liquid markets, which are generally the energy price exposures.

In order to achieve the objectives of the hedging program, the following general delegations support this strategic framework:

- Matching trading authority timing with the creation of price risk on the load side.
- Narrow volumetric limits on market price exposures.
- Using same commodities and markets where possible to hedge price risk.
- Delegation to Supply desk to hedge what is required to mitigate market price risk at the same time it is created on the retail load side, in terms of wholesale instruments, market geography and tenor.
- Limiting the tenor of retail product offerings to those whose component risks can be hedged effectively in liquid markets.

As a general strategic principle, the FRMC acknowledges that there may be mismatches between retail and wholesale price exposures, as long as such mismatches do not expose the company to severe imbalances between risk and reward.

These mismatches include:

- Shaping risks – where the hourly or daily profile of energy obligations on retail books does not match the profile of supply hedges
- Basis risks – where the location of retail product settlements does not match the location of wholesale settlements, but is generally still in the same commodity and general market area
- Optionality risk – recognizing that many of the retail customers are on full requirements contracts which allow them to consume energy volumes based on their own load profiles
- Settlement risks – where some volatile market-determined costs are not forward-hedged due to lack of liquidity and thus are exposed to the volatility of short-term settlement markets
- "Other" risks – includes such risks as Ancillaries, Reliability Must Run (RMR), Renewable Energy Credits (RPS) and ERCOT administrative fees, some of which are hedgeable and others that have little or no forward market.

### 7.2.    Exceptions and Violations

In the event of a breach of this Policy, the Risk Management team will carry out an immediate assessment of the breach. Risk Management, led by the CFO, will carry out the breach review within 1 business day of the breach being highlighted.  All infractions will be listed and reviewed in the FRMC meetings. Consequences for Policy breaches range from warning letters for the employee's HR file, suspension of their employment and up to and including employee termination.


## 8.    Credit Risk Management

The Credit Risk management function at Entrust Energy is divided into Wholesale and Retail credit functions.

For Wholesale, a credit support agreement has been secured with a third party supplier.

For Retail, the Credit Policy is governed by the FRMC and is a separate document from the Risk Policy.

**Appendix A:  Trade Execution Authorization**

<u>PRIMARY:</u>

- Michele Supple – VP Supply & Risk Management
- Kenzie Pape – Sr. Supply Analyst
- Wayne Morgan –  CEO
- Raquel Bermeo – Supply Analyst

## Appendix B:  Volumetric and Tenor Compliance Limits

| NET OPEN POWER POSITION LIMITS | | | | |
|---|---|---|---|---|
| | ERCOT*** | | PJM & NYISO*** | |
| Time Bucket | Min | Max | Min | Max |
| January * | 90% | 120% | 90% | 120% |
| February * | 90% | 120% | 90% | 120% |
| March * | 80% | 110% | 80% | 110% |
| April * | 80% | 110% | 80% | 110% |
| May * | 80% | 110% | 80% | 110% |
| June * | 90% | 120% | 80% | 110% |
| July * | 90% | 120% | 80% | 110% |
| August * | 90% | 120% | 80% | 110% |
| September * | 90% | 120% | 80% | 110% |
| October * | 80% | 110% | 80% | 110% |
| November * | 80% | 110% | 80% | 110% |
| December * | 90% | 120% | 90% | 120% |
| | | | | |
| 2 - 24 Months Out ** | 80% | 120% | 80% | 120% |
| 25 - 36 Months Out ** | 70% | 120% | 70% | 120% |
| 37+ Months Out** | 70% | 130% | 70% | 130% |

* Prompt month only

** Parameters only apply if there are greater than 20,000 MWh of retail fixed load obligation in each Time Bucket

***Volumetric Limits apply to the ISO level, not the zonal level

| TENOR LIMIT | |
|---|---|
| Description | Limit |
| Aggregate Portfolio | In no case can a wholesale transaction exceed the maximum term of the authorized retail products. |

## Appendix C:  Short Term Desk Procedures

**ERCOT (EE & POTX)**

➢ The next day load forecast will be created each weekday morning, utilizing a like-weather-day approach and adjusted as necessary utilizing ERCOT's ISO-wide peak load and our load ratio share of that peak. During summer and winter months, the day-ahead load forecast must be approved by the VP of Supply or above.

