United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 24, 2025

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION



| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-31070** |
| **ENTRUST ENERGY, INC.,** *et al.*, | § | |
| | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **ENTRUST ENERGY, INC.,** *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 21-3930** |
| | § | |
| **SHELL ENERGY NORTH AMERICA (US), L.P.,** *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## AMENDED MEMORANDUM OPINION

This adversary proceeding concerns whether Shell improperly terminated its energy agreements with Entrust during Winter Storm Uri. The parties seek summary judgment on Entrust's breach of contract claim and Shell's defenses. Shell's laches defense is denied with prejudice. All other summary judgment relief is denied without prejudice.

This Amended Memorandum Opinion withdraws all discussion relating to Shell's right to suspension per the Liquidating Trustee's motion for reconsideration. There are no changes to the order that accompanied the opinion.

## BACKGROUND

Entrust and Shell are parties to certain energy contracts, under which Shell agreed to provide financial services and energy supplies to

Entrust at a fixed rate. Entrust would purchase energy from Shell and would then sell the energy to its customers. The contracts required Entrust to comply with its own Risk Policy. The Risk Policy contained hedging requirements forcing Entrust to keep the difference between its projected energy deliveries for a stated period and the amount it had purchased for that period within specific bands. Projected hedging outside of those bands required the approval of Entrust's CEO or VP of Finance.

On February 14, 2021, Shell terminated its present and future energy transactions with Entrust pursuant to a termination provision in the parties' agreements. Shell alleged that Entrust failed to comply with its Risk Policy, triggering an Event of Default under the agreements. The parties agree that certain forecasts were out of compliance with Entrust's hedging requirements. Entrust alleges that it had obtained the approvals needed to comply with its Risk Policy. Shell denies that the necessary approvals had been obtained.

The Court must answer two key questions:

- Were Entrust's hedging variances authorized by its CEO or VP of Finance? If so, the variances were not an event of default?

- Which party first defaulted under the Energy Contracts?

Those issues may not be decided on summary judgment. A trial is required.

## I.   FACTUAL BACKGROUND

Entrust Energy, Inc. was a Texas-based retail energy company. In 2019, Entrust entered into certain agreements with Shell Energy North America (US), L.P., in which Shell would provide both financial services and a supply of energy to Entrust.

### A.   The Energy Contracts

The agreements relevant to this dispute are the parties' Global Agreement and EEI Master Agreements (the "Energy Contracts"). ECF No. 230 at 12, 107. The contracts are governed by New York law. ECF No. 230 at 30, 134.

The Global Agreement serves as an umbrella agreement for the parties' various contracts defined as "Transaction Agreements." ECF No. 230 at 59. It includes various terms that supplement the Transaction Agreements. Section 3.17(a) of the Global Agreement provides that Entrust "shall at all times comply" with its Risk Policy, and:

> shall enter into supply purchase transactions reasonably approximated to match the forecasted daily commodity sales on all months for the term of the Energy Customer Contracts, taking into consideration historical consumption, customer load forecasts, attrition rates, weather influences on consumption and any other factors the Customer Parties utilize to forecast consumption.

ECF No. 230 at 17. Section 7.1 of the Global Agreement lists Events of Default, including if "[a]ny Customer Party fails to perform or observe any covenant or other agreement contained in Section 3.17." ECF No. 230 at 23. The Global Agreement requires Entrust to comply with its Risk Policy, and Entrust's failure to comply is an Event of Default.

It was not an Event of Default merely because hedging transactions failed to meet the required targets. Under the Risk Policy, Entrust's CEO or VP of Finance could authorize variances. Authorized variances did not result in an Event of Default.

Shell and three Entrust entities (Entrust, Entrust East, and POTX) are parties to three EEI Master Agreements. The EEI Master Agreements include a form contract and a cover sheet that modifies the form contract. ECF No. 230 at 67, 107. The EEI Master Agreements govern the "Transactions" between the parties. ECF No. 230 at 120. A "Transaction" is defined as "a particular transaction agreed to by the Parties relating to the sale and purchase of a Product pursuant to this Master Agreement." ECF No. 230 at 120. A "Product" is "electric capacity, energy or other product(s) related thereto as specified in a Transaction by reference to a Product listed in Schedule P hereto or as otherwise specified by the Parties in the Transaction." ECF No. 230 at

118. When Shell gave notice that it was terminating the transactions between itself and Entrust (see below), it was in reference to these transactions defined by the Global Agreement and EEI Master Agreements.

The EEI Master Agreements contain exclusive remedies and liquidated damages calculations upon an Event of Default. The following provisions from the EEI Master Agreements are relevant to this Memorandum Opinion:

5.2 <u>Declaration of an Early Termination Date and Calculation of Settlement Amounts</u>. If an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party (the "Non-Defaulting Party") shall have the right to (i) designate a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate all, but not less than all, Transactions (each referred to as a "Terminated Transaction") between the Parties, (ii) withhold any payments due to the Defaulting Party under this Agreement and (iii) suspend performance.

(i) <u>Calculation by Non-Defaulting Party</u>. The Non-Defaulting Party shall calculate, in a commercially reasonable manner, a Settlement Amount for each such Terminated Transaction or group of Terminated Transactions as of the Early Termination Date (or, to the extent that in the reasonable opinion of the Non-Defaulting Party certain of such Terminated Transactions or group of Terminated Transactions are commercially impracticable to liquidate and terminate or may not be liquidated and terminated under applicable law

on the Early Termination Date, then each such Transaction or group of Terminated Transactions (individually, an "Excluded Transaction" and collectively, the "Excluded Transactions") shall be terminated as soon thereafter as reasonably practicable), and upon termination shall be deemed to be a Terminated Transaction or group of Terminated Transactions and the Termination Payment payable in connection with all such Terminated Transactions or group of Terminated Transactions shall be calculated in accordance with Section 5.3 below.

. . . .