➢ The next day load forecast, and the resulting Net Open Position (NOP) report will be sent to management, including but not limited to the following: VP of Supply, CFO, ERCOT's Senior Supply Analyst, CEO, VP of Finance, and VP Chief of Staff.

➢ If the next day load forecast is outside the following NOP bands, approval from the CEO or VP of Finance is required. If necessary, the approval request email shall be sent by 9:45 AM CST the day prior to flow. The NOP % bands do not apply if the day ahead forecast is within 100 MWh long or short.

  o Summer Months (June, July, August, September):  90% - 120% hedged
  o Winter Months (January, February): 90% - 120% hedged
  o Shoulder Months (March, April, May, October, November, December): 85% to 120% hedged

➢ When next day forecasted high temperatures are greater than 100° or less than 40° in Dallas, TX, the forecast and position must be approved by both the VP of Supply and one of the following: CEO or VP of Finance.

➢ During the summer and winter months (defined below), a 14-day load forecast and NOP report will also be created twice per week, utilizing a like-weather-day load forecasting approach. This will allow for foresight into Entrust's exposure over the next 2 weeks.

➢ The average of the daily NOP limits on the rolling 7-day load forecast must be within the following bands, outside of these bands will require approval from the CEO or VP of Finance. The NOP % bands do not apply if the day ahead forecast is within 100 MWh long or short.

  o Summer Months (June, July, August, September):  90% - 120%hedged
  o Winter Months (January, February): 90% - 120% hedged
  o Shoulder Months (March, April, May, October, November, December): 85% to 120% hedged

➢ All hourly shorts will be bid into the ISO's Day Ahead Market (DAM) or submitted to Shell for them to bid into the DAM on our behalf. This limits our exposure to RT market prices.

  o Deviation from this strategy will require approval from the VP of Supply and one of the following: the CEO or VP of Finance.

**PJM**

➢ The next day load forecast will be created each morning, utilizing a like-weather-day approach and adjusted as necessary utilizing PJM's ISO-wide peak load and our load ratio share of that peak.

➢ The next day load forecast, and the resulting Net Open Position (NOP) report will be sent to management, including but not limited to the following: VP of Supply, CFO, PJM's Senior Supply Analyst, CEO, VP of Finance, and VP Chief of Staff.

➢ If the next day load forecast is outside the following NOP bands, approval from the CEO or VP of Finance is required. If necessary, the approval request email shall be sent by 9:45 AM CST the day prior to flow.

  o Summer Months (June, July, August, September):  85%-120% hedged
  o Winter Months (January, February): 85%-120% hedged
  o Shoulder Months (March, April, May, October, November, December): 80% to 120% hedged

➢ When next day forecasted high temperatures are greater than 95° or less than 30° in Philadelphia, PA, the forecast and position must be approved by both the VP of Supply and one of the following: CEO or VP of Finance.

➢ During the summer and winter months (defined below), a 14-day load forecast and NOP report will also be created and distributed 2 times per week, utilizing a like-weather-day load forecasting approach. This will allow for foresight into Entrust's exposure over the next 2 weeks.

➢ The average of the daily NOP limits on the rolling 7-day load forecast must be within the following bands, outside of these bands will require approval from the CEO or VP of Finance:

  o Summer Months (June, July, August, September): 85%-120%hedged
  o Winter Months (January, February): 85%-120%hedged
  o Shoulder Months (March, April, May, October, November, December): 80% to 120% hedged

➢ All hourly shorts will be bid into the ISO's Day Ahead Market (DAM). This limits our exposure to RT market prices.

  o Deviation from this strategy will require approval from the VP of Supply and one of the following: the CEO or VP of Finance.