5.3 Net Out of Settlement Amounts. The Non-Defaulting Party shall aggregate all Settlement Amounts into a single amount by: netting out (a) all Settlement Amounts that are due to the Defaulting Party, plus, at the option of the Non-Defaulting Party, any cash or other form of security then available to the Non-Defaulting Party pursuant to Article Eight, plus any or all other amounts due to the Defaulting Party under this Agreement against (b) all Settlement Amounts that are due to the Non-Defaulting Party, plus any or all other amounts due to the Non-Defaulting Party under this Agreement, so that all such amounts shall be netted out to a single liquidated amount (the "Termination Payment") payable by one Party to the other. The Termination Payment shall be due to or due from the Non-Defaulting Party as appropriate.

5.4 Notice of Payment of Termination Payment. As soon as practicable after a liquidation, notice shall be given by the Non-Defaulting Party to the Defaulting Party of the amount of the Termination Payment and whether the Termination Payment is due to or due from the Non-

Defaulting Party. The notice shall include a written statement explaining in reasonable detail the calculation of such amount. The Termination Payment shall be made by the Party that owes it within two (2) Business Days after such notice is effective. The Termination Payment shall bear interest at the Interest Rate from the date upon which notice is effective until paid. Notwithstanding any provision to the contrary contained in this Agreement, the Non-Defaulting Party shall not be required to pay to the Defaulting Party any amount under Article 5 until the Non-Defaulting Party receives confirmation satisfactory to it in its reasonable discretion that all other obligations of any kind whatsoever of the Defaulting Party to make any payments to the Non-Defaulting Party or any of its Affiliates under this Agreement or otherwise which are due and payable as of the Early Termination Date (including for these purposes amounts payable pursuant to Excluded Transactions) have been fully and finally performed and that the Defaulting Party has returned any Performance Assurance of the Non-Defaulting Party's that is held simultaneously or before the Non Defaulting Party makes any Termination Payment hereunder.

5.5 <u>Disputes With Respect to Termination Payment</u>. If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Termination Payment, in whole or in part, the Defaulting Party shall, within two (2) Business Days of receipt of Non-Defaulting Party's calculation of the Termination Payment, provide to the Non-Defaulting Party a detailed written explanation of the basis for such dispute; provided, however, that if the Termination Payment is due from the Defaulting Party, the Defaulting Party shall first transfer Performance Assurance to the Non-Defaulting Party in an amount equal to the Termination Payment.

. . . .

7.1 <u>Limitation of Remedies, Liability and Damages</u>. . . .
THE PARTIES CONFIRM THAT THE EXPRESS
REMEDIES AND MEASURES OF DAMAGES
PROVIDED IN THIS AGREEMENT SATISFY THE
ESSENTIAL PURPOSES HEREOF. FOR BREACH OF
ANY PROVISION FOR WHICH AN EXPRESS REMEDY
OR MEASURE OF DAMAGES IS PROVIDED, SUCH
EXPRESS REMEDY OR MEASURE OF DAMAGES
SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE
OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET
FORTH IN SUCH PROVISION AND ALL OTHER
REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE
WAIVED. . . .

ECF No. 230 at 71, 124, 127.

The parties' agreements were structured so that Entrust would
purchase energy from Shell at a fixed rate to reduce the risk of exposure
to market-price fluctuations. As part of the agreements, Entrust was
obligated to report information concerning its financial affairs to Shell
on a regular basis, including periodic reporting on updates to its Risk
Policy. In relevant part, Entrust's Risk Policy mandated that Entrust
create load forecasts. Based on the load forecast, Entrust would report
to Shell if Entrust's hedging fell out of certain, prescribed ranges.
Entrust was required to obtain the approval of its CEO or VP of Finance
during periods when Entrust's hedging activity was outside of pre-
approved bands of risk. The following provisions of the Risk Policy
memorialize the hedging and approval requirements:

The next day load forecast will be created each weekday
morning . . . . During summer and winter months, the day-
ahead load forecast must be approved by the VP of Supply
or above.

. . . .

If the next day load forecast is outside the following NOP[1] bands, approval from the CEO or VP of Finance is required. If necessary, the approval request email shall be sent by 9:45 AM CST the day prior to flow. . . .

> Winter Months (January, February): 90% - 120% hedged . . . .

During the summer and winter months (defined below), a 14-day load forecast and NOP report will also be created twice per week, utilizing a like-weather-day load forecasting approach. This will allow for foresight into Entrust's exposure over the next 2 weeks.

The average of the daily NOP limits on the rolling 7-day load forecast must be within the following bands, outside of these bands will require approval from the CEO or VP of Finance. . . .

> Winter Months (January, February): 90% - 120% hedged[.]

ECF No. 230 at 163.

## B.   Employment of Soichiro Osawa as Interim Managing Director of Entrust

A central question is whether Entrust had a CEO (that is, a person authorized to approve hedging waivers) at the time of the dispute.

On January 7, 2021, Entrust's board of directors adopted a unanimous written consent terminating Entrust's President and CEO Wayne Morgan from "all executive roles" and appointing Soichiro Osawa as Entrust's "Interim Managing Director." ECF No. 243-1 at 2–3. The

---

[1] Net Open Position ("NOP") is the difference between Entrust's projected energy deliveries for a stated period and the amount of energy it had purchased for that period. ECF No. 244 at 6.

board resolution also stated that, "[g]iven the financial difficulties the Company and Subsidiaries have been and will continue to experience, the Board will recommend the dissolution and wind down of the Company and the Subsidiaries to the shareholders of the Company . . . ." ECF No. 243-1 at 3. Mr. Osawa was an employee of one of Entrust's owners, Nippon Gas Co., Ltd. He had been an Entrust employee since June 20, 2016. ECF Nos. 243-20 at 2; 243-21 at 2; 265 at 4. Under the employment relationship, Entrust would pay Mr. Osawa's salary and Nippon would reimburse Entrust. ECF No. 265 at 2.

Upon the termination of Mr. Morgan as CEO, Kunihiko Kashiwaya, an Entrust board member, confirmed by follow-up email to Mr. Morgan that "the board now appointed Mr. Soichiro Osawa as Interim Managing Director to replace your position and to continue the operation. To enable smooth transition, and to prevent irreparable disruption in the operation, the board sincerely request your full support and cooperation to hand over the leadership to Mr. Osawa in a timely and professional manner." ECF No. 266 at 11. Mr. Kashiwaya also stated to Mr. Morgan that "effective today, the board replaced your CEO role with interim MD (Sho) but we agree with the extension of employment for the period necessary for transition, on the condition that transition will be implemented with your full support and cooperation under Sho's supervision and instruction . . . ." ECF No. 266 at 13.

On January 8, 2021, Mr. Osawa sent an email to Entrust employees announcing Mr. Morgan's termination and that "[i]n the interim, the Board appointed me as Managing Director to oversee business and operations. This is just a change of leadership, and in no way jeopardizes the operation and the organization as a whole. In fact, Wayne and I are working closely to ensure a smooth transition for the next couple of weeks." ECF No. 265 at 7.

Conversations between Mr. Osawa and Entrust's management further confirm that Mr. Osawa was functionally employed to replace Mr. Morgan as Entrust's chief executive. It is undisputed that Mr. Osawa was not bestowed with the "CEO" title.

In a January 7, 2021, conversation between Mr. Osawa and Gary Helders (Entrust's CFO), Mr. Helders asked if Mr. Osawa would be "taking over" Mr. Morgan's position as the "primary signor on all of our bank accounts," and whether Mr. Osawa would "be replacing [Mr. Morgan] as the CEO in title and the presiding officer of the company to sign all regulatory docs and such." ECF No. 243-43 at 3–4. Mr. Osawa replied, "Yes, I will be replacing him. The title would be Managing Director, not CEO." ECF No. 243-43 at 4.

The Entrust entities' bylaws confirm that the board was empowered to appoint an officer with any title to perform whatever functions the board would grant the position. ECF Nos. 243-22 at 13; 243-23 at 11–12; 243-46 at 11. Although Mr. Osawa was titled as an Interim Managing Director, he was functionally appointed by Entrust's board to replace Mr. Morgan as Entrust's chief executive.

## C.   Winter Storm Uri and Shell's Termination of the Energy Transactions

Winter Storm Uri hit Texas in February 2021. Uri caused energy prices to soar to record levels.[2]

During Uri, three next-day load forecasts (dated February 13, 14, and 15, 2021) fell out of compliance with hedging requirements.[3] Approval by Entrust's CEO or VP of Finance was required. ECF Nos. 243-24 at 2; 243-25 at 2; 243-26 at 2. Mr. Osawa approved the next-day load forecasts. ECF No. 230 at 180, 185, 190.

---

[2] There have been extensive disputes within the state concerning the role of regulators in setting prices during Uri. The reason for high prices plays no role in this dispute between Shell and Entrust.

[3] The rulings in this Memorandum Opinion are based on the forecasts to which the parties agree were out of compliance with hedging requirements. The parties have not presented evidence sufficient for a finding as to whether any additional reports were out of compliance with hedging requirements. This Memorandum Opinion does not foreclose the ability of the parties to present evidence at trial on the issue of whether any additional reports violated the Risk Policy.

Two 14-day load forecasts contained rolling 7-day load forecasts that also fell out of compliance with hedging requirements. ECF No. 264 at 13. These 14-day forecasts are dated February 10 and 12, 2021. ECF Nos. 243-16 at 2, 5, 15; 243-17 at 2, 5, 15. When the rolling 7-day load forecasts fell out of compliance with hedging requirements, approval by Entrust's CEO or VP of Finance was required. ECF No. 264 at 15–16. It is less clear whether Mr. Osawa approved these variances.

On Saturday, February 13, 2021, Entrust sent correspondence to Shell indicating that Entrust expected to lose about $6.5 million as a result of its forecasted NOP on Sunday, February 14, 2021. ECF No. 230 at 197. Attached to the correspondence was an updated 14-day load forecast, which again indicated that the rolling 7-day load forecast fell out of compliance with hedging requirements. ECF No. 230 at 211. Entrust alleges that this 14-day load forecast was merely an updated report that did not actually require approvals from Entrust's CEO or VP of Finance. ECF No. 264 at 17. According to Entrust, the report was not one of its regularly scheduled 14-day load forecasts since it was prepared on a weekend and there was no trading of energy hedges on the weekend. ECF No. 264 at 17. Entrust alleges that the statement that the load forecast fell out of compliance was a self-populating entry in a spreadsheet that did not reflect that approval had already been provided on February 12, 2021. ECF No. 229 at 18.

On February 14, 2021, Shell sent correspondence to Mr. Osawa containing a Notice of Default and Termination Letter, which terminated all transactions between Entrust and Shell. ECF No. 230 at 236–37. The notice provides:

> As evidenced by the POTX forecast and hedge report provided today by Entrust to Shell, Entrust is in material default of the hedging requirements of Section 3.17 of the Global Agreement, thereby causing an Event of Default with respect to Entrust under the Global Agreement. Due to the current extreme weather event, Entrust's failure to maintain hedges as required by the Global Agreement has

> resulted in, or will result in, expected losses to Entrust in excess of $40 million, making Entrust deeply insolvent and no longer financially viable, and Shell can no longer risk increasing its exposure to Entrust.  As a result of Entrust's Event of Default, effective immediately (i) Shell will no longer transact with Entrust under the Master Agreements or otherwise, (ii) all transactions outstanding under the Master Agreements are terminated, (iii) all Scheduling Coordinator Agreements are terminated, and (iv) all lending commitments under the Loan Agreement are terminated.

ECF No. 230 at 237.  On November 30, 2022, this Court determined that the effective date of the termination notice was "the close of business on February 16, 2021."  ECF No. 144 at 1.

Pursuant to the EEI Master Agreements, Shell sent Entrust a termination payment calculation on March 9, 2021.  ECF No. 243-36 at 3.  Shell calculated the forward value of undelivered power from February 15, 2021, to be $50,775,058 and credited Entrust with this amount, resulting in a payment (net of loads and invoice obligations owed by Entrust to Shell) of $8,267,036 payable from Shell to Entrust.  ECF No. 243-36 at 4.

It is undisputed that Shell did not pay the termination payment within two days of the calculation as required by § 5.4 of the EEI Master Agreements, and that Entrust did not dispute the payment amount within two days of receipt as required by § 5.5 of the EEI Master Agreements.  Rather, the documentary evidence suggests that the termination payment calculation was a "starting point in negotiations," not a final calculation, and the parties engaged in negotiations regarding the payment amount.  ECF No. 257 at 5, 10, 13, 16.  The day after Shell sent its payment calculation, Mr. Osawa requested a "data file that shows calculations for some of the items included in the Total Exposure ($8.3M)."  ECF No. 243-37 at 2.  On March 16, Shell provided Mr. Osawa with the data file.  ECF No. 243-38 at 2.  On March 31, Shell

followed up with Mr. Osawa to ask whether there was "any additional information needed from us on the settlement calculation." ECF No. 243-40 at 2. Mr. Osawa responded that Entrust was still "reviewing the settlement calculation data" and requested "a file that shows the individual transactions matched with the price that Shell is valuing the trades at." ECF No. 243-40 at 2. Mr. Osawa also introduced Shell to Entrust's consultant, David Ferguson, who was tasked with "supporting the work to reconcile the numbers on our end." ECF No. 243-40 at 2. The parties continued to engage in discussions, and on April 20, Mr. Ferguson stated to Entrust that he had "all of the information that [he] will need" to review the "forward hedge valuation." ECF No. 243-41 at 2. The next day, Shell sent Mr. Ferguson an "updated settlement calculation" that had been "updated per our prior discussions." ECF No. 243-42 at 2.

On August 18, 2021, Entrust sent Shell correspondence stating that

> Shell did not have a right to designate an Early Termination Date under the Purchase and Sale Agreements until February 17, 2021 at the earliest and thus, that is the first date on which the Transactions might have been properly terminated. Therefore, Shell remained subject to its scheduling and delivery obligations under the Transactions through February 17, notwithstanding the Notice of Default and termination that Shell emailed to Entrust at 10:55 p.m. (Central) on February 14.

ECF No. 69-2 at 5. Entrust then provided its own termination payment calculation of $124,282,817 owed to Entrust and stated:

> In accordance with Section 5.4 of the Purchase and Sale Agreements, payment of the invoiced amounts is due within two (2) Business Days of receipt of the attached Final Invoice. In the event that Shell disputes Entrust's calculation in whole or in part, Section 5.5 of the Purchase

and Sale Agreements requires that Shell provide Entrust a detailed written explanation of the basis for such a dispute within two (2) Business Days of Shell's receipt of the Final Invoice.

ECF No. 69-2 at 6, 8.

## II.   PROCEDURAL BACKGROUND

On March 30, 2021, Entrust and its related entities filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. *See, e.g.*, Case No. 21-31070, ECF No. 1.  That same day, the Court entered its order for joint administration of the Chapter 11 cases.  Case No. 21-31070, ECF No. 10.  On December 29, 2021, the Court confirmed Entrust's amended joint plan of liquidation.  Case No. 21-31070, ECF No. 480.  The plan became effective on January 6, 2022.  Case No. 21-31070, ECF No. 493.

### A.   This Adversary Proceeding

On October 11, 2021, the trustee of the Liquidating Trust in Entrust's bankruptcy cases filed this adversary proceeding against Shell and a co-defendant.  ECF No. 1.  Entrust's *Third Amended Complaint*, filed on December 29, 2022, is the operative complaint.  ECF No. 154.  Shell filed its answer on January 27, 2023.  ECF No. 160.  On June 6, 2023, the Court entered its Memorandum Opinion and Order dismissing all but a single claim in the *Third Amended Complaint*.  ECF Nos. 186; 187.

Entrust's remaining claim is for breach of contract asserted against Shell.  ECF Nos. 154 at 41; 187.  Entrust claims that Shell breached the parties' agreements by

wrongfully terminat[ing] the EEI Master Agreement with Entrust (including all Transactions that were an integrated part thereof), the EEI Master Agreement with Entrust East (including all Transactions and Confirmations that were an integrated part thereof), and

> the EEI Master Agreement with POTX (including all
> Transactions that were an integrated part thereof) without
> the occurrence of a qualifying or legitimate Event of
> Default. Shell knew or should have known that its asserted
> "technical" default was not a legitimate breach of Entrust's
> Risk Policy, and would not qualify as a legitimate and
> material Event of Default that could justify termination of
> all Transactions and all obligations under the parties'
> Contracts.

ECF No. 154 at 42. Entrust also alleges that Shell breached the
agreements by (i) failing to deliver electric power to Entrust during the
period between February 14, 2021, through February 16, 2021 (i.e., the
period between actual termination and the date the termination notice
is deemed effective); (ii) setting off obligations due under the various
contracts during Shell's calculation of the termination payment in
violation of the agreements; and (iii) failing to pay the undisputed
portion due under the EEI Master Agreements. ECF No. 154 at 42–43.
Entrust alleges damages, including but not limited to

> the difference between the higher ERCOT real-time
> market prices and the forward contract price for electricity
> that Shell was contractually obligated to provide to Entrust
> under such contracts as well as the associated fees and
> costs . . . ; and

> the settlement value of the hedges on February 17, 2021,
> but in no event later than February 16, 2021.

ECF No. 154 at 43.

Shell's answer asserts the following defenses: (i) failure to state a
claim, (ii) acquiescence, (iii) waiver, (iv) estoppel, (v) prior material
breach, (vi) excess damages, (vii) laches, and (viii) failure to exercise
contractual rights / forfeiture of contractual rights. ECF No. 160 at 32–
35.

On March 7, 2023, the parties entered into a stipulation, under which Shell agreed to pay to Entrust the undisputed portion of the termination payment ($8,267,036) and contractual interest, for a total payment of $10.2 million.  ECF No. 173 at 2–3.  The parties agreed that the amount would be subtracted from any larger termination payment the Court may find due from Shell to Entrust.  ECF No. 173 at 3–4.  The Court approved the stipulation on March 8, 2023.  ECF No. 174.

On May 22, 2024, Entrust filed a motion for summary judgment on Shell's second, third, fourth, seventh, and eighth defenses.  ECF No. 229.  On June 28, 2024, Shell filed a motion for summary judgment on Entrust's breach of contract claim.  ECF No. 244.  The parties moved for cross-relief with respect to the summary judgment motions.  ECF Nos. 241; 264.  The Court held a hearing and took the motions under advisement.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a).  Venue is proper in this District pursuant to 28 U.S.C. § 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party."  *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  It is the movant's burden to establish that no genuine issue of material fact exists.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005)).  A party asserting that a fact cannot be or is

not genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. Of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

There is a genuine issue of material fact as to whether Entrust was in Default when Shell terminated its transactions with Entrust. If Entrust was in Default, there is a genuine issue of material fact as to whether Shell breached its contractual obligations following the termination of the transactions, including in its calculation of the termination payment. The parties' cross-motions for summary judgment on Entrust's breach of contract claim are denied without prejudice.

Shell's laches defense is denied with prejudice. Summary judgment on the remaining defenses is not ripe at this stage of the adversary proceeding. Except for the laches defense, the parties' cross-motions for summary judgment on Shell's defenses are denied without prejudice.

## I.   THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER SHELL BREACHED THE ENERGY CONTRACTS

Shell argues that summary judgment should be granted in its favor because there is no genuine issue of material fact precluding a finding that (i) Entrust is the Defaulting Party under the Energy Contracts; (ii) Shell did not breach its obligations under the Energy Contracts; and (iii) Shell's breach, if any, did not cause Entrust damages. Entrust moves for cross-relief.

To establish a claim for breach of contract under New York law, Entrust must prove that "(1) a contract exists; (2) [Entrust] performed in accordance with the contract; (3) [Shell] breached its contractual obligations; and (4) [Shell's] breach resulted in damages." *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) (quoting *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022)). The parties agree that they were bound by the Energy Contracts at the time of Shell's termination. They contest the second, third, and fourth elements.

### A.   There Is a Genuine Issue of Material Fact as to Whether Entrust Is a Defaulting Party

The parties agree that the second breach of contract element—Entrust's performance under the Energy Contracts—revolves around whether Entrust was the Defaulting Party at the time of Shell's termination. *See id.* Shell terminated its transactions with Entrust on the basis that Entrust was not in compliance with its Risk Policy on February 14, 2021. ECF No. 230 at 237. This is the only default alleged by Shell.

Section 5.1 of the EEI Master Agreements permits a Non-Defaulting Party to terminate all energy transactions between the parties if an Event of Default occurs.  ECF No. 230 at 124.  Section 7.1 of the Global Agreement lists as an Event of Default if "[a]ny Customer Party fails to perform or observe any covenant or other agreement contained in Section 3.17" of the Global Agreement.  ECF No. 230 at 23.  Section 3.17 of the Global Agreement requires Entrust to comply with its Risk Policy.  ECF No. 230 at 17.  If Entrust fails to comply with its Risk Policy, it is an Event of Default under the Global Agreement.  And an Event of Default permits the Non-Defaulting Party to terminate the energy transactions.

Shell argues that Entrust failed to comply with its Risk Policy by failing to get approvals by its CEO or VP of Finance when (i) two of its rolling 7-day load forecasts fell out of compliance with hedging requirements under the Risk Policy and (ii) three of its next-day load forecasts fell out of compliance with hedging requirements under the Risk Policy.  Under Entrust's Risk Policy, if a next day load forecast falls out of compliance with hedging requirements (90%–120% hedged in January or February), approval from the CEO or VP of Finance is required.  Similarly, when a rolling 7-day load forecast falls out of compliance with hedging requirements (90%–120% hedged in January or February), approval from the CEO or VP of Finance is required.  ECF No. 230 at 163.

### (1)    *The Next Day Load Forecasts*

Three next day load forecasts (dated February 13, 14, and 15, 2021) fell out of compliance with the 90%–120% hedging requirement.  Mr. Osawa approved the forecasts.  Shell alleges that Mr. Osawa was Entrust's "Interim Managing Director," not its CEO or VP of Finance, and accordingly, his approval of the forecasts was ineffective.

At all relevant times, Entrust was comprised of three entities: Entrust, Entrust East, and POTX.  Entrust and POTX are incorporated in the State of Texas.  ECF Nos. 243-23 at 2; 243-46 at 2.  Entrust East is incorporated in the State of Delaware.  ECF No. 243-22 at 2.  Under

both Texas and Delaware law, the law of the state of incorporation governs the internal affairs of an entity. Tex. Bus. Orgs. Code Ann. § 1.101; *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005). The Texas Business Organizations Code does not define a "chief executive officer." Rather, it defines a corporation's "President" as either the individual designated as the president under the governing documents or the "officer . . . authorized to perform the functions of the principal executive officer of an entity without regard to the designated names of the officer . . . ." Tex. Bus. Orgs. Code Ann. § 1.002(70); *see also WWLC Inv., L.P. v. Miraki*, 624 S.W.3d 796, 799–800 (Tex. 2021). Similarly, the Delaware Code does not define a "chief executive offer" and instead provides that "[e]very corporation organized under this chapter shall have such officers with such titles and duties as shall be stated in the bylaws or in a resolution of the board of directors which is not inconsistent with the bylaws . . . ." Del. Code Ann. tit. 8, § 142(a).

The Entrust entities' bylaws define the roles of its officers. Entrust East's bylaws provide that the officers of the corporation shall include, among others, a Chief Executive Officer, a President, and such other officers "as the Board from time to time may determine." ECF No. 243-22 at 13. The bylaws state that the officers "shall each have such powers and duties as generally pertain to their respective offices" and "as from time to time may be conferred by the Board." ECF No. 243-22 at 13. The bylaws do not define the role of a Chief Executive Officer. ECF No. 243-22 at 13–14. The bylaws define the President as "the chief executive officer of the Corporation," who "shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board." ECF No. 243-22 at 13.

POTX's bylaws state that the corporation's officers shall be, among others, a President, a Secretary, and "any other officers and agents as may be deemed necessary by the Board of Directors." ECF No. 243-23 at 11–12. The bylaws further provide that the powers and duties

of the officers "shall be as provided from time to time by resolution of the Board of Directors or by direction of an officer authorized by the Board of Directors to prescribe the duties of other officers," and in the absence of a resolution, "the respective officers shall have the powers and shall discharge the duties customarily and usually held and performed by like officers of corporations similar in organization and business purposes . . . ." ECF No. 243-23 at 12.

Entrust's bylaws require the appointment of a President and a Secretary and permit the board to appoint any officers as it deems necessary. ECF No. 243-46 at 11. Similar to the other Entrust entities, the appointed officers "will exercise such powers and perform such duties as may be determined from time to time by the Board." ECF No. 243-46 at 11. The bylaws define the President as the "chief executive officer of the Corporation" who "will supervise and control all of the business and affairs of the Corporation." ECF No. 243-46 at 12. The President will also "have all powers and perform all duties incident to the office of the President and will have such other powers and perform such other duties as the Board of Directors may from time to time prescribe." ECF No. 243-46 at 12.

Read together, these provisions establish that Entrust defines officer roles by function rather than name. A person appointed by the board to act as Entrust's chief executive is the corporation's President, regardless of title.

Entrust's Risk Policy does not require the load forecasts to be approved by someone with the "title of CEO." It requires that the load forecasts be approved by "the CEO." A CEO is not a defined role under Entrust's bylaws or general corporations law. Rather, it is associated with the role of the president of a company. It is undisputed that Mr. Osawa was appointed by the board to replace Mr. Morgan as Entrust's chief executive. Regardless of his title as an Interim Managing Director, he was appointed to the functional role of the company's president, with all powers and duties of the president. The Risk Policy cannot be read to permit Mr. Morgan to approve load forecasts, but not Mr. Osawa, who was appointed to replace Mr. Morgan and perform his same duties.

Because the next day load forecasts were approved by Mr. Osawa acting as Entrust's chief executive, the approvals were effective. Entrust is not a Defaulting Party based on the approvals of the next day load forecasts.

### (2)   The Rolling 7-Day Load Forecasts

The parties agree that two 14-day load forecasts (dated February 10 and 12, 2021) contain rolling 7-day load forecasts that fell out of compliance with the 90%–120% hedging requirement. That, standing alone, did not create a default. If Entrust's CEO approved of the non-compliance, no default arose. Nevertheless, it is not disputed that no specific approvals were provided by Entrust's CEO with respect to the forecasts. Entrust argues that Mr. Osawa satisfied the Risk Policy by "engaging in discussions regarding Entrust's exposure and by taking appropriate action." ECF No. 264 at 15.

Entrust acknowledges that out-of-compliance next day load forecasts must employ a specific procedure for approval. ECF No. 264 at 16. The approval methodology is the following: an Entrust employee attaches the next day load forecast to an email sent to the CEO or VP of Finance and states that approval is needed. *See, e.g.*, ECF No. 230 at 180. The CEO or VP of Finance then responds to the email stating, "Approved." *See, e.g.*, ECF No. 230 at 180. The evidence indicates that this methodology is also employed for other forecasts that require approval under the Risk Policy. For example, under the Risk Policy, when next day forecasted high temperatures are less than forty degrees in Dallas, Texas, the "forecast and position must be approved by both the VP of Supply and one of the following: CEO or VP of Finance." ECF No. 230 at 163. On February 10, 2021, an Entrust employee attached a next day forecast to an email sent to Mr. Osawa and stated "[a]pproval is needed since the forecasted high temp in Dallas is under 40 degrees." ECF No. 266 at 147. Mr. Osawa responded to the email stating, "Approved." ECF No. 266 at 146. Entrust admits that this procedure is required for next day load forecasts but argues "[t]here is no requirement in the Risk Policy that this be the method for approval of the 7-day NOP." ECF No. 264 at 16.

Entrust supports its position with its declaration of Michele Supple, Entrust's VP of Supply and Risk Management:

> The Risk Policy required preparation of a 14-day load forecast twice each week.  It was uncommon for a 14-day load forecast to show an "average of the daily NOP limits on the rolling 7-day load forecast" (the "7-Day NOP") that was outside of the required hedging bands.  And unlike the next day load forecasts that were prepared each weekday and required approval emails by a specific time each weekday if approval was required, there was no timing or procedural requirements in the Short Term Desk Procedures for the 14-day forecast.  Instead, if Entrust and POTX 14-day forecasts showed that the 7-Day NOP was outside of the applicable hedging band, this triggered a discussion about the strategy for addressing the issue, rather than an email that simply "approved" the report.  It is my recollection and understanding that the necessary Entrust management engaged in such discussions each time the Entrust and POTX 14-day load forecasts both showed a 7-Day NOP that was out of compliance, including during the approach of Winter Storm Uri in February 2021.

ECF No. 270 at 3.

The Risk Policy simply states that rolling 7-day load forecasts require approval by the CEO or VP of Finance when, during winter months (January and February), hedging is outside of the 90%–120% bands.  ECF No. 230 at 163.  The Risk Policy does not address whether approval must be obtained orally, in writing, or by a different method.

Entrust references an email sent from Ms. Supple to Mr. Osawa on February 10, 2021, at 9:44 a.m. containing a 7-day chart showing peak load and reserve percentages for the week of February 10 and an explanation of Ms. Supple's hedging strategy for the time period.  ECF No. 266 at 144–46.  Mr. Osawa responded to the email stating "Michele, thanks for the heads up.  I agree with your approach."  ECF No. 266 at 144.

The only out-of-compliance rolling 7-day load forecast the email chain can purportedly approve is the February 10 forecast. The hedging strategies were sent to Mr. Osawa the day after the February 10 forecast was sent to him. ECF No. 243-16 at 2. The 14-day forecast discusses hedging compliance starting on February 10. ECF No. 243-16 at 2. The report shows that the Entrust entity was out of compliance with hedging on February 13, 2021, and that the POTX entity was out of compliance with hedging on February 10, 2021. ECF No. 243-16 at 5, 15. The parties agree that the average of the daily NOP limits on the rolling 7-day forecasts for both entities were out of compliance with hedging requirements.

The Risk Policy does not require specific words demonstrating approval. Mr. Osawa's approval of Ms. Supple's strategies to regain compliance with hedging requirements might indicate approval of the load forecast within the meaning of the Risk Policy. But there are genuine factual issues that preclude a summary determination that the approval was sufficient. For example, under the Risk Policy, approval request emails for out-of-compliance next day load forecasts must be sent "by 9:45 AM CST the day prior to flow." ECF No. 230 at 163. The same level of detail is absent for the rolling 7-day forecasts. Without more evidence, it is unclear based on the current documentary evidence whether Mr. Osawa's approval was obtained in a manner that complied with the Risk Policy.

With respect to the February 12 report, Entrust cites a February 11 Microsoft Teams conversation between Ms. Supple and Mr. Osawa. ECF No. 266 at 152. Ms. Supple sent Mr. Osawa an image of a 7-day load forecast that does not appear to be in final form and discussed her hedging strategies. ECF No. 266 at 152–53. Mr. Osawa expressed his approval of Ms. Supple's hedging strategies and authorized her to employ the strategies. ECF No. 266 at 155. Mr. Osawa and Ms. Supple had the conversation about two hours before the February 12 report was released via email. ECF Nos. 243-17 at 2; 266 at 155. For the same reasons as the February 10 report, it is unclear at this stage whether this is sufficient.

There is a genuine issue of material fact as to whether the approvals of the February 10 and February 12 rolling 7-day reports complied with the Risk Policy.

## B.   There Is a Genuine Issue of Material Fact as to Whether Shell Is a Defaulting Party

If Entrust was not the Defaulting Party when Shell terminated its Entrust transactions, then Shell may be in breach of the Energy Contracts. That issue will be determined at trial. The parties also seek an order granting summary judgment on the issue of whether Shell breached its other contractual obligations and whether Entrust can prove damages.

### (1)   Wrongful Setoff

Entrust alleges that Shell breached the Energy Contracts by calculating the Early Termination Payment in a wrongful and self-serving manner. ECF No. 154 at 42. The parties have not presented any arguments or evidence on the wrongful setoff issue at this stage of the adversary proceeding. Summary judgment is inappropriate.

### (2)   Failure to Pay Invoiced Amounts

Entrust alleges that Shell breached the Energy Contracts "by failing to pay the Invoiced Amount and/or all other amounts to which Entrust, and now the Trust, is entitled under Section 4.1(b) and Article 5 of the EEI Master Agreements as the undisputed minimum amount due under the EEI Master Agreements." ECF No. 154 at 42–43.

The parties have also not presented any arguments on this issue. On March 7, 2023, the parties entered into a stipulation to which Shell paid Entrust the undisputed portion of the termination payment with contractual interest. ECF No. 173 at 2–3. The stipulation provides that the payment satisfies Entrust's claim for relief for turnover of estate property, but that "[n]o other claims stated in the Third Amended Complaint will be deemed satisfied or dismissed by the Stipulated Payment." ECF No. 173 at 3.

In light of the stipulation, summary judgment is not appropriate.

### C.  Entrust Has Sufficiently Pled Damages

Shell argues that Entrust is unable to demonstrate that Shell's breach, if any, resulted in damages.  ECF No. 244 at 24.  Shell's arguments are a rehash of its defenses.  Shell offers no argument or evidence as to whether Entrust can actually prove its claimed damages.  Entrust's allegations of damages arising out of Shell's breach and calculation of the termination payment are facially sufficient.  *See* ECF No. 154 at 42; *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  Summary judgment on this issue is denied.

## II.  SHELL'S DEFENSES

The parties seek summary judgment on Shell's defenses of acquiescence, waiver, estoppel, laches, and failure to exercise contract rights / forfeiture of contract rights.  Shell's laches defense is denied with prejudice.  Summary judgment on the remaining defenses is denied.

### A.  There Is a Genuine Issue of Material Fact as to Whether Shell Repudiated the Energy Contracts

Entrust argues that all of Shell's defenses to which Entrust seeks summary judgment must be dismissed "to the extent that they are based upon allegations of conduct or omissions *after* Shell delivered its Termination Notice."  ECF No. 229 at 47.  Entrust argues that Shell repudiated the Energy Contracts at the time it served its termination notice, absolving Entrust of all further duties under the contracts after the time of termination.  According to Entrust, § 5.2 of the EEI Master Agreements provides the exclusive remedies for default, which include termination or suspension of energy transactions with "prior notice that becomes effective on a Business Day."  ECF No. 229 at 49.  Further, under § 10.1 of the EEI Master Agreements, termination of the EEI Master Agreements requires third days' notice, and "[t]here are no remedies permitted under the MPA that would allow immediate termination or suspension of energy Transactions, or of the contract itself, on any day of the week, let alone on a Sunday evening, even in

response to a 'material' breach." ECF No. 229 at 49. Entrust argues that, in violation of these terms, Shell announced in its termination notice that "Shell will no longer transact with Entrust under the Master Agreements or otherwise," which acts as a complete repudiation of the Energy Contracts. ECF No. 229 at 50. Accordingly, once Shell repudiated all of its obligations in violation of § 5.2, "Entrust was no longer under any obligation to provide Shell with any notice of Shell's wrongful termination, notice of opportunity to cure, nor notice of Entrust's designation of an Early Termination Date for purposes of calculating the Termination Payment due to Entrust." ECF No. 229 at 51.

Where a contract includes exclusive terms for termination, a party must follow the contract's termination requirements. *See Process Am., Inc. v. Cynergy Holdings, LLC, No. 12 Civ. 772 (BMC)*, 2014 WL 3844626 *9 (E.D.N.Y. April 30, 2014). For a repudiation of a contract to be deemed to have occurred, "the expression of intent not to perform by the repudiator must be 'positive and unequivocal[.]'" *Princes Point LLC v. Muss Dev. L.L.C.*, 30 N.Y.3d 127, 133 (2017) (quoting *Tenavision, Inc. v Neuman*, 45 N.Y.2d 145, 150 (1978)). A "party's demand is a repudiation only if it 'amounts to a clear and unequivocal statement of intention not to perform except on conditions that go beyond the contract.'" *U.S. Bank Nat. Ass'n v. Citigroup Glob. Markets Realty Corp.*, No. 13 CIV. 6989 GBD, 2014 WL 7714382, at *5 (S.D.N.Y. Nov. 14, 2014) (quoting *O'Shanter Res., Inc. v. Niagara Mohawk Power Corp.*, 915 F. Supp. 560, 568 (W.D.N.Y.1996)). A wrongful repudiation of a contract by one party entitles the nonrepudiating party to immediately claim damages for breach. *Princes Point LLC*, 30 N.Y.3d at 133.

Section 7.1 of the EEI Master Agreements provides that the remedies contained in the EEI Master Agreements are the parties' exclusive remedies, and that all other remedies at law or in equity are waived. ECF No. 230 at 127. If Shell expressed a "clear and unequivocal statement of intention" to not perform under the Energy Contracts, it would be considered a repudiation absolving Entrust of any further duties under the contracts and entitling it to bring an immediate claim

for breach.  But Shell's termination notice does not necessarily indicate an entire repudiation of all contracts.

Shell's termination notice states that effective immediately, "Shell will no longer transact with Entrust under the Master Agreements or otherwise" and that "all transactions outstanding under the Master Agreements are terminated."  ECF No. 230 at 237.  The EEI Master Agreements are contracts that govern the terms of energy transactions entered into by the parties.  The agreements define a "Transaction" as "a particular transaction agreed to by the Parties relating to the sale and purchase of a Product pursuant to this Master Agreement."  ECF No. 230 at 120.  The parties would enter into individual transactions for the sale and purchase of power, which would be governed by the EEI Master Agreements.  When Shell gave notice that it would "no longer transact with Entrust," the notice can be interpreted as a statement that Shell would no longer enter into further transactions for the sale of power while continuing to employ the agreements' procedures for liquidating damages.  It is difficult to understand how even an erroneous termination would be the equivalent of a "clear and unequivocal statement of intention not to perform" under the contract.  Even if Shell was mistaken that it was the Non-Defaulting Party, Shell may not have repudiated the EEI Master Agreements because it was continuing act pursuant to the termination provisions contained in the agreements.  Shell's conduct following the termination also does not suggest a repudiation, as Shell continued to act as the Non-Defaulting Party by sending Entrust an early termination payment calculation pursuant to § 5.2 of the EEI Master Agreements.

If Shell did not repudiate, then Entrust may have been required to follow the exclusive remedies provisions in the EEI Master Agreements by sending its own termination notice and termination payment calculation.  Although the Court does not yet determine the propriety of Shell's defenses, Entrust may have also waived its ability to contest Shell's termination of the energy transactions through its course of conduct following the termination.

There are factual issues precluding any of those findings. For example, it is unclear at this stage whether Entrust was aware at the time of Shell's termination that it may have been the Non-Defaulting Party, and if so, the effect of that awareness on its duties under the contracts. The parties have also submitted evidence suggesting that following Shell's termination payment calculation, the parties went beyond the contract by engaging in settlement discussions instead of following the EEI Master Agreements' timeframes for objections and payments of the settlement amount. These issues, and their effects on the parties' rights and responsibilities under the contracts, will be determined at trial.

If Shell terminated the contracts while Entrust was the Defaulting Party, then Shell followed the proper procedures for termination. Section 10.1 of the EEI Master Agreements provides that

> this Master Agreement shall remain in effect until terminated by either Party upon thirty (30) days' prior written notice; provided . . . that this Master Agreement and any other documents executed and delivered hereunder shall remain in effect with respect to the Transaction(s) entered into prior to the effective date of such termination until both Parties have fulfilled all obligations with respect to such Transaction(s), *or such Transaction(s) have been terminated under Section 5.2 of this Agreement.*

ECF No. 230 at 73 (emphasis added).

Under § 10.1, although thirty days' notice is required to terminate the EEI Master Agreements, the section is conditioned upon § 5.2, which, as described above, permits the Non-Defaulting Party to set an early termination date no earlier than the day notice is effective to accelerate all amounts owing between the parties. ECF No. 230 at 124. Shell followed these procedures, and the Court has held that its notice was deemed effective on February 16, 2021. Even if Shell was required to provide thirty days' notice to terminate the EEI Master Agreements,

in light of the provision permitting termination of the energy transactions upon the effective date of notice, it is difficult to discern what damages a failure to provide thirty days' notice would have caused.

There is a genuine issue of material fact as to whether Shell repudiated the Energy Contracts.

### B.   Shell's Laches Defense Is Denied

Shell's seventh defense asserts the doctrine of laches against Entrust's breach of contract claim.  "[L]aches is unavailable as a defense to . . . claims of breach of contract[.]"  *Garber v. Stevens*, 941 N.Y.S.2d 127, 129 (2012); *see also Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913, 919 (S.D.N.Y. 2021).

Shell argues that, although laches is unavailable as a defense to breach of contract claims, Entrust's breach of contract claim is "in essence, for a specific performance 're-do' of the Termination Payment process.  Entrust characterizes its rights under the EEI Master Agreement in its Motion as, among others, 'enforcing its right to a Termination Payment.'"  ECF No. 241 at 62.

Shell is correct in arguing that laches would be available as a defense to an equitable specific performance claim.  *See Granite Broadway Dev. LLC v. 1711 LLC*, 845 N.Y.S.2d 10, 11 (2007); *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998).  But Entrust's breach of contract claim is not a specific performance claim.  The breach of contract claim is a legal claim for damages.  ECF No. 154 at 41–43, 54. And to the extent that Entrust seeks to litigate the parties' termination payment calculations pursuant to the EEI Master Agreements, an award of liquidated damages pursuant to a contract is a legal remedy distinct from the equitable remedy of specific performance.  *See Granite Broadway Dev. LLC*, 845 N.Y.S.2d at 11.

Shell's laches defense is denied with prejudice.

### C.     Summary Judgment on Shell's Remaining Defenses Is Premature

Summary judgment on Shell's remaining defenses—acquiescence, waiver, estoppel, and failure to exercise contract rights / forfeiture of contract rights—is not ripe for decision.  Resolution of the defenses will require a preliminary determination on multiple preceding issues, including whether Entrust was the Defaulting Party at the time Shell terminated the energy transactions, whether Shell's termination of the transactions amounted to a repudiation of the Energy Contracts, and whether the parties waived the EEI Master Agreements' termination payment and notice provisions through their course of conduct following Shell's notice of termination.

Until the Court determines these threshold issues, genuine issues of material fact preclude a finding as to the propriety of Shell's defenses.

### CONCLUSION

The separate order entered at ECF No. 295 remains effective.

Signed:  March 24, 2025

Marvin Isgur
United States Bankruptcy Judge