## Appendix D:  Approved Trading Instruments and Markets

| TRADING INSTRUMENTS and MARKETS | | | |
|---|---|---|---|
| **Instrument Type** | **Trading Instrument Description** | **Physical Delivery Location or Settlement Index** | **Price or Floating Index** |
| Physical | Fixed Price, Fixed Volume Power ("Fixed Price Power") | ERCOT, PJM, NYISO Load Zones or Trading Hubs | Fixed Price or Gas Index |
| | Fixed Strike, Optional Volume Power ("Power Call Option") | | |
| | Floating Price, Optional Volume Power ("Heat Rate Call Option") | | |
| | Renewable Energy Credits ("RECS") | ERCOT, PJM, NYISO | Fixed Price |
| | UCAP ("Capacity") | NYISO, PJM | Fixed Price |
| | Responsive Reserve Service ("RRS") | ERCOT Load Zones | Fixed Price |
| | Non-Spinning Reserve Service ("NSRS") | | |
| | Regulation Service Up ("URS") | | |
| | Regulation Service Down ("DRS") | | |
| Financial | Natural Gas fixed for float swap ("Fixed Price Swap") | NYMEX last day, or Liquid Gas Index | Fixed Price |
| | Natural Gas float for float swap ("Basis Swap") | NYMEX last day or Liquid Gas Index | Liquid Gas Index |
| | Power fixed for float swap ("Fixed Price Swap") | ERCOT, PJM, NYISO Load Zones or Trading Hubs | Fixed Price |
| | Ancillary Financial Swap | Average hourly MCPC (market clearing price for capacity for RRS, NSRS, URS, or DRS) | Fixed Price |
| | Weather Swap or Option [1] | | |
| | Hurricane Insurance [1] | | |

[1] These products are considered Exotic Products and need to be signed-off by the Board of Directors prior to transacting.

## Appendix E:  Authorized Retail Products

| RETAIL PRODUCTS OFFERED | | |
|---|---|---|
| Product | Channel | Tenor Limit |
| Fixed | Residential & Commercial | 60 months from prompt month or as defined by our hedging limits with Shell |
| Variable | Residential & Commercial | N/A – month-to-month product |
| Index | Commercial | 60 months from prompt month or as defined by our hedging limits with Shell |
| Block and Index | Commercial | 60 months from prompt month or as defined by our hedging limits with Shell |

## Appendix F: Entrust Supply Transaction Authority Limits

| Product/Tenor Per Trading Day | Board of Directors | CEO | Vice President, Supply | Senior Supply Analyst | Supply Analyst |
|---|---|---|---|---|---|
| **Exotic Products** | Board approval required | Board approval required | Board approval required | Board approval required | Board approval required |
| **Forward Contracts up to 60 months from prompt month** | > 100 MWs | <= 100 MWs, at no more than $200/MW | <= 50 MWs, at no more than $150/MW | <= 20 MWs, at no more than $100/MW | N/A |
| **Forward Contracts up to 1 Month** | > 250 MWs | <= 250 MWs, no price cap | <= 100 MWs, at no more than $300/MW | <= 100 MWs, at no more than $100/MW | <= 25 MW, at no more than $100/MW |
| **RECs** | > 60 months | Up to 60 months until delivery, notional cost to not exceed $500,000 | Up to 48 months until delivery, notional cost to not exceed $350,000 | Up to 24 months until delivery, notional cost to not exceed $200,000 | N/A |
| **Ancillary Services** | > 50MWs, > 60 months | <= 50 MWs, up to 60 months | <= 25 MWs, up to 48 months | N/A | N/A |

In the event a Transaction exceeds the Individual Trader's Limits, a higher Trading Authority must provide his or her Delegation of Authority in writing prior to transacting.

Transaction limits do not apply to ISO Day-Ahead and Real-Time hourly transactions.  ISO bidding activity is governed by Appendix C:  Short Term Desk Procedures